UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

                                        :

UNITED STATES OF AMERICA

                                        :

       - v. -

                                        :     S1 23 Cr. 396 (JGLC)

JOSEPH MALVASIO,
         a/k/a "Joe Cohen,"              :
GREGG MARCUS,
         a/k/a "Gregg Pierce," and    :
CHRISTOPHER POLK,
         a/k/a "Myron Miles,"         :

                       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

### THE GOVERNMENT'S OPPOSITION TO DEFENDANT GREGG MARCUS'S MOTION FOR SEVERANCE AND DISMISSAL OF COUNT ONE

Matthew Podolsky
Acting United States Attorney
Southern District of New York

Jackie Delligatti
Georgia V. Kostopoulos
Dana McCann
Peter J. Davis
Assistant United States Attorneys
     *- Of Counsel -*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ..................................................................................... 2

I.   Background ....................................................................................................... 2

II.  Overview of the Conspiracy ............................................................................. 3

ARGUMENT ............................................................................................................. 7

I.   Defendant's Motion to Dismiss Is Meritless ................................................... 7

     A. Applicable Law ........................................................................................... 7

     B. Discussion .................................................................................................. 9

II.  The Defendant's Motion for Severance is Meritless ..................................... 11

     A. Applicable Law ......................................................................................... 11

     B. Discussion ................................................................................................ 16

CONCLUSION ........................................................................................................ 19

The Government submits this memorandum of law in opposition to defendant Gregg Marcus's motion for severance and for dismissal of count one of the Superseding Indictment. (Dkt. 100 (the "Motion")).

## PRELIMINARY STATEMENT

Count One of the Superseding Indictment charges all three defendants—Joseph Malvasio, Gregg Marcus, and Christopher Polk—with participating in a single conspiracy to commit wire fraud. Under settled caselaw, those allegations alone defeat a pre-trial motion to dismiss based on duplicity. *See, e.g.*, *United States v. Percoco*, No. 16 Cr. 776 (VEC), 2017 WL 6314146, at *12 (S.D.N.Y. Dec. 11, 2017) ("[F]acially alleging a single conspiracy is enough to warrant denial of a motion to dismiss an indictment for duplicity"). Those allegations also satisfy the plain text of Rule 8(b), which allows joinder of defendants when they are alleged to "have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Indeed, "the simplest case for joinder" is where—as here—"the defendants are charged with having conspired with each other." *United States v. Rittweger*, 524 F.3d 171, 178 (2d Cir. 2008) (quoting *United States v. Marzano*, 160 F.3d 399, 401 (7th Cir. 1998)).

The Motion nonetheless seeks pre-trial dismissal of Count One as duplicitous and to sever defendant Marcus from defendant Polk (but not from defendant Malvasio) because of supposed misjoinder and alleged prejudice. These arguments fail because they ignore that the defendants are charged in a single conspiracy count and because, pre-trial, even a boilerplate conspiracy allegation defeats both of Marcus's claims. That is enough to deny the Motion. But the Motion also rests on the faulty premise that, contrary to the Superseding Indictment, Marcus and Polk were not part of the same conspiracy. That is wrong, and the Government will introduce evidence at trial that Marcus and Polk were aware of each other's roles in the conspiracy; occupied the same

1

pivotal position within the conspiracy; and frequently told the same lies to further their common aim to defraud prospective borrowers out of thousands of dollars in advance fees.   The Motion is meritless and should be denied.

## FACTUAL BACKGROUND

### I.    Procedural History

On August 3, 2023, a grand jury sitting in this District returned an indictment charging Malvasio and Marcus with conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349, and substantive wire fraud, in violation of Title 18, United States Code, Section 1343.   On March 17, 2025, a grand jury sitting in this District returned a superseding indictment (the "Superseding Indictment").   Count One of the Superseding Indictment charges defendants Malvasio, Marcus, and Polk, with participating in a conspiracy to commit wire fraud from at least in or about March 2017 through at least in or about August 2023, in violation of Title 18, United States Code, Section 1349.   (Superseding Indictment ¶¶ 1-2.)   As set forth in the Superseding Indictment, Malvasio, Marcus, and Polk, "in order to obtain millions of dollars in advance fees, agreed to engage in and engaged in schemes to make false statements to victims seeking private loans, and sent and received, and caused others to send and receive, emails and other electronic communications, to and from the Southern District of New York and elsewhere, in furtherance of those schemes."   (*Id.* ¶ 2.)    Count Two of the Superseding Indictment maintains the same substantive wire fraud count against Malvasio and Marcus as the first indictment and alleges that Malvasio and Marcus, in order to obtain millions of dollars in advance fees, engaged in a scheme through a business called "Global Capital Partners Fund" to make false statements to victims seeking private loans.   (*Id.* ¶ 3.)   Count Three charges Malvasio and Polk with substantive wire fraud, in violation of Title 18, United States Code, Section 1343.

Specifically, as set forth in the Superseding Indictment, Malvasio and Polk, in order to obtain millions of dollars in advance fees, engaged in a scheme through businesses called "Harbor Equity" and "Commercial Private Equity" to make false statements to victims seeking private loans.  (*Id*. ¶ 4.)

On March 26, 2025, Marcus filed the Motion, which seeks dismissal of Count One and severance of his trial from Polk's.  (Dkt. 100.)  Neither Polk nor Malvasio has moved for a severance.

## II.     Overview of the Conspiracy

From at least in or about 2017 through at least 2023, Malvasio, Marcus, and Polk defrauded approximately 500 victims of over $15 million total through their operation of an advance fee scheme that was run through several different fraudulent companies.  Malvasio and Marcus operated a business called "Global Capital Partners Fund."  Malvasio and Polk operated businesses called "Harbor Equity" and "Commercial Private Equity."  Although technically separate entities, the defendants used these businesses to defraud victims in the exact same way: by stealing tens of thousands—or sometimes hundreds of thousands—of dollars in advance fees and then never issuing loans the defendants had "committed" to funding.

Marcus and Polk were the scheme's salespeople.  They attracted victims by making various misrepresentations to them, including, but not limited to, that the defendants funded loans all the time; that any advance fees paid by the victims would be refunded if the loans were not approved; that any issues regarding their projects disclosed upfront by victims would not impede getting a loan; and that the defendants had the ability and capital to fund ten, fifty, hundred-million, and even billion-dollar loans.

After the initial screening call with Marcus or Polk, the defendants sent a "letter of intent" to each victim, which stated the terms of the purported loan and the fee that the victims would have to pay to be considered for a loan by the defendants.   The fee generally depended on the size of the loan the victim was seeking and ranged from a few thousand to tens of thousands of dollars. The defendants intentionally structured the conspiracy to make the fee that accompanied the letter of intent—*i.e.*, the "letter of intent fee"—nonrefundable as soon as the defendants transmitted what they called a "commitment letter" to the victim, which typically followed within a few days.   The defendants would transmit commitment letters—in which they stated a "commitment" to fund each loan—to their intended victims even when the defendants had not undertaken any real effort to evaluate the victims' loan applications.   Victims could continue with the process only if they paid the hefty "commitment fee," which ranged from tens to hundreds of thousands of dollars.

Once Marcus or Polk had successfully lured the victims into paying the initial fees, Malvasio would take charge of the communications with that victim.   Malvasio would tell each victim that the victim was required to pay the defendants an additional "appraisal fee" before they could receive a loan.   While the victims largely anticipated that they would have to obtain an appraisal as part of the process of receiving a loan, the defendants generally charged three to four times more than the industry standard for each appraisal and refused to accept prior appraisals obtained by the victims (despite Marcus and Polk often having falsely told victims that prior appraisals would be considered).

The defendants continued to defraud and lie to the victims who decided to pay this third advance fee and proceed with the appraisal process.   Once the victims agreed to proceed, the defendants would order an appraisal on the subject property.   Malvasio relied on a small handful of select appraisers and would pay them thousands of dollars less than what the defendants charged

4

the victims for the appraisal.   Once the appraisal had been ordered, Malvasio would then manipulate the appraisal process by directing the appraiser—without the victims' knowledge—to value the subject properties at their lowest possible value.   Malvasio would also take additional steps to conceal the scheme by directing the appraisers not to communicate with any of the victims.

As a result of the defendants' actions, the vast majority of the final appraisal reports obtained by the defendants valued the subject properties well below the stated value in the loan application documents submitted to the defendants by the victims.   The result, as the defendants intended, was that the low appraisal placed the victim's property outside of the "loan to value ratio" set forth in the commitment letter's terms, providing the defendants with a basis to decline to issue the loan.   After reviewing each appraisal report, Malvasio typically contacted each victim and told them the property appraised too low, that the defendants would not be able to move forward with issuing a loan, and that all fees paid to date by the victim would not be refunded.[1] Malvasio refused to provide the majority of the victims with a copy of the manipulated appraisal reports, claiming that the reports—paid for by the victims—in fact belonged to him, and that the victims were "contractually forbidden" from obtaining their own copies from the appraiser.   On the rare occasions that Malvasio agreed to share a copy of the appraisal reports with a victim, the victims quickly identified obvious flaws with the defendants' manipulated appraisal process, including: (a) Malvasio's instructions to the appraiser to calculate the property's lowest possible value, without accounting for the intended development or use of the subject properties; and (b) examples where the appraiser failed to even visit the property before determining its value.

---

[1] As set forth in the original indictment, throughout the conspiracy, the defendants also manufactured other excuses in order to not issue a loan but to keep any fees paid by the victims.

5

At this point, victims would often reach out to Marcus or Polk, their initial points of contact. Marcus and Polk were both instructed by Malvasio to tell victims that they "no longer had the file" and that the victim would have to speak to "Mr. Malvasio's office" regarding any complaints. Marcus and Polk said this to victims despite the fact that they were communicating regularly with Malvasio regarding each fee they took in and knew exactly what was happening with each loan application.   Despite these extensive communications with the victims, and despite victims often receiving earlier misrepresentations regarding the refundability of fees, the defendants refused to refund any of the fees paid by the victims and continued to assert that the victims had violated the terms of the loan agreement.

The defendants took numerous additional steps to conceal their fraudulent scheme from both their actual and intended victims.   For example, the defendants paid a company to post dozens of fake online reviews in which fake loan recipients claimed to have successfully obtained loans from the defendants.   Marcus and Polk each worked extensively with these companies to "optimize" their online presence and bury any allegations of fraudulent activity posted publicly by victims.   In other instances, the defendants retaliated against their victims by threatening legal action in order to prevent them from publicly disclosing the defendants' fraudulent actions.

Throughout the conspiracy, the defendants received the various fraudulent fees they collected in several different bank accounts, which were controlled by Marcus and Polk.   The fraudulent scheme generated more than $15 million in fraud proceeds, virtually all of which the defendants split among themselves and transferred to their personal bank accounts.

## ARGUMENT

### I.    Marcus's Motion To Dismiss Is Meritless

Marcus moves to dismiss Count One of the Superseding Indictment as duplicitous while ignoring well-settled law that reserves that determination for the jury.    Marcus cites no reason to deviate from this established caselaw, and the Motion should be denied.

### A.  Applicable Law

An indictment is duplicitous if it joins two or more distinct crimes in a single count. *United States v. Aracri,* 968 F.2d 1512, 1518 (2d Cir.1992). However, an indictment is not improper merely because it charges in one count what it could, at least in theory, have charged in multiple counts; "acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme." *United States v. Vilar*, 729 F.3d 62, 79 (2d Cir. 2013) (internal quotation marks and alteration omitted). "As long as the essence of the alleged crime is carrying out a single scheme to defraud, then aggregation is permissible." *United States v. Tutino*, 883 F.2d 1125, 1141 (2d Cir. 1989); *see also United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992); *United States v. Margiotta*, 646 F.2d 729, 732-33 (2d Cir. 1981) (approving the inclusion of multiple fraudulent mailings used to carry out one overarching scheme in a single mail fraud charge).    Duplicitous pleading is not presumptively invalid; rather, it is impermissible only if it prejudices the defendant.    *United States v. Olmeda,* 461 F.3d 271, 281 (2d Cir.2006).

The Second Circuit has explained that a "conspiracy indictment presents unique issues in the duplicity analysis because a single agreement may encompass multiple illegal objects." *Aracri*, 968 F.2d at 1518 (internal quotation marks omitted).    That is why "the allegation in a

single count of a conspiracy to commit several crimes is not duplicitous, for the conspiracy is the crime and that is one, however diverse its objects." *Id.* (internal quotation marks and alterations omitted).

Generally, duplicity challenges are not ripe before trial; as long as "the Indictment on its face sufficiently alleges a single conspiracy, the question of whether a single conspiracy or multiple conspiracies exists is a question of fact for the jury." *United States v. Rajaratnam*, 736 F. Supp. 2d 683, 688 (S.D.N.Y. 2010); *see also United States v. Szur*, No. 97 Cr. 108 (JGK), 1998 WL 132942, at *11 (S.D.N.Y. Mar. 20, 1998) (same); *United States v. Friedman*, 854 F.2d 535, 561 (2d Cir. 1988) ("Whether the evidence in a case establishes single or multiple conspiracies is a question of fact to be resolved by a properly instructed jury."); *United States v. Johansen*, 56 F.3d 347, 350 (2d Cir. 1995) (similar).

Even "[b]oilerplate allegations" of a single conspiracy survive this "facial test." *United States v. Ohle*, 678 F. Supp. 2d 215, 222-23 (S.D.N.Y. 2010)). "In other words, facially alleging a single conspiracy is enough to warrant denial of a motion to dismiss an indictment for duplicity." *United States v. Percoco*, No. 16 Cr. 776 (VEC), 2017 WL 6314146, at *12 (S.D.N.Y. Dec. 11, 2017) (internal quotation marks and brackets omitted)). "Pretrial dismissal is inappropriate so long as the Court cannot conclude on the basis of the pleadings alone that there is *no* set of facts that could warrant a reasonable jury in finding a single conspiracy." *United States v. Greenberg*, No. 21 Cr. 92 (AJN), 2022 WL 827304, at *11 (S.D.N.Y. Mar. 9, 2022) (emphasis in original). Applying this standard, "courts in this Circuit have repeatedly denied motions to dismiss a count as duplicitous." *Ohle*, 678 F. Supp. 2d at 222.

Even when a duplicity challenge is considered after trial, the law recognizes that "[t]here is no requirement that each member of a conspiracy conspire directly with every other member of

it, or be aware of all acts committed in furtherance of the conspiracy, or even know every other member." *United States v. Rooney*, 866 F.2d 28, 32 (2d Cir. 1989) (citations omitted).  "[A] single conspiracy may include multiple groups of people, and the pursuit of multiple illegal objects does not automatically divide a single conspiracy into multiple conspiracies." *United States v. Rigas*, 281 F. Supp. 2d 660, 665 (S.D.N.Y. 2003).

### B.  Discussion

To begin, the Superseding Indictment alleges a single conspiracy on its face.   Count One charges Malvasio, Marcus, and Polk with participating in a conspiracy to commit wire fraud from at least in or about March 2017 through at least in or about August 2023, in violation of Title 18, United States Code, Section 1349.   (Superseding Indictment ¶¶ 1-2.)   Although a "boilerplate" allegation of conspiracy is all that is required to defeat the defendant's motion, *see, e.g.*, *Rajaratnam*, 736 F. Supp. 2d at 689, the Superseding Indictment goes beyond that low bar. Indeed, the Grand Jury returned an indictment charging that Malvasio, Marcus, and Polk, "in order to obtain millions of dollars in advance fees, agreed to engage in and engaged in schemes to make false statements to victims seeking private loans, and sent and received, and caused others to send and receive, emails and other electronic communications, to and from the Southern District of New York and elsewhere, in furtherance of those schemes."   (*Id.* ¶ 2.)   In short, the Superseding Indictment charges one conspiracy with overlapping timeframes, a singular purpose, and identical methods of carrying out the conspiracy.   That is more than sufficient.

Moreover, each of the cases Marcus cites supports denying his Motion.   He relies primarily on *Ohle, Gabriel*, and *Tuzman*, three cases in which three different judges in this District each *denied* a pre-trial duplicity challenge to a conspiracy count.   These courts uniformly recognized the well-settled principle that it is firmly up to a jury to decide whether criminal conduct

9

amounts to one or multiple conspiracies.  *See United States v. Gabriel*, 920 F. Supp. 498, 505 (S.D.N.Y. 1996) (denying motion because, "[g]iven Count Six's boilerplate allegations of a single conspiracy, the Court cannot conclude on the basis of the pleadings alone that there is no set of facts falling within the scope of Count Six that could warrant a reasonable jury in finding a single conspiracy"); *United States v. Ohle*, 678 F. Supp. 2d 215, 222 (S.D.N.Y. 2010) (denying motion because "if the Indictment on its face sufficiently alleges a single conspiracy, the question of whether a single conspiracy or multiple conspiracies exists is a question of fact for the jury."); *United States v. Tuzman*, 301 F. Supp. 3d 430, 449 (S.D.N.Y. 2017) (denying motion to dismiss single conspiracy count as duplicitous).  Defendant cites only one case—an out-of-circuit opinion from the District of Puerto Rico—where a court dismissed an indictment as duplicitous pre-trial. *See United States v. Munoz-Franco*, 986 F. Supp. 70 (D.P.R. 1997).  But courts in this District have rejected *Munoz-Franco* because it is irreconcilable with Second Circuit precedent.  *See Ohle*, 678 F. Supp. 2d at 222.[2]

Further still, although not necessary to defeat Marcus's Motion at this stage, the Government will prove at trial that Marcus, Malvasio, and Polk participated in a single conspiracy. For example: on September 1, 2020, in response to an inquiry from Polk regarding whether to issue a letter of intent to a loan applicant, Malvasio texted Polk: "Can't write direct in my name. I can only do table funding to you or write it with [Global Capital Partners]."   Polk responded, "If I send it to Greg[g] [Marcus], we all make 1/3??????"   The evidence at trial will also show that

---

[2] Even in the First Circuit, other courts have since disregarded *Munoz-Franco*.  *See United States v. Ernst*, 502 F. Supp. 3d 637, 655 (D. Mass. 2020) (declining to follow *Munoz-Franco* because "the court may not second guess the factual sufficiency of the allegations on a motion to dismiss, and may only dismiss an indictment where the government will not be able to prove its case as a matter of law.").

Global Capital Partners, Harbor Equity, and Commercial Private Equity defrauded some of the same victims; that Marcus and Polk had the same role in the conspiracy; and that they repeatedly told the same lies to further the conspiracy.

In sum, all three defendants were properly charged in one conspiracy, and any challenge to that charge "is a question of fact to be resolved by a properly instructed jury." *Friedman*, 854 F.2d at 561. The Motion should be denied.

## II.    Marcus's Motion For Severance Is Meritless

Marcus also attempts to repackage his duplicity challenge using Rule 8(b), essentially arguing that the Court should "unjoin" him and Polk because he disagrees with the merits of the Government's conspiracy charge. But the defendant similarly misstates Rule 8(b)'s application to the Superseding Indictment. Count One of the Superseding Indictment alleges that all three defendants "participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). Accordingly, Rule 8(b) is satisfied, and the defendants are properly joined. Marcus also fails to allege any prejudice sufficient to override the overwhelming judicial economy interest that counsels in favor of a single trial. Marcus's motion for severance therefore fails.

### A.  Applicable Law

#### 1.    Joinder – Rule 8(b)

Federal Rule of Criminal Procedure 8(b) governs joinder of offenses and defendants and provides: "The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count." Fed. R. Crim. P. 8(b). Joinder

is presumptively appropriate where, as here, defendants are charged with participating in a single conspiracy. *See, e.g.*, *United States v. Nerlinger*, 862 F.2d 967, 973 (2d Cir. 1988) ("The established rule is that a non-frivolous conspiracy charge is sufficient to support joinder of defendants under Fed. R. Crim. P. 8(b)."); *Rittweger*, 524 F.3d at 178 ("[T]he 'simplest case for joinder is where the defendants are charged with having conspired with each other.'" (quoting *Marzano*, 160 F.3d at 401)).

Rule 8(b) also permits joinder of defendants charged in distinct conspiracies as opposed to a single conspiracy. Under those circumstances, joinder remains appropriate so long as those defendants share either a substantial identity of facts or participants, or a common plan or scheme. *See, e.g.*, *Attanasio*, 870 F.2d at 815 (upholding joinder of defendants involved in separate conspiracies on the grounds that the conspiracies shared a common purpose and there was "an overlap of participants and acts"); *Rittweger*, 524 F.3d at 178 (upholding joinder of defendants involved in separate conspiracies even though certain defendants did not participate in or have knowledge of the other conspiracy).

As evidenced by the use of the disjunctive "or," the satisfaction of either the "substantial identity of facts or participants" or "common plan or scheme" prong is sufficient to support joinder. *See, e.g.*, *United States v. Chalmers*, 474 F. Supp. 2d 555, 571 (S.D.N.Y. 2007) ("joinder is appropriate where, as in this case, the defendants' criminal acts are alleged to arise out of a common plan or scheme"); *United States v. Aronson*, No. 98 Cr. 564 (DAB), 1999 WL 97923, at *3 (S.D.N.Y. Feb. 24, 1999) (joinder was proper where the charges shared a substantial identity of facts and participants).

Most importantly, as evidenced by *Nerlinger*, Courts need only apply the "substantial identity of facts or participants, or a common plan or scheme" test when defendants are charged in

12

separate conspiracies and not when a grand jury has returned an indictment charging them in one conspiracy.

## 2.    Severance of Properly Joined Charges – Rule 14(a)

Federal Rule of Criminal Procedure 14(a) provides that "[i]f the joinder of offenses or defendants in an indictment . . . for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."   Fed. R. Crim. P. 14(a).   The Supreme Court has made plain, however, that there is a "preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993); *see also Feyrer*, 333 F.3d at 114 (citing "economy, convenience, and avoidance of delay" as some of the reasons underlying the strong preference for joint trials).   This strong preference reflects a settled precept in criminal law: "Joint trials 'play a vital role in the criminal justice system.'   They promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'"   *Zafiro*, 506 U.S. at 537 (quoting *Richardson v. Marsh*, 481 U.S. 200, 209-10 (1987)).

Therefore, any analysis of prejudice under a Rule 14 motion must be viewed through the lens of the strong presumption in favor of joint trials.   As the Supreme Court has explained:

> It would impair both the efficiency and the fairness of the criminal justice system to require . . . that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand.   Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability—advantages which sometimes operate to the defendant's benefit.   Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.

13

*Richardson*, 481 U.S. at 210; *see also United States v. Zafiro*, 945 F.2d 881, 886 (7th Cir. 1991) (joint trials reduce not only litigation costs but also "error costs," *i.e.*, the costs associated with depriving the jury of making its determinations based on "the full picture")*, aff'd,* 506 U.S. 534 (1993).

The presumption in favor of joint trials "is particularly strong where, as here, the defendants are alleged to have participated in a common plan or scheme." *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998); *see also United States v. Cardascia*, 951 F.2d 474, 482 (2d Cir. 1991); *United States v. Turoff*, 853 F.2d 1037 (2d Cir. 1988). "[T]he cases are legion that there is a strong public interest in joint trials where, as here, the defendants are . . . charged in the same conspiracy." *United States v. Pirro*, 76 F. Supp. 2d 478, 483 (S.D.N.Y. 1999); *see also United States v. Bin Laden*, 109 F. Supp. 2d 211, 214 (S.D.N.Y. 2000) ("When more than one defendant is accused of participating in the same act or transaction or series of acts or transactions, federal law expresses a strong preference for a single, joint trial of all defendants." (footnote omitted)).

Even where a joint trial may cause some prejudice to a defendant, "[t]he risks of prejudice attendant in a joint trial are presumptively outweighed by the conservation of time, money, and scarce judicial resources that a joint trial permits." *United States v. Jimenez*, 824 F. Supp. 351, 366 (S.D.N.Y. 1993). The question under Rule 14 is therefore whether that prejudice "'is sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials.'" *United States v. Page*, 657 F.3d 126, 129 (2d Cir. 2011) (quoting *United States v. Walker*, 142 F.3d 103, 110 (2d Cir. 1998)). Moreover, "defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Zafiro*, 506 U.S. at 540. "[D]iffering levels of culpability and proof are inevitable in any multi-defendant trial and,

standing alone, are insufficient grounds for separate trials." *United States v. Carson*, 702 F.2d 351, 366-67 (2d Cir. 1983); *see also Cardascia*, 951 F.2d at 483 (A "disparity in the quantity of evidence and of proof of culpability are inevitable in any multi-defendant trial, and by themselves do not warrant a severance.").

The issue under Rule 14 is accordingly not whether a defendant would prefer to be tried alone, or might suffer some prejudice from being tried with his or her co-defendants, but whether any prejudice to him or her from a joint trial "is sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials." *United States v. Lanza*, 790 F.2d 1015, 1019 (2d Cir. 1986) (citation omitted). A discretionary severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539; *see also United States v. Panza*, 750 F.2d 1141, 1149 (2d Cir. 1984) (prejudice must be "sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials").

"'[L]ess drastic measures [than severance], such as limiting instructions, often will suffice' to cure any risk of prejudice and permit joinder." *Page*, 657 F.3d at 129 (quoting *Zafiro*, 506 U.S. at 539). For example, "'the fact that evidence may be admissible against one defendant but not another does not necessarily require a severance.'" *United States v. Spinelli*, 352 F.3d 48, 56 (2d Cir. 2003) (quoting *Carson*, 702 F.2d at 367). Rather, "to the extent that a category of evidence is irrelevant to [a particular defendant], a limiting instruction will suffice to remove any prejudice." *United States v. Bennett*, 485 F. Supp. 2d 508, 515 (S.D.N.Y. 2007); *United States v. Ramos*, 346 F. Supp. 2d 567, 575 (S.D.N.Y. 2004) ("Such 'limiting instructions to the jury have emerged as the preferred device for curing any prejudicial spillover that may result from a multi-defendant,

15

multi-count trial.'" (quoting *United States v. Santiago*, 174 F. Supp. 2d 16, 22 (S.D.N.Y. 2001))).

Consequently, "[t]he principles that guide the district court's consideration of a motion for

severance usually counsel denial." *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993).

### B.    Discussion

#### 1.    The Defendants Are Properly Joined

The Superseding Indictment charges all three defendants in a single conspiracy.   The

defendants are therefore properly joined under Rule 8(b) because "[t]he established rule is that a

non-frivolous conspiracy charge is sufficient to support joinder of defendants under Fed. R. Crim.

P. 8(b).   *See, e.g.*, *Nerlinger*, 862 F.2d at 973.   Indeed, the "simplest case for joinder is where the

defendants are charged with having conspired with each other." *Rittweger*, 524 F.3d at 178.   Such

is the case here.   It is "simple" because, just as required by the first clause of Rule 8(b), the

defendants are alleged to have "participated in the same act or transaction."   Fed. R. Crim. P. 8(b).

Marcus ignores *Nerlinger*, *Rittweiger*, and the general import of having been charged with

participating in a single conspiracy.   Instead, he misrepresents Rule 8(b)'s application to

indictments alleging a single conspiracy by relying on cases where an indictment joined defendants

charged in *separate* conspiracy counts.   *See United States v. Giraldo*, 859 F. Supp. 52 (E.D.N.Y.

1994) (analyzing joinder in an indictment that charged two separate conspiracies); *United States

v. Ohle*, 678 F. Supp. 2d at 225 (separately charged conspiracies); *United States v. Kouzmine*, 921

F. Supp. 1131 (S.D.N.Y. 1996) (separately charged conspiracies); *United States v. Menashe,* 741

F. Supp. 1135 (S.D.N.Y. 1990) (separately charged conspiracies); *United States v. Rajaratnam*,

753 F. Supp. 2d 299, 307 (S.D.N.Y. 2010) (separately charged conspiracies); *United States v.

Carrozza*, 728 F. Supp. 266, 270 (S.D.N.Y. 1990) (separately charged conspiracies).   Indeed,

Marcus does not cite a single case in which a court analyzed Rule 8(b)'s application to a single

conspiracy charge; many of the cases he does cite even affirm joinder of separate conspiracies;[3] and none of the cases on which he mistakenly relies contemplates severance in the way Marcus advocates for—that is, severing a defendant from a single conspiracy count.   It is no surprise that Marcus cannot find support for the unusual relief he seeks; ultimately, he is challenging an indictment, properly returned by a Grand Jury, that on its face charges all defendants with participating in same "act or transaction," just as Rule 8(b) requires.   The Motion should be denied.

### 2.     Marcus Suffers No Prejudice Under Rule 14(a)

Marcus's contention that he would be unduly prejudiced by a trial with Polk under Rule 14(a) rests on the same faulty premise that the Superseding Indictment charges two distinct conspiracies.   Br. 9.   Accordingly, Marcus does not make any showing of prejudice—he simply identifies evidence that the Government will use to prove Count One.

Further still, the evidence will show that Polk and Marcus served the exact same roles in the conspiracy as the "salespeople" at each of their respective companies. There is therefore no risk that a joint trial would prejudicially overstates Marcus's culpability.   And even if there were, that is not a basis for severance.   *Zafiro*, 506 U.S. at 540 ("[D]iffering levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials.").

---

[3] *See, e.g.*, *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003) (affirming joinder of two separate conspiracies when defendants were aware of the other conspiracies); *United States v. Turoff*, 853 F.2d 1037, 1044 (2d Cir. 1988); *United States v. Carrozza*, 728 F. Supp. 266, 272 (S.D.N.Y. 1990), aff'd, 956 F.2d 1160 (2d Cir. 1992) (severing some, but not all, separately-charged conspiracies); *United States v. Rajaratnam*, 753 F. Supp. 2d 299   (S.D.N.Y. 2010) (same).

Marcus also ignores tremendous gains in judicial economy that would be realized through a single trial. As described above, these three companies victimized loan applicants in exactly the same way. They used the same three fees, which were collected and distributed among the defendants in the same way; Marcus and Polk made the same misrepresentations to victims regarding their ability and willingness to fund loans, and told the same lies about their ability to help victims recover fees once those fees were paid; the defendants used the same appraisal process to repeatedly deny otherwise qualified applicants; they used the same appraisal company in order to manipulate that appraisal process; and they used the same exact outside services to plant fake reviews and news coverage and to obscure legitimate victim complaints of fraud. With the exception of a few additional victim witnesses, trials that separate defendant conduct according to the fraudulent companies they operated would therefore look nearly identical.

Marcus therefore cannot meet his heavy burden to show that he would face a "serious risk" of "substantial prejudice" in a joint trial with the individuals with whom he was properly charged. *United States v. Harwood*, 998 F.2d 91, 95 (2d Cir. 1993) (internal quotation marks omitted); *see also United States v. Werner*, 620 F.2d 922, 928-29 (2d Cir. 1980) ("substantial prejudice" must be shown under Rule 14 because a "lesser showing would undermine the policies behind Rule 8 and essentially read that rule from the books"). Simply put, none of his arguments compellingly demonstrates "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence," *Zafiro*, 506 U.S. at 539, so as to override the strong preference for and public interest in a joint trial.

## **CONCLUSION**

For the reasons set forth above, Marcus's Motion should be denied.

Respectfully submitted,

MATTHEW PODOLSKY
Acting United States Attorney for the
Southern District of New York

By: _____
Jackie Delligatti
Georgia V. Kostopoulos
Dana McCann
Peter J. Davis
Assistant United States Attorneys

Dated: April 2, 2025
New York, New York

19