UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                   :

UNITED STATES OF AMERICA         :

                                   :

           -*v.*-                 :         S1 23 Cr. 396 (JMF)

                                   :

JOSEPH MALVASIO,            :
     a/k/a "Joe Cohen,"       :
GREGG MARCUS,              :
     a/k/a "Gregg Pierce," and   :
CHRISTOPHER POLK,         :
     a/k/a "Myron Miles,"     :

                                   :

                 Defendants.    :

                                   :

-------------------------------------------------------------x

# <u>THE GOVERNMENT'S MOTION TO COMPEL THE RELEASE OF<br>NON-PRIVILEGED COMMUNICATIONS</u>

                                    JAY CLAYTON
                                      United States Attorney
                                      Southern District of New York

Georgia V. Kostopoulos
Adabelle U. Ekechukwu
Patrick J. Gallagher
Micah F. Fergenson

Assistant United States Attorneys
- *Of Counsel* -

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................ 1

RELEVANT FACTS .................................................................................................... 3

    I.      The Criminal Scheme ................................................................................. 3

    II.    Procedural History .................................................................................... 4

      A.    History of Marcus and Malvasio's Invocation of Privilege.................................. 4

      B.    The Government's Filter Team Review and Production to Marcus and Malvasio  6

      C.    The Subject Materials and the Defendants' Corporate Counsel........................... 8

APPLICABLE LAW .................................................................................................... 11

    I.      The Attorney-Client Privilege........................................................................ 11

    II.    The Work-Product Doctrine ......................................................................... 12

    III.   Privilege Assertions by a Defunct Corporate Entity............................................ 13

    IV.   The Crime-Fraud Exception ......................................................................... 15

ARGUMENT............................................................................................................. 16

    I.      The Subject Materials Are Not Privileged............................................................ 17

      A.    Malvasio Has Failed to Demonstrate Any Applicable Privilege............................ 17

      B.    The Subject Materials Are Not Protected by Individual or Corporate Privilege.. 18

    II.    Even If Any of the Subject Materials Are Privileged, the Crime-Fraud Privilege Exception Applies........................................................................ 24

CONCLUSION .......................................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**

*Allied Irish Banks, P.L.C.*,
   252 F.R.D. 163 (S.D.N.Y 2008)......................................................................................... 13

*Amusement Indus., Inc. v. Stern*,
   293 F.R.D. 420 (S.D.N.Y. 2013) ...................................................................................... 16

*Clark v. United States*,
   289 U.S. 1 (1933) .............................................................................................................. 16

*Express Homebuyers USA, LLC v. WBH Mktg., Inc.*,
   2018 WL 4922467 (S.D. Fla. Feb. 9, 2018) ..................................................................... 20

*Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc.*,
   2015 WL 3450045 (S.D.N.Y. May 28, 2015) ................................................................... 14

*Gilliland v. Geramita*,
   2006 WL 2642525 (W.D. Pa. Sept. 14, 2006) ............................................................ 14, 20

*Horace Mann Ins. Co. v. Nationwide Mut. Ins. Co.*,
   240 F.R.D. 44 (D. Conn. 2007) ........................................................................................ 18

*In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*,
   805 F.2d 120 (3d Cir. 1986) ........................................................................................ 22, 23

*In re County of Erie*,
   473 F.3d 413 (2d Cir. 2007) ............................................................................................. 12

*In re Grand Jury Investigation,*
   2017 WL 4898143 (D.D.C. Oct. 2, 2017) ........................................................................ 27

*In re Grand Jury Subpoena # 06–1*,
   274 F. App'x 306 (4th Cir. 2008) ..................................................................................... 14

*In re Grand Jury Subpoena Dated Jan. 4*,
   750 F.2d 223–25 (2d Cir. 1984) ....................................................................................... 18

*In re Grand Jury Subpoena Dated July 6*,
   510 F.3d 180 (2d Cir. 2007) ............................................................................................. 13

*In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*,
   731 F.2d 1032 (2d Cir. 1984) ........................................................................................... 16

*In re Grand Jury Subpoena*,
   274 F.3d 563 (1st Cir. 2001) ............................................................................................. 22

i

*In re Grand Jury Subpoena*,
    419 F.3d 329 (5th Cir. 2005) ......................................................................... 27

*In re Grand Jury Subpoenas Dated Jan. 11 & June 28,*
    2025 WL 2673680 (S.D.N.Y. Sept. 18, 2025) .................................................. 14, 15

*In re John Doe, Inc.*,
    13 F.3d 633 (2d Cir. 1994) ............................................................................. 15, 16

*In re Richard Roe, Inc.*,
    168 F.3d 69 (2d Cir. 1999) ............................................................................. 16, 26

*Intervenor v. United States* (*In re Grand Jury Subpoenas*),
    144 F.3d 653 (10th Cir. 1998) ....................................................................... 22

*Off. Comm. of Admin. Claimants ex rel. LTV Steel Co. v. Moran*,
    802 F. Supp. 2d 947 (N.D. Ill. 2011) ........................................................... 15

*Overton v. Todman & Co., CPAs, P.C.*,
    249 F.R.D. 147 (S.D.N.Y. 2008) ................................................................... 20

*SEC v. Carrillo Huettel LLP*,
    2015 WL 1610282 (S.D.N.Y. Apr. 8, 2015) ......................................... 14, 15, 19-20

*United States v. Adlman*,
    134 F.3d 1194 (2d Cir. 1998) ........................................................................ 13, 14

*United States v. Correia*,
    468 F. Supp. 3d 618 (S.D.N.Y. 2020) ........................................................... 12

*United States v. Edwards*,
    303 F.3d 606 (5th Cir. 2002) ........................................................................ 26

*United States v. Graf*,
    610 F.3d 1148 (9th Cir. 2010) ...................................................................... 22

*United States v. Int'l Bhd. of Teamsters*,
    119 F.3d 210 (2d Cir. 1997) .......................................................................... 12, 22

*United States v. Jacobs*,
    117 F.3d 82 (2d Cir. 1997) ............................................................................ 25

*United States v. Kaplan,*
    2003 WL 22880914 (S.D.N.Y. Dec. 5, 2003) ............................................... 28

*United States v. Levin*,
    2015 WL 5838579 (S.D.N.Y. Oct. 5, 2015) .................................................. 25

*United States v. Mejia*,
    655 F.3d 126 (2d Cir. 2011) ................................................................................ 12

*United States v. Nixon*,
    418 U.S. 683 (1974) .......................................................................................... 12

*United States. v. Nobles*,
    422 U.S. 225 (1975) .......................................................................................... 13

*United States v. Spinosa*,
    2021 WL 2644936 (S.D.N.Y Jun. 28, 2021) .......................................................... 25

*United States v. Tucker*,
    254 F. Supp. 3d 620 (S.D.N.Y 2017) .............................................................. 25, 28

*United States v. United Techs. Corp.*,
    979 F. Supp. 108 (D. Conn. 1997) ...................................................................... 22

*United States v. Zolin*,
    491 U.S. 554 (1989) .......................................................................................... 15

*Wultz v. Bank of China Ltd.*,
    304 F.R.D. 384 (S.D.N.Y. 2015) ......................................................................... 12

## Treatises

8 J. Wigmore, Evidence § 2327 at 638 (McNaughton ed., 1961) ..................................... 5

**PRELIMINARY STATEMENT**

The Government respectfully seeks an order authorizing the release to the prosecution team of approximately 700 email communications for which Malvasio has asserted a non-viable claim of attorney-client privilege (the "Subject Materials").[1]  Additionally, the Government requests that the Court order Marcus to provide a privilege log for an additional set of documents (the "Marcus Filter Materials") for which Marcus has declined to expressly invoke any attorney-client privilege claim or provide the Government with a privilege log.

Most of the Subject Materials concern a series of arbitrations between the defendants and the victims of their charged criminal scheme.  Although the Government has sought to exclude these arbitrations in its motions *in limine* (Dkt. 195 at 24-28), the Subject Materials bear directly on such evidence if the arbitrations are introduced at trial.  Therefore, should the Court deny the Government's motion in *limine* as to the arbitration awards, the Government seeks a ruling that the Subject Materials are not privileged and should be released to the prosecution team.  The Subject Materials are currently in the Government's possession but have not been reviewed by the prosecution team because Malvasio has made sweeping invocations of both individual and corporate privilege.  Should the arbitration evidence become relevant at trial, the Court should reject Malvasio's attempt to claim privilege over the Subject Materials.

First, Malvasio has failed to meet his burden of demonstrating that any of the Subject Materials are privileged, let alone that he is able to invoke that privilege.  Despite repeated requests by the Government that the defendants identify basic information about their privilege assertions,

---

[1] On April 27, 2026, pursuant to Paragraph 8(D) of Your Honor's Individual Rules and Practices in Criminal Cases, the Government met and conferred by video conference with counsel for Malvasio and Marcus regarding both its motions *in limine* and the instant motion.

Malvasio provided a facially deficient privilege "index" in lieu of a privilege log. Marcus, in turn, has failed to provide any log at all. In addition, Malvasio makes sweeping individual and corporate privilege assertions without any grounds for doing so, and improperly attempts to invoke privilege on behalf of both his co-defendant Marcus, and on behalf of Polk's companies, for which he was neither an officer nor an employee.

Second, even if Malvasio's privilege invocations were, somehow, sufficient, Malvasio attempts to assert corporate privilege on behalf of a series of companies that are, by the defendants' own admission, defunct. None of the defendants' lending companies is currently operational, and none has claimed—or could claim—any form of corporate privilege. Nor has Malvasio demonstrated that he (or Marcus, on whose behalf he attempts to invoke privilege) maintained any individual privilege over any of the Subject Materials, which exclusively concern litigation initiated by (or against) the defendants' lending companies.

Finally, although the Subject Materials, to the extent they become relevant at trial, are not by any means privileged, the Government respectfully believes that any conceivable privilege claim would be defeated by the crime-fraud exception. Although the Court need not rule on the exception at this time, at least two categories of Subject Materials are implicated by the crime-fraud exception, specifically, communications regarding: (1) the victim arbitrations, which includes an arbitration where Malvasio appears to have transmitted a forged appraisal report to counsel; and (b) lawsuits against two victims by Marcus and Malvasio's company.

## RELEVANT FACTS

### I.     The Criminal Scheme

As explained in the Government's motions *in limine*, the defendants are charged with both wire fraud and conspiracy to commit wire fraud in connection with their operation of a series of purported lending businesses that, over a six-year period, defrauded over 400 victims out of more than $15 million in advance fees.  (*See* Dkt. 195.)

The defendants operated the scheme under the auspices of three purportedly legitimate lending businesses (the "Defendant Lending Companies"), all of which are now defunct and inactive.[2]  Malvasio and Marcus operated a company called Global Capital Partners Fund, LLC ("GCPF"), which was based in Manhattan.  Malvasio and Polk, in turn, operated through a series of separate supposed lending companies.  Over a five-year period, Polk founded two such lending companies that solicited fees from victims: Harbor Equity ("HE") and Commercial Private Equity ("CPE") (together, the "Polk Lending Companies").[3]  Both of the Polk Lending Companies were registered in Georgia under the names of Polk's fiancée and a family friend.[4]  However, in truth, while Polk at times claimed to be merely a contractor or employee of the Polk Lending Companies,

---

[2] Counsel for Malvasio, Polk, and Marcus have confirmed that all three entities are in fact inactive. Malvasio's personal company, National Commercial Mortgage, Inc. ("NCM"), which was not one of the defendant lending companies, is the only remaining active corporate entity.

[3] Polk also briefly operated a third company, Harbor Private Equity ("HPE"), but appears to have changed the name of HPE to Harbor Equity shortly after forming it, and never registered HPE with the Georgia Division of Corporations.

[4] Polk represented himself to borrowers as the Managing Director and Chief Executive Officer of the Polk Lending Companies.  *See, e.g.*, Ex. A at 10 (excerpt of Polk responses to interrogatories).  Pursuant to Rule 10(A) of the Court's Individual Rules, because Exhibit E contains personal identifying information attributable to a victim, the Government has redacted Exhibit E.  Additionally, the Government has provided Exhibit J to the Court in its native format.

he exercised control over all three of the Polk Companies.  Polk managed the Polk Lending Companies' day-to-day affairs, issued loan documentation to potential borrowers on behalf of each company, managed the websites associated with the Polk Lending Companies, and controlled the bank accounts for each of the three Polk Lending Companies.

Malvasio had no formal role at any of the Polk Lending Companies.  Instead, Polk would sell potential loans to Malvasio, and Malvasio, through a different corporate entity, would commit to finance the loan.  For each loan that Polk and Malvasio committed to fund, Malvasio would issue Polk a so-called "take-out" agreement to Malvasio, in which Malvasio committed to fund the loan.  *See, e.g.*, Ex. B (March 24, 2023 table funding agreement between Malvasio committing to fund an $8 million loan for the Polk Lending Companies).

## II.    Procedural History

### A.  History of Marcus and Malvasio's Invocation of Privilege

Marcus and Malvasio have explicitly disclaimed any advice-of-counsel defense.  (*See* Dkt. 179.)  Nevertheless, in January 2026, the defendants added two of their former attorneys to their witness list: (a) David Ghattas, who represented the Polk Lending Companies in a series of victim-led arbitrations, and whom Polk subsequently withdrew as a witness; and (b) James Joseph, who similarly represented GCPF in several victim-led arbitrations.  Marcus and Malvasio refused to provide any factual proffer regarding Joseph's anticipated testimony, or to confirm whether, to the extent there was any privilege over the defendants' communications with Joseph, the defendants would waive privilege in advance of Joseph's testimony (as would be required, since testimony on the privileged matter effects a subject-matter waiver, not merely a waiver over the testimony on direct examination).  *See* J. Wigmore, Evidence § 2327 at 638 (McNaughton ed., 1961) ("[t]he

client's offer of his own or the attorney's testimony as to a specific communication to the attorney is a waiver as to all other communications to the attorney on the same matter.").

On January 28, 2026, the Government requested that the Court order the defendants to, among other things, provide a proffer as to Joseph's anticipated testimony so that the Government could assess whether it would seek to preclude such testimony as impermissible "presence of counsel" evidence and assess whether the defendants impliedly waived the attorney-client privilege by proffering such testimony.  (Dkt. 179.)  Among its other requests for relief, the Government noted that it had screened thousands of emails between the defendants and Joseph; that prompt resolution of these issues in advance of trial was necessary in order to avoid any mid-trial delay; and that, if the defendants did not intend to waive privilege, the Government might seek a ruling "that the privilege between Marcus and Joseph no longer holds due to implied waiver or the applicability of the crime-fraud exception, thus opening up new discovery[.]"  (*Id.*)

That same day, Marcus filed a letter confirming that Marcus was not relying on an advice-of-counsel defense and stating that Marcus had waived privilege.  (Dkt. 180.)[5]  But at the subsequent conference, Malvasio, through his counsel, noted that he did not intend to waive any corporate or individual privilege over his own communications with Joseph.  On February 4, 2026, Marcus reversed course, informing both the Court and the Government that he no longer would call Joseph as a witness and would continue to assert the privilege.  (*See* Dkt. 185.)  In his letter to the Court, Marcus noted that Joseph "had represented Mr. Marcus, Mr. Malvasio, and GCPF in connection with several arbitrations with loan applicants, arbitrations in which the defendants and

---

[5] Malvasio had previously disclaimed any advice-of-counsel defense in correspondence with the Government.

their company prevailed." (*Id.*)  Marcus added, "We intend to submit evidence of the arbitral awards in another manner." (*Id.*)  That same day—and, apparently, in lieu of Joseph's testimony—Marcus produced and marked as defense exhibits three commercial arbitrations awards from 2020 and 2021.  In all three arbitrations, Joseph represented GCPF in arbitrations brought by victims of the defendants' scheme.   (*See* Dkt. 195 at Ex. A – Ex. C.)  Each single-page award identifies counsel for each party, summarily states that judgment is in favor of GCPF, addresses arbitration fees, and is signed by an arbitrator. (*Id.*)

In a scheduling order entered after Marcus's letter was filed, the Court directed the defendants to notify the Government of any plans to call an attorney as a witness by March 5, 2026, "to ensure that there is adequate time to litigate any attorney-client privilege or work product issues before trial." (Dkt. 186.)  None of the defendants provided any notice on or by that date.

### B.  The Government's Filter Team Review and Production to Marcus and Malvasio

As the Court is aware, pursuant to a series of judicially-authorized search warrants, the Government obtained and produced the contents of several of the defendants' email accounts, as well as the contents of their employees' email accounts.  A Government filter team screened any potentially privileged communications from the prosecution case team.

On March 6, 2026, the Government produced: (a) approximately 953 potentially privileged emails it had screened from Malvasio's email accounts (the "Malvasio Filter Materials"); and (b) approximately 4,542 potentially privileged emails it had screened from Marcus's email accounts (the "Marcus Filter Materials").  In conjunction with that production, the Government requested that Malvasio and Marcus: (a) identify and release any non-privileged communications back to the Government; and (b) provide a privilege log to the Government identifying the basis for any

6

withheld or redacted documents, including which privilege the defendants were asserting, as well as to whom the privilege belonged. *See* Ex. I (March and April 2026 email correspondence with defense counsel regarding privilege production).

To date, Marcus has not asserted or invoked privilege over any of the materials in the Marcus Filter Materials, has refused to identify any non-privileged materials from the Marcus Filter Materials, and has otherwise refused to engage with any of the Government's repeated requests for a privilege log for any of the materials contained in the Marcus Filter Materials. (*See id.*)

On March 24, 2026, Malvasio produced approximately 256 emails and their attachments that he did not claim to be privileged, as well as an additional 58 emails and their attachments which were partially redacted, with no identified basis for the redaction.[6] In lieu of a privilege log, Malvasio ultimately provided the Government with what he characterized as an "index" identifying the Subject Materials, *i.e.*, the 696 emails (and corresponding attachments) that had been withheld or redacted. *See* Ex. J (index of Malvasio Filter Materials). The index fails to identify the basis for the privilege for any of these communications, let alone their subject matter. In an April 10, 2026 email to the Government, counsel for Malvasio broadly claimed, without elaboration, that the "basis for all of the information withheld is attorney-client privilege, though we reserve our right in the future to assert the attorney work product doctrine and any other applicable privilege relating to the documents and to assert privilege over any documents or information inadvertently produced." (*See* Ex. I.) Counsel for Malvasio further identified that,

---

[6] The Government repeatedly reiterated its request for a privilege log, which Marcus refused to engage with, apart from characterizing the privilege issue as "moot," *see* Ex. I, and Malvasio explicitly refused to provide.

for any withheld or redacted documents relating to GCPF, the assertion of privilege was on behalf of both himself, Marcus, and GCPF; and that, for documents relating to Harbor Equity and CPE, the assertion of privilege was on behalf of Malvasio individually. (*Id.*) Counsel did not explain on what basis Malvasio could supposedly assert privilege on behalf of a co-defendant, or on behalf of the Polk Lending Companies, over which Polk himself does not assert any privilege.

### C.  The Subject Materials and the Defendants' Corporate Counsel

Malvasio's materially deficient privilege "index" makes it difficult to pinpoint the subject area for each of the 696 email communications contained in the Subject Materials. Nonetheless, the Government has been able to several categories of communications that are germane to this motion based on the limited information it has available.

### A.  Counsel for GCPF

As reflected in the Subject Materials, Marcus and Malvasio hired a series of attorneys to represent GCPF throughout the pendency of the scheme.  All three of these attorneys were paid using GCPF's bank accounts, using funds the defendants, in turn, had stolen from other victims.

#### 1.  James Joseph, Esq.

In connection with the arbitrations brought by victims against GCPF to recover the fees paid to the defendants, the defendants retained Joseph, of Joseph, Terracciano & Lynam, LLP. Joseph appears to have represented GCPF in all of the victim-initiated arbitrations brought against GCPF.  In each of those arbitration proceedings, as reflected in the arbitration awards described *supra*, GCPF was named as the respondent.  Invoices associated with Joseph's representation reflect that Joseph represented GCPF, rather than Marcus or Malvasio in their individual capacities. *See, e.g.*, Ex. C (legal invoice for arbitration); Ex. D (invoice for legal services).

### 2.  Mintz & Gold LLP

GCPF also hired Peter Guirguis, of Mintz & Gold LLP, after a victim ("Victim-1"), whom the Government presently intends to call at trial, posted a public review of GCPF describing how he was scammed by the defendants.  Guirguis, who told Victim-1 he represented both GCPF and Malvasio, sent a demand letter to Victim-1 threatening to sue the victim unless the victim removed his review, calling Victim-1's review "false and defamatory." *See* Ex. E.  Victim-1 refused to remove the review unless the defendants agreed to refund the fees they had stolen from him.  The defendants did not attempt to contact Victim-1 again, or attempt to initiate any kind of civil lawsuit against Victim-1.

### 3.  Certilman Balin Adler & Hyman, LLP

Finally, GCPF retained Joshua Feldman, Esq. and Paul Sweeney, Esq., of Certilman Balin Adler & Hyman, LLP, to file a civil complaint against a broker, John Locascio, whose client lost thousands of dollars in fees to the defendants in connection with the victim's loan application. After unsuccessfully attempting to recover his client's fees from the defendants, Locascio reported GCPF to the Better Business Bureau.  *See Global Capital Partners Fund LLC v. Locascio*, 22 Civ. 8362 (ER) (S.D.N.Y. Sept. 30, 2022), at Dkt. 1 (civil complaint against Locascio). The basis for the defendants' lawsuit, which was brought solely on behalf of GCPF, was that Locascio had published reviews containing so-called "false and disparaging statements" about GCPF, including that the defendants are "total scam artists and crooks"; that they have "a long history of criminal activity"; that the defendants "use a PR company to try and drown out their bad press"; that they use "intimidation for suing people who leave bad reviews"; that their online publications are "all self written proclamations"; and that Marcus and his then-wife "have owned several companies

9

that have been shut down for legal reasons." *See* Ex. F (GCPF complaint against Locascio).  The lawsuit was brought on behalf of GCPF, rather than either of the defendants' individually, and invoices issued by Sweeney's firm identified GCPF as its client.

### B. Counsel for the Polk Lending Companies

As reflected in the Subject Materials, Polk hired an attorney, David Ghattas, Esq., to represent the Polk Lending Companies in five arbitration proceedings brought by victims of the scheme.  Polk, through his counsel, has informed the Government that the Polk Lending Companies are defunct, and that he does not assert any privilege involving Ghattas's representation of the Polk Lending Companies, or take any position as to this motion.[7]

Ghattas, of the Law Offices of David E. Ghattas, PC, represented the Polk Lending Companies in the five arbitration proceedings brought by victims against the Polk Lending Companies in 2022 and 2023.  All five of the arbitrations were brought against CPE, which was the main lending company that Polk operated during this time period.  Only one of the five arbitration proceedings named "Joseph Cohen," a pseudonym Malvasio used when acting in concert with the Polk Lending Companies; those individual claims were ultimately dismissed.[8]

---

[7] Polk separately retained Ghattas to represent him in his individual capacity after Malvasio and Marcus's arrest in August 2023.  For the avoidance of doubt, although those materials would not be contained in the Subject Materials, the Government is not seeking any communications between Ghattas and Polk dated after Malvasio's arrest and relating to Ghattas's individual representation of Polk in connection with the Government's criminal investigation of Polk.  The Government understands, based on its communications with Polk's counsel, that Polk does not assert that there is any remaining corporate or individual privilege over any communications between Ghattas, Polk, and Malvasio contained in the Subject Materials, and that Polk does not intend to take any position with respect to the Government's motion.

[8] Malvasio had no formal role in the Polk Lending Companies; nor was he an employee or contractor of the Polk Lending Companies.  Instead, as the take-out agreements between Polk and Malvasio reflect, Malvasio, acting on behalf of National Commercial Mortgage, Inc., would agree to fund loans that Polk brokered and sold to Malvasio on behalf of the Polk Lending Companies.

Three of the five arbitration proceedings resulted in awards in the victims' favor against CPE; the remaining two actions were withdrawn by the victims and dismissed.

While Ghattas provided at least one retainer agreement to Polk and Malvasio in connection with the one arbitration where Malvasio was named (using the pseudonym "Cohen") as a party, *see* Ex. G, there is no evidence that Malvasio ever executed a retainer agreement with Ghattas in connection with Ghattas's representation of CPE in this (or any other) arbitration proceeding. The only executed retainer agreement was signed by Polk's fiancée, who appears to have signed a retainer agreement for two of the five arbitration proceedings. Nor is there any evidence that Malvasio separately retained Ghattas to individually represent him, including in the sole arbitration where a victim brought individual claims against "Joseph Cohen." Indeed, in one communication on behalf of the Polk Lending Companies, Ghattas explicitly disclaimed representing Polk or Malvasio (using the pseudonym "Cohen") in their individual capacities, noting that, if the victims did not agree to release Polk and "Cohen" from the arbitration, that Ghattas would be "required to advice [*sic*] each individual Respondent to seek independent legal advice regarding potential conflicts and procedural options," *see* Ex. H, and that Polk and "Cohen" (*i.e.*, Malvasio) would otherwise need additional time "to obtain counsel," *id.* at 2.

## APPLICABLE LAW

### I.    The Attorney-Client Privilege

The attorney-client privilege does not broadly cover all communications between an individual and an attorney, even if an attorney has, at times, been engaged by that individual (or

---

At times, however, Malvasio used an email address provided to him by Polk using the domain name "@commercialprivateequity.com."

their company) to work on certain legal matters. "The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011); *see also In re County of Erie*, 473 F.3d 413, 420 (2d Cir. 2007) (the "predominant purpose of the communication" must be "to render or solicit legal advice"). "The burden of establishing the existence of an attorney-client privilege, in all of its elements, rests with the party asserting it." *United States v. Int'l Bhd. of Teamsters*, 119 F.3d 210, 214 (2d Cir. 1997). "[B]ecause the attorney-client privilege 'stands in derogation of the search for truth so essential to the effective operation of any system of justice . . . [it] must be narrowly construed." *United States v. Correia*, 468 F. Supp. 3d 618, 621 (S.D.N.Y. 2020); *see also United States v. Nixon*, 418 U.S. 683, 703-13 (1974).

## II.      The Work-Product Doctrine

"Federal law governs the applicability of the work-product doctrine in all actions in federal court." *Wultz v. Bank of China Ltd.*, 304 F.R.D. 384, 393 (S.D.N.Y. 2015) (citing *Allied Irish Banks, P.L.C. v. Bank of Am., N.A.*, 252 F.R.D. 163, 173 (S.D.N.Y. 2008)). Federal Rule of Civil Procedure 26(b)(3) codifies the doctrine in part, providing that "a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)," unless "the party shows that it has substantial need for the materials . . . and cannot, without undue hardship, obtain their substantial equivalent by other means." The work-product rule is designed "to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." *United States v. Adlman*, 134 F.3d 1194, 1196 (2d Cir. 1998) (quoting

12

*Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947)); *accord United States. v. Nobles*, 422 U.S. 225, 238-39 (1975).

The doctrine protects factual material, "including the result of a factual investigation" — commonly referred to as fact work product — as well as material that "reveals the 'mental impressions, conclusions, opinions, or legal theories of an attorney or other representative'" — commonly referred to as opinion work product. *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 183 (2d Cir. 2007). The party asserting work-product protection must demonstrate that the material at issue "(1) [is] a document or a tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by his representative." *Allied Irish Banks, P.L.C.*, 252 F.R.D. at 173 (internal quotation marks and citation omitted). "In anticipation of litigation" means that "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Adlman*, 134 F.3d at 1202 (citation omitted). Thus, even where "[t]here is little doubt under the evidence that [a party] had the prospect of litigation in mind when it directed the preparation of the" documents, *id.* at 1204, or that "such documents might also help in preparation for litigation," *id.* at 1202, work-product protection is not available for "documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of litigation," *id.*; *accord Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc.*, 2015 WL 3450045, at *5 (S.D.N.Y. May 28, 2015).

## III. Privilege Assertions by a Defunct Corporate Entity

"The weight of authority . . . holds that a dissolved or defunct corporation retains no privilege." *SEC v. Carrillo Huettel LLP*, No. 13 Civ. 1735 (GBD) (JCF), 2015 WL 1610282, at *2 (S.D.N.Y. Apr. 8, 2015) (collecting cases); *see also In re Grand Jury Subpoenas Dated Jan.*

*11, 2023 & June 28, 2023*, 23 CR. 004 (JHR), 2025 WL 2673680, at *6 (S.D.N.Y. Sept. 18, 2025) (granting motion to compel where corporate entity "no longer functionally existed" and thus "has no privilege to assert") (internal citations and quotations omitted); *Gilliland v. Geramita*, 05 Civ. 1059 (TFM), 2006 WL 2642525, at *4 (W.D. Pa. Sept. 14, 2006) (where CEO was deceased and all other officers and directors had resigned, "Defendant cannot meet its burden to prove that the privilege has been validly asserted because there is no person with authority to properly invoke the privilege"); *but see In re Grand Jury Subpoena # 06–1,* 274 F. App'x 306, 309 (4th Cir. 2008) (per curiam) (describing the issue of whether "the corporate attorney-client privilege survives the dissolution of the corporate entity" as an "unsettled legal question").

Although certain courts have expressed uncertainty on this issue, *see id.*, the *Carrillo Huettel* court persuasively identified "[s]everal rationales" for the conclusion that dissolved corporations do not retain privilege. "First, the interests that are furthered by the extension of the privilege beyond the death of a natural person simply do not apply in the context of a corporate entity," including because "there is no 'tradition' of the privilege surviving the demise of a corporation" and because "'[t]he possibility that a corporation's management will hesitate to confide in legal counsel out of concern that such communication may become unprivileged after the corporation's demise is too remote and hypothetical to outweigh the countervailing policy considerations supporting discoverability." *Carrillo Huettel*, 2015 WL 1610282, at *2 (internal citation and quotation marks omitted). Second, "as a practical matter, there is no one who can speak for a defunct corporation in order to assert the privilege." *Id*. at *3.  Third, "limiting the duration of the attorney-client privilege to the life of a corporation is consistent with the principle

that the privilege is to be construed narrowly because it withholds relevant information from the judicial process." *Id.*

"To determine whether a corporation has 'died,' courts [] look to practical business realities rather than technical legal status." *Off. Comm. of Admin. Claimants ex rel. LTV Steel Co. v. Moran*, 802 F. Supp. 2d 947, 949 (N.D. Ill. 2011) ("LTV Steel"); *see also In re Grand Jury Subpoenas Dated Jan. 11, 2023 & June 28, 2023* at *5 (applying factors set forth in in *LTV Steel* to grant government's motion to compel communications between the defendants and former corporate counsel).

## IV.     The Crime-Fraud Exception

"The crime-fraud exception strips the privilege" from communications or materials that were made "'in furtherance of contemplated or ongoing criminal or fraudulent conduct.'" *In re John Doe, Inc.*, 13 F.3d 633, 636 (2d Cir. 1994) (quoting *Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d at 1038).  The purpose of the crime-fraud exception is to "assure that the 'seal of secrecy' . . . between lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime." *United States v. Zolin*, 491 U.S. 554, 563 (1989).  "The [attorney-client] privilege takes flight if the relation is abused.  A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law.  He must let the truth be told." *Clark v. United States*, 289 U.S. 1, 15 (1933) (Cardozo, J.).    The    same    exception    applies    to    attorney    work-product.    *See Amusement Indus., Inc. v. Stern*, 293 F.R.D. 420, 425 (S.D.N.Y. 2013).

A party seeking to invoke the crime-fraud exception must demonstrate that there is probable cause (1) "that the client communication or attorney work product in question was *itself* in furtherance of the crime or fraud" and (2) "to believe that the particular communication with

15

counsel or attorney work product was *intended* in some way to facilitate or to conceal the criminal activity." *In re Richard Roe, Inc.*, 168 F.3d 69, 71 (2d Cir. 1999) (emphasis in original and internal quotation marks omitted).  Stated differently, this standard requires "that a prudent person [would] have a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof." *In re John Doe*, 13 F.3d at 637 (quoting *Subpoena Duces Tecum Dated September 15, 1983,* 731 F.2d at 1039).  There need not be a "definitive" showing of the fraudulent nature of the client's objective; rather, "there need only be presented a reasonable basis for believing that objective was fraudulent." *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983,* 731 F.2d at 1039. Furthermore, "[i]t is sufficient to come within the exception that the client intended to use the attorney's services in furtherance of a crime or fraud even if the attorney was unaware of this purpose." *Amusement Indus., Inc. v. Stern*, 293 F.R.D. 420, 426 (S.D.N.Y. 2013); *see Clark*, 289 U.S. at 15 ("The attorney may be innocent, and still the guilty client must let the truth come out.") (citing cases).

## ARGUMENT

As set forth below, the Court should order the release of the Subject Materials.  First, Malvasio's blanket privilege assertions on behalf of himself, his co-defendants, and his co-defendants' companies, as well as on behalf of a series of defunct companies, are wholly insufficient to meet the defendant's burden of demonstrating that the Subject Materials are privileged.  The Subject Materials are particularly relevant should the Court permit evidence of the defendants' arbitration awards, which, as noted above, should be excluded for the reasons explained in the Government's motions *in limine*.  (Dkt. 195 at 24-28).  Moreover, Marcus, who

16

fails to assert any privilege whatsoever over the Marcus Filter Materials, should be ordered to produce a privilege log over any communications for which he believes a privilege applies.

Second, even if Malvasio had sufficiently asserted privilege, none of the lending companies who would have held the privilege is a functioning entity, and the attorney-client privilege therefore no longer applies to any of the Subject Materials, regardless of their subject matter or content. Nor has Malvasio demonstrated any conceivable individual privilege he maintained with corporate counsel for GCPF or the Polk Lending Companies.

That, on its own, is sufficient to compel the release of the Subject Materials in full to the Government. But even if the Court determines that some subset of the Subject Materials is protected by any residual individual or corporate privilege, this Court should still order the release of the Subject Materials under the crime-fraud exception. The Court, however, need not decide that issue at this time given that there is no colorable claim of privilege over the Subject Materials.

## I.    The Subject Materials Are Not Privileged

### A.  Malvasio Has Failed to Demonstrate Any Applicable Privilege

As a threshold matter, Malvasio has failed to meet his burden to adequately assert privilege, regardless of the type of privilege he seeks to assert. "It is axiomatic that the burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship, a burden not discharged by mere conclusory or ipse dixit assertions." *In re Grand Jury Subpoena Dated Jan. 4, 1984*, 750 F.2d 223, 224–25 (2d Cir. 1984) (internal citations and quotations omitted). "An essential step on meeting the burden of establishing the existence of a privilege or an immunity from discovery is the production of an adequately detailed privilege log sufficient to enable the demanding party to contest the claim." *Horace Mann Ins. Co. v. Nationwide Mut. Ins. Co.*, 240 F.R.D. 44, 47 (D. Conn. 2007) (internal citations and

17

quotations omitted).  "The requirement that detail be provided operates to discourage pro forma, half-baked, dilatory, and even jocular assertions of privilege," given that "invocation of a claim of privilege without producing an accompanying privilege log can be an unfair discovery tactic that increases delay in the resolution of lawsuits, fosters excessive motion practice, increases the costs of litigation, and greatly increases the work of the court."  *Horace Mann*, 240 F.R.D. at 47.

With respect to the Subject Materials, and as noted above, Malvasio makes a series of unfounded (and unsupported) assertions: (1) that all of the Subject Materials are attorney-client privileged; (2) that, for any communications relating to GCPF, he is asserting privilege on behalf of himself, Marcus, and GCPF; and (3) for any communications relating to the Polk Lending Companies, he is asserting privilege on behalf of himself individually.  Those assertions are the sum total of Malvasio's privilege claims, accompanied by a so-called "index" (attached as Exhibit J) that similarly fails to identify the basis for any privilege assertion.  Malvasio's claims are insufficient to make out even a threadbare assertion of privilege.  Specifically, Malvasio fails to identify the nature of the privileged relationship or communications over which he asserts privilege, the subject matter of any purported legal advice the Subject Materials contain, or even that any privileged relationship existed between Malvasio and the other participants in the Subject Materials.  In short, Malvasio has supplied little more than the "mere conclusory or ipse dixit assertions" that are insufficient to meet his burden.  *In re Grand Jury Subpoena Dated Jan. 4, 1984* at 225.

## B.  The Subject Materials Are Not Protected by Individual or Corporate Privilege

Even assuming Malvasio's assertions of privilege were otherwise sufficient, they fail as a matter of black letter law.  There is no factual or legal basis for the blanket corporate or individual

privilege assertions advanced by Malvasio, let alone any basis for Malvasio to shield his communications by asserting privilege on behalf of his co-defendant or on behalf of his co-defendant's company.

1.    GCPF, As a Defunct Corporation, Has No Privilege to Assert

Approximately 629 communications from the Subject Materials concern GCPF, including approximately 304 emails regarding arbitrations; 177 emails regarding GCPF's lawsuits against Victim-1 and Locascio; and 148 emails relating to other matters.[9]

First, as to Malvasio's assertions of privilege on behalf of GCPF, release of the Subject Materials is warranted because GCPF is defunct. Any privilege GCPF might have therefore enjoyed no longer exists. "[T]he weight of authority . . . holds that a dissolved or defunct corporation retains no privilege," *Carrillo Huettel LLP*, 2015 WL 1610282, at *2 (collecting cases). This Court should follow that persuasive authority, as other judges in this District have, and similarly conclude that the corporate privilege does not survive dissolution of the entity that previously held the privilege.

As noted above, "[t]o determine whether a corporation has 'died,' courts should look to practical business realities rather than technical legal status." *LTV Steel* at 949-959 (holding corporate entity's temporary dissolution did not preclude it from asserting privilege because corporate entity "retain[ed] management capable of asserting the privilege."). Applying this principle, at least one court has found the attorney-client privilege no longer viable for companies that "technically still have legal existence" where "there is no current management personnel who

---

[9] Upon request, the Government can provide the Court with an index identifying which of the Subject Materials it believes relate to the subject matter categories identified *supra*.

19

can now assert the attorney-client privilege on behalf of the corporation." *Gilliland*, 2006 WL 2642525, at *3. By contrast, another court has upheld a company's ability to assert the privilege when two officers submitted affidavits stating they remained in control of the company. *Overton v. Todman & Co., CPAs, P.C.*, 249 F.R.D. 147, 148 (S.D.N.Y. 2008) (distinguishing *Gilliland* on bases that "both the President and another former officer of DBI have asserted the attorney-client privilege in affidavits" and stated "they are 'still [DBI's] President' and 'still one of its officers'").

Applying this standard, there are several facts establishing GCPF's defunct status. First, and perhaps most importantly, the defendants have explicitly acknowledged that GCPF is now defunct, and its corporate registration has lapsed or expired. *See* Ex. I (emails from defense counsel confirming defunct status). Second, GCPF's other actions "suggest that [it is] no longer treated . . . as a functioning entity." *Express Homebuyers USA, LLC v. WBH Mktg., Inc.*, No. 18 Civ. 60166 (LSS), 2018 WL 4922467, at *3 (S.D. Fla. Feb. 9, 2018). GCPF has deactivated its corporate website, and does not appear to maintain any other internet or website presence since the defendants' arrests. *See* Ex. K (corporate registration status for Harbor Equity, Commercial Private Equity, and GCPF as of May 2026).[10] While GCPF's corporate registration with its respective department of state remains active, GCPF has failed to submit required filings to maintain its current registration status in New York. (*See id.*) In short, Malvasio—the former President of GCPF, and the party with the burden of demonstrating the applicability of the privilege—has admitted that the GCPF is now defunct, and thus it can no longer assert any privilege it may have once had over the Subject Materials. That admission, which is supported by

---

[10] Polk and Malvasio only briefly assumed the corporate name of "Harbor Private Equity," which does not appear to have been registered with the Corporations Division of the Georgia Secretary of State.

more than ample independent evidence of GCPF's defunct status, is fatal to Malvasio's privilege claim as to GCPF, to the extent he can even raise a privilege claim on behalf of a defunct entity (and he cannot).

        2.   <u>Malvasio Has Failed to Demonstrate Any Remaining Individual Privilege Over the Subject Materials</u>

Second, there is no evidence of any residual individual privilege over the GCPF-related Subject Materials described above, or the approximately 70 emails contained in the Subject Materials that relate to the Polk Lending Companies. Where an *individual* seeks to assert a personal attorney-client privilege over a matter involving corporate legal advice—as Malvasio apparently seeks to do here, both on his own behalf and on behalf of Marcus—that person must meet a five-prong test:

> First, they must show they approached [counsel] for the purpose of seeking legal advice. Second, they must demonstrate that when they approached [counsel] they made it clear that they were seeking legal advice in their individual rather than in their representative capacities. Third, they must demonstrate that [counsel] saw fit to communicate with them in their individual capacities, knowing that a possible conflict could arise. Fourth, they must prove that their conversations with [counsel] were confidential. And, fifth, they must show that the substance of their conversations with [counsel did not concern matters within the company or the general affairs of the company.

*In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120, 123-25 (3d Cir. 1986); *see Int'l Bhd. of Teamsters*, 119 F.3d at 215 (Second Circuit citing *Bevill* approvingly); *see also United States v. Graf*, 610 F.3d 1148, 1161 (9th Cir. 2010) (adopting *Bevill* approach); *In re Grand Jury Subpoena*, 274 F.3d 563, 571 (1st Cir. 2001) (following *Bevill*); *Intervenor v. United States (In re Grand Jury Subpoenas)*, 144 F.3d 653, 659 (10th Cir. 1998) (same).

21

Malvasio cannot meet that test.  First, as to Malvasio's communications with Ghattas and Polk, Malvasio cannot demonstrate any privileged relationship between himself and Ghattas, who represented the Polk Lending Companies in five arbitrations brought by borrowers against the Polk Lending Companies.  Malvasio himself was not named in any of the arbitrations, except for a brief reference to his alias as a respondent in one of the five arbitrations before those claims were dismissed.  He was not an employee or an officer of the Polk Lending Companies.  He was never deposed in those arbitrations, signed no retainer with Ghattas, and purported to maintain an arms-length relationship between himself and the Polk Lending Companies.  Indeed, far from satisfying any of the factors set forth in *Bevill*, Malvasio's participation as a third party in communications between Polk and counsel for the Polk Lending Companies vitiates any applicable individual privilege.  *See United States v. United Techs. Corp.*, 979 F. Supp. 108, 111 (D. Conn. 1997) ("Once a privileged communication has been disclosed purposely to a third party, the attorney-client privilege is waived, unless the disclosed material falls under the common interest rule.").

Nor can Malvasio credibly claim a personal privilege over the Subject Materials either on his own behalf or on behalf of Marcus, as he apparently seeks to do here.  There is no evidence that Malvasio or Marcus maintained any kind of individual attorney-client relationship with the attorneys who were retained to defend (or litigate) business-related claims involving GCPF.  And even with respect to those elements, it is by no means apparent that either defendant "made it clear that [he was] seeking legal advice in [his] individual rather than in [his] representative capacities" or that counsel was communicating with either defendant in his "individual capacity[y], knowing that a possible conflict could arise." *Bevill*, 805 F.2d at 123-25.

In any event, even if Malvasio (or Marcus) could satisfy the other prongs of *Bevill*, as explained above, the Subject Materials almost exclusively concern business-related litigation against (or on behalf of) GCPF and the Polk Lending Companies. Those categories include: (a) victim arbitrations brought against GCPF and the Polk Lending Companies; (b) lawsuits that GCPF threatened to bring, or did in fact bring, against victims of the defendants' criminal scheme after those victims published negative reviews about the defendants' lending companies; and (c) closing-related communications corresponding to the handful of small loans the defendants closed. These disputes clearly concerned "matters within [CPE or GCPF] or the general affairs of [CPE or GCPF]" and thus the defendants cannot, at a minimum, meet the fifth prong of the test. *Bevill*, 805 F.2d at 121 (internal citations and quotations omitted).

3. To the Extent the Subject Materials or the Marcus Filter Materials Are Privileged, Marcus Has Also Failed to Meet His Burden

Marcus's privilege assertions fare no better. For one, as explained above, Malvasio cannot assert privilege on behalf of his co-defendant. More broadly, Marcus's failure to invoke privilege or furnish a privilege log as to the Marcus Filter Materials means that Marcus has similarly failed to adequately assert any form of privilege of these materials, to say nothing of the Subject Materials from Malvasio. Over the course of nearly two months, Marcus's counsel has refused to provide a privilege log, ignored the Government's requests that Marcus identify which of the Marcus Filter Materials (if any) are privileged, and has continued to withhold patently non-privileged communications contained in the Marcus Filter Materials from the Government.[11] Marcus has

---

[11] For example, based on the Government's review of metadata associated with the Marcus Filter Materials, a number of communications contained in the Marcus Filter Materials appear to not be privileged, including USAO_FT_GM_00157276 (an email Marcus appears to have sent to

plainly not met his burden, and the Court should order Marcus to immediately identify any privileged communications from the Marcus Filter Materials and supply a privilege log so that the Government can evaluate the viability of such claims.

## II.    Even If Any of the Subject Materials Are Privileged, the Crime-Fraud Privilege Exception Applies

For the reasons explained in this motion, the Subject Materials are not covered by any applicable privilege and should be released to the prosecution team.  As noted above, the Subject Materials will become relevant if the Court denies the Government's motion *in limine* to exclude evidence of the defendants' arbitration awards.  But even if the Court were to find any cognizable privilege as to any subset of the Subject Materials, the Government believes that the crime-fraud exception would independently apply to any privileged Subject Materials that concern: (a) the victim arbitrations against GCPF and against the Polk Lending Companies, which includes an arbitration where Malvasio appears to have transmitted a forged appraisal report to counsel; and (b) GCPF's lawsuits against two victims (together, the "Crime-Fraud Materials").

To be clear, the Court need not decide the applicability of the crime-fraud exception at this time.  To the extent the Court grants the Government's motion *in limine* and excludes evidence of the arbitration awards, the Subject Materials will likely no longer be relevant for trial.  Moreover, even if the Subject Materials became necessary to refute the defendants' purported arbitration evidence, there is no cognizable privilege claim that the defendants could claim over the Subject Materials in the first place.

---

himself) and USAO_FT_GM_00157304 (an email exchange between Marcus, Malvasio, and an appraiser who worked at GCPF's direction).

However, to the extent there are any relevant privileged communications in the Subject Materials, the Government will demonstrate "a factual basis for a showing of probable cause to believe that a fraud or crime has been committed." *United States v. Jacobs*, 117 F.3d 82 (2d Cir. 1997), *abrogated on other grounds by Loughrin v. United States*, 573 U.S. 351 (2014).  As set forth *supra*, the Indictment charges the defendants with offenses relating to, among other things, their operation of a series of fraudulent lending businesses that made material misrepresentations to victims in order to collect (and keep) the victims' fees and advance payments on loans the defendants had no intention or capacity to close or fund.  Those fraudulent lending practices, in turn, are the specific topics and correspondence contained in the Subject Material.  That, standing alone, is sufficient to meet the first element of the crime-fraud exception.  *See, e.g.*, *United States v. Tucker*, 254 F. Supp. 3d 620, 624 (S.D.N.Y. 2017) ("[T]he fact that a grand jury issued the Indictment . . . supports a finding of probable cause that a crime was committed"); *United States v. Levin*, 15 Cr. 101 (KBF), 2015 WL 5838579, at *5 (S.D.N.Y. Oct. 5, 2015) (same).  There is likewise probable cause to believe that the two categories of communications included in the Crime-Fraud Materials were in furtherance of the crimes and frauds charged in the Indictment. Both sets of communications involve the defendants' efforts to conceal their fraud from (and, by extension, mislead) the victims of their criminal scheme.  The purpose of the defendants' engagement of counsel for these actions was not, in fact, to obtain any bona fide legal advice, but to conceal and continue the criminal enterprise they were actively engaged in by "using [their] attorneys'] services to cover up [their] crimes[.]"  *United States v. Edwards*, 303 F.3d 606, 618 (5th Cir. 2002) (applying crime-fraud exception to communications between defendant and counsel retained to represent defendant in civil actions relating to the alleged fraudulent scheme).

### 1.    GCPF's Lawsuits Against Victim-1 and Locascio

First, Malvasio and Marcus's communications with GCPF's counsel regarding their efforts to retaliate against several victims by initiating civil litigation against them falls squarely within the crime-fraud exception.  As set forth *supra*, both lawsuits were initiated after those victims attempted to report the defendants' criminal conduct on public online forums, including the Better Business Bureau and Google.  Marcus and Malvasio took significant efforts to suppress and conceal negative reviews of GCPF, including by paying a third-party to generate fake positive reviews of the scheme.  It follows that those lawsuits, in turn, served a similar purpose: to attempt to conceal the defendants' misconduct; to allow the defendants' alleged ongoing fraud to continue uninterrupted; and to deter other victims from making similar complaints.  That analysis holds true even under the heightened standard that applies to the subset of the Crime-Fraud Materials that concern the defendants' affirmative civil litigation against Locascio, where the very litigation the defendants initiated was, arguably, "in furtherance of a fraud."  *See In re Richard Roe, Inc.*, 168 F.3d 69, 71 (2d Cir. 1999).  Therefore, the Locascio litigation writ large, "or an aspect thereof . . . had little or no legal or factual basis," and "was carried on substantially for the purpose of furthering the crime or fraud."  *Id.* at 71.

### 2.    The Victim Arbitrations

The second category of Crime-Fraud Materials concerns the victim arbitrations, where Malvasio and Marcus used their attorneys as conduits for their own misrepresentations to borrowers in connection with arbitrations initiated by the victims against GCPF and the Polk Lending Companies.  Specifically, in one of the victim arbitrations brought against the Polk Lending Companies, Malvasio appears to have attempted to alter an appraisal report before

providing it to Ghattas, who in turn provided it to the victim in response to a discovery demand. By doing so, Malvasio used Ghattas to further the fraudulent scheme by having Ghattas convey documents to the victims that were designed to prevent the victims from discovering the truth about the defendants, the defendants' fraudulent lending practices, and the defendants' use of aliases. Even assuming Malvasio had any credible claim of privilege over these materials—and to be clear, he does not and cannot—Malvasio's attempts to pass off an altered document in response to a discovery request places his communications with Ghattas regarding the victim arbitrations within the crime-fraud exception. *See, e.g.*, *In re Grand Jury Investigation*, No. 17 Misc. A. 2336 (BAH), 2017 WL 4898143, at *10 (D.D.C. Oct. 2, 2017) (applying crime-fraud exception when targets were alleged to have caused an attorney to submit letters to the Justice Department containing false information).

There is also ample probable cause that Malvasio and Marcus's correspondence with Joseph about the other victim-related arbitrations against GCPF were similarly "in furtherance of the contemplated or ongoing criminal or fraudulent conduct." *In re Grand Jury Subpoena,* 419 F.3d 329, 343 (5th Cir. 2005). Much like the lawsuits that GCPF initiated against victims, the victim-initiated arbitrations risked revealing the truth of the defendants' criminal scheme, both to individual claimants and more broadly to others. The correspondence between Marcus, Malvasio, and Joseph about the victim arbitrations are replete with examples of the defendants attempting to use the arbitration to conceal the scheme from the claimants, including, just in one example, communications where Joseph acknowledges Marcus's use of a fake name and conceals his true name from the borrowers.

27

Accordingly, the crime-fraud exception may provide another independent basis to order the release of the Subject Materials bearing on the victim arbitrations with GCPF and the Polk Lending Companies (353 communications), and the GCPF lawsuits against Victim-1 and Locascio (177 communications). *See Tucker*, 254 F. Supp. 3d at 625 (concluding that *in camera* review was unnecessary due to government's showing that entire category of attorney-client communications were in furtherance of crime or fraud); *United States v. Kaplan*, No. 02 Cr. 883 (DAB), 2003 WL 22880914, at \*10 (S.D.N.Y. Dec. 5, 2003) (finding crime-fraud exception applicable on categorical basis to all files seized in search of attorney's office pertaining to clients who were "indicted or convicted of insurance fraud" in connection with attorney's representation of them and deeming *in camera* review unnecessary). The Government may seek a ruling from the Court as to the applicability of the crime-fraud exception in the event that the Court finds that any privilege extends to the Subject Materials. However, for the reasons explained above, the Government believes that the Subject Materials are squarely not privileged, in any event.

## CONCLUSION

For the foregoing reasons, the Court should enter an order compelling:

(1)    The release of the Subject Materials because no cognizable claim of privilege applies; and

(2)    Marcus to identify any communications in the Marcus Filter Materials for which he is asserting a privilege claim, and to provide the Government with a privilege log.

Dated:  New York, New York
        May 9, 2026

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: _____

Georgia V. Kostopoulos
Adabelle U. Ekechukwu
Patrick J. Gallagher
Micah F. Fergenson
Assistant United States Attorneys
(212) 637-2212 / -1944 /-2251 / -2190

29