UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                                :

UNITED STATES OF AMERICA,             :

               -v-                      :               23-CR-396 (JMF)

JOSEPH MALVASIO, a/k/a "Joe Cohen,"    :               ORDER
and GREGG MARCUS, a/k/a "Gregg Pierce,"  :

              Defendants.      :

-----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

Attached to this Order are the notes received from the jury (Court Exhibits 3, 5-6),

the Court's written response, with attachments, to one of those notes (Court Exhibit 4), and

the jury's Verdict Form (Court Exhibit 7), all with jurors' signatures redacted.

SO ORDERED.

Dated: June 24, 2026
      New York, New York                         JESSE M. FURMAN
                                           United States District Judge

**JURY NOTE**

Court Exhibit 3

Your Honor,

May we request the transcript of the defense cross examination (on both sides) of Hescock and Anasta?

thank you.

Date: 6/23/26

Time: 12:55 pm



**Foreperson's signature**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**JESSE M. FURMAN**
**United States District Judge**

**(212) 805-0282**
**Jesse_furman@nysd.uscourts.gov**

June 23, 2026

To the Members of the Jury:

In response to your Note from today at 12:55 p.m., enclosed are copies of the transcripts of the defense cross-examinations of Mr. Hescock and Mr. Anasta.  As you requested only the cross-examinations, the transcripts do not include the witnesses' direct, re-direct, or re-cross examinations.

Thank you for your patience.

Thank you,

Judge Furman

Q693MAL2                    Anasta - Direct

THE COURT:  All right.  Cross-examination.

CROSS-EXAMINATION

BY MR. TALKIN:

Q.  Good morning, Mr. Anasta.

A.  Good morning.

Q.  I want to start by taking you back to the phone call you had with Mr. Malvasio when you were in Miami.  You remember that phone call, correct?

A.  Yes, I do.

Q.  He called you and he told you that the appraisal came back too high?

A.  Yes, he did.

Q.  So, he volunteered that information to you, correct?

A.  Yes.

Q.  And he didn't hide it from you, correct?

A.  No.

Q.  He didn't wait to tell you that the appraisal value was that lower value of about $1.7 million before he told you about the first higher appraisal, did he?

A.  Can you say that again?

Q.  I'll ask the question a little better.

There came a time later where you say you learned from him that the appraisal came back, another draft came back at about $1.7 million.  Do you remember that?

A.  Yes.

Q.  And he told you that after he had already told you that the appraisal came back too high?

appraisal came back too high?

A.   Yes.

Q.   So he wasn't hiding the fact that there was a chance you were going to get a lower appraisal, right?

A.   Yeah, I agree.

Q.   And now, concentrating on that conversation while you were in Miami, during that call, he told you, look, we are going to have to go back and look at the construction cost.

He said that to you, right?

A.   Yes.

Q.   And then I believe you had a discussion with the assistant district attorney about how on June 7, you got a letter from Mr. Malvasio, you remember that?

A.   Yes, I do.

Q.   That was a letter that was put into evidence as 3798, correct?

A.   I don't know the exact reference number.

Q.   Sure.  I'll put it up for you.  It's in evidence.

MR. TALKIN:  Can we put up Government's 3798, please. I apologize.  We are having some technical difficulty.  That's not it.  Can you take that down, please.

I'll ask that the government put it up, please.  Thank you.

THE COURT:  If we can't get that up, you should ask a new question.  We're looking for 3798.

MR. TALKIN:  Yes.  The attachment, A.  3798-A the

Q693MAL2                         Anasta - Cross

attachment.  The letter.

THE COURT:  Next question.

Q.  So you said that before you got that letter that it had been some weeks after your last discussion with Global Capital, correct?

A.  Yes, correct.

Q.  And that was weeks of silence, you never heard from them?

A.  There may have been a phone call or two but I don't remember at the time.

MR. TALKIN:  I want to ask we put up Defense Exhibit 3605 just for the witness, please.  That's just to the witness?  Okay.

Q.  I want you just to leaf through this, or you can't leaf. We'll click through this for you.  I want you to look at it and see if you recognize it.

A.  Yes, I do.

Q.  And is this a series of e-mails between you and Mr. Malvasio between June 7 and May, going back to the last page, May 19 of 2021?

A.  I can only see one page.

MR. TALKIN:  Can you click to the fifth page, the last page of the exhibit.

THE COURT:  Just flip through page by page slowly, please.

MR. TALKIN:  Go through and flip through one page

Q693MAL2                    Anasta - Cross

slowly.

Your Honor, I apologize.  Can we take a five-minute recess?  I know that --

THE COURT:  No.

MR. TALKIN:  I want to get the technical glitches worked out.

THE COURT:  No, please carry on.

MR. TALKIN:  Your Honor, may I approach the witness?

THE COURT:  You may.

Q.  Take a second and leaf through that, please.  Go to the last page, five pages in.  Do you recognize those correspondence between you, that series of correspondence between you and Mr. Malvasio and Global Capital?

A.  Yes.

Q.  Is that a fair and accurate representation of your e-mail traffic between May 21 and June 7?

A.  Yes.

MR. TALKIN:  Your Honor, I'll offer that in as evidence.

THE COURT:  Any objection.

MS. KOSTOPOULOS:  No objection.

THE COURT:  Admitted.  DX 3605.

(Defendant's Exhibit 3605 received in evidence)

MR. TALKIN:  May I approach the witness and get it back, your Honor?

Q693MAL2                        Anasta - Cross

THE COURT:  You may.

Q.  Turning to the second-to-last page of the document. Actually you need to go up one more page to the third-to-last page just because the date's on there.  I apologize.

THE COURT:  Mr. Talkin, question, please.

MR. TALKIN:  Yes.

Q.  So going to the second, the third-to-last page, is it in front of you yet?

A.  No.

MR. TALKIN:  May I approach the witness and give him a copy?

THE COURT:  You may.

Q.  Going to that, you see there is an e-mail from you -- from him to you on May 21 of '21?  You see that?

A.  Yes.

Q.  And in that e-mail, he tells you that you can't complete the appraisal until you supply the exact cost of the construction, correct?

A.  But this an e-mail from me.

Q.  This is from him to you.

A.  No.  What you provided me is from me to Joe.

MR. TALKIN:  May I approach the witness, your Honor?

THE COURT:  You may.

THE WITNESS:  Okay.

Q.  To go through that e-mail, he say to you we can't complete

Q693MAL2                        Anasta - Cross

the appraisal process until you supply the exact cost of the construction, right?

A.   Yeah, that's what the e-mail states.

Q.   And this is an e-mail between you and Joe Malvasio?

A.   Yes, that is correct.

Q.   Then he says in there, he says, look, you told me cost could be $600,000, and the estimate is for $1.8 million.  Do you see that?

A.   Yes.

Q.   So there's a difference between the $600,000 and the $1.8 million in construction costs?

A.   Yes, but I don't know where he's getting the 600,000 from.

Q.   He says that you told him that.

A.   Yes, he does state that, but I didn't tell him that.

Q.   And he said if the costs are $600,000, then you need to establish that the costs are $600,000.

A.   Agreed, yes.

Q.   And then if you read up, you responded shortly thereafter on the same day denying had you said the $600,000, correct?

A.   Correct.

Q.   And you say that you gave everything to the appraiser?

A.   Correct.

Q.   And then you say that the commitment said as completed/stabilized.  Do you remember that?

A.   Yes.

Q. When you were asked for an appraisal from -- when the appraisal request came to you, Mr. Malvasio did not tell you it was going to be as stabilized, did he?

A. No.

Q. He said as completed.

A. Agreed.

Q. And completed and stabilized are two different things, correct?

A. Correct.

Q. What does stabilized mean to you?

A. So stabilized means that the property is up and operational, not just completed.

Q. And obviously when a property is up and operational, it's more valuable than when it's just completed?

A. Sometimes, yes.

Q. And your appraisal that you gave him was also a stabilized value as well, wasn't it?

A. I believe it was as completed.

        MR. TALKIN:  May I approach the witness, your Honor?

        THE COURT:  You may.

Q. This is not in evidence so don't -- I am just asking if that helps you remember.  Does that help you remember whether or not the appraisal was as completed or as stabilized?

A. So, I believe it states as completed and stabilized.

Q. Correct.  So that appraisal considered it being completed

Q693MAL2                    Anasta - Cross

project that was actually being rented and in use, is that correct?

A.  Yes, so there is not always a discrepancy between completed and stabilized.

Q.  My question is, is that correct?

A.  Yes.

■■■■■■■■    ■■■■■■■■■■■■    ■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■

        MR. TALKIN:  May I approach the witness?

        THE COURT:  You may but let's get back to the microphone because it makes it harder for everyone.

        MR. TALKIN:  I just want to grab the document.  Thank you.

Q.  Now I'm going to go back to the e-mail chain that you had with him after you responded to him on 5/21, you did not, he asked you, you did not provide him with any additional information, meaning Mr. Malvasio at that time, did you?

A.  Could you refresh my memory?

Q.  On the 21st, you say that you respond to Mr. Malvasio asking him, asking you to establish the construction costs by saying I already gave it to the appraiser?

A.  Yes.

Q.  And you did not give Mr. Malvasio any of those documents at that time?

Q693MAL2                        Anasta - Cross

A.  I don't believe so, but I don't remember.

Q.  He responded back to you, reading up, he responded back to you on May 24 of '21 and he said, he asked you to send him the documents, is that right?

A.  I need some time to read.

Q.  Sure.

A.  Yeah, what's the question again?

Q.  He asked you to send some very specific documents, correct?

A.  Yes, I believe so, yes.

Q.  With this said, reading at the bottom, if -- can you highlight the last paragraph of that e-mail.  Is it up in front of you on your screen?

A.  No.

THE COURT:  Now it is.

Q.  So, on May 24, he says to you that we need -- you need to document to them the complete and accurate costs of the build, correct?

A.  Yes.

Q.  And in response to that, did you send him any documents?

Q693MAL2                        Anasta - Cross

A.  I believe I did.

Q.  And you sent him the same documents that you had sent to the appraiser, correct?

A.  Yes.

Q.  And that was on June 25, is that correct?  Excuse me. May 25?

A.  I don't remember the exact date.

Q.  If we can move up to the next e-mail.

▌▌▌▌▌▌▌▌    ▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌

▌▌▌▌▌▌    ▌▌▌▌▌▌▌    ▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌

▌▌▌▌▌▌    ▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌    ▌▌▌▌▌

▌▌▌▌▌▌    ▌▌    ▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌

THE COURT:  All right.  If the government has DX 3605, could you post that, please.

▌▌▌▌▌▌    ▌▌▌▌▌▌▌▌▌▌    ▌▌▌

▌▌▌

Q.  Is it on your screen?

A.  No.

Q693MAL2                    Anasta - Cross

Q.  All right.  So, you see 3605 in front of you now, correct?

A.  Yes, I do.

Q.  If we could go to the second-to-last page of that document. I want to go back.  You see at the top where it says, "Matel, as per our conversation," that's the one from May 21, correct?

A.  Yes.

Q.  Now if we could go one page back up.  And then you respond on May 21 and you are saying on May 21 that I don't know where you got the $600,000, but I provided everything to the appraiser.  Correct?

A.  Correct.

Q.  And at that point in time you did not provide with Mr. Malvasio any of the documents you had provided the appraiser at that point in time.

A.  I believe they already had my construction estimates and everything from well before.

Q.  But at that point in time, you did not provide it to him when he asked.  You told him I am not providing it.  The appraiser has it.  Isn't that what you said?

A.  Yes, I said that the appraiser had requested -- so there was additional things that were requested from the appraiser afterwards that I then went back and provided those to the appraiser.

Q.  And then after you, after you didn't provide those documents, Mr. Malvasio got back to you and said kindly or

please provide to us the complete and accurate cost to complete your building, correct?

A.   Is there an exhibit?

Q.   On May 24, if we can move up one page, please.

A.   Can you state your question again?

Q.   At that point in time again you were requested documents to prove the costs by Mr. Malvasio?

A.   Yes.

Q.   And at that point in time you did not provide them.

A.   I believe I did provide him with some documents.

Q.   You didn't provide the documents until June 7 of 2021. Isn't that correct?

A.   I don't recollect.

Q.   If we could go to the first page, please.

A.   Yes, I went back and got additional information from the contractor.

Q.   And you also provided on -- and in that same e-mail you provided your budget, correct, the budget that you said was for the building of the field house?

A.   Yes, I believe that was an abated budget.

Q.   If we could go to 3608.  DX 3608, please.  It's not in evidence.

          THE COURT:  Next question.

Q.   This loan you were buying was a con -- this loan you were getting was for construction, correct?

Q693MAL2                        Anasta - Cross

A.   Yes.

Q.   And it was to complete the construction on the building at Anasta Center?

A.   Yes, for the new -- the new buildings and the addition.

Q.   And the budget for that was $1.8 million?

A.   So this 1.8 also includes some renovations to the existing structure as well.  But the construction for the field house and the connector building is part of the overall 1.8, but it doesn't include everything.

Q.   So it was about $1.6 million?

A.   I don't remember exactly, but it was less than this amount.

Q.   And you were going to use the entire amount of that construction loan just towards construction, correct?

A.   Yes, correct.

Q.   And the construction, if you don't complete the construction, the as-completed value of that property will not reach what you expected because it's relying on the completion of the construction?

A.   Correct.

Q.   And if you ran out of money, you wouldn't be able to complete the construction?

A.   That's correct.

Q.   So, Mr. Malvasio expressed a concern to you that you needed to show that you were going to be able to complete the construction, even if he gave you $1.1 million, correct?

Q693MAL2                        Anasta - Cross

A.   Well, he expressed that he thought that the costs would be even less.  And his concern was that if he had given the $1 million and the construction was less, that the money would be going towards me and not towards the construction.

Q.   Well, he expressed concern that the money would not be put into the building, and if it doesn't get put into the building, it won't sustain the value that you want, correct?

A.   Can you --

Q.   If you got money for construction, and then you don't put it towards the construction, it won't be concluded in the as-finished, as-completed value, correct?

A.   Yes, correct.

Q.   And that would diminish the value of the property?

A.   Yes, but that wasn't what the concern was.  The concern was that, that the money would be more than what was needed for the construction, because he stated, oh, if the construction is only going to be 600,000, why should I be giving you a million.

Q.   I'll ask that we pull up Government's Exhibit 3798.  And can we go to A, please, that is the actual letter.  If we can go to the second page.

You see that he laid out five questions to you in that letter?

A.   Yes.

Q.   And in that letter, he asks you questions that would enable you to actually close this loan, correct?

A.   Yes.

Q.   And question number 2 is he says how would the borrower pay the closing costs on $850,000 loan should we offer an alternative loan out of the borrower's funds.

He asks you that question?

A.   Yes.

Q.   What he's talking about there is that he's considering not giving you a $1.1 million loan, but a lesser loan of $850,000?

A.   I believe so.

Q.   So, he didn't reject your request for a loan, he was proposing an alternative amount?

A.   Well, in terms of what's stated in this, yes, but since their minimum was a million, and stated that they can't provide the financing as agreed upon.

Q.   Can we go back to the page before, please.  Last paragraph he says to you we do have a minimum loan amount of $1 million. There are occasions that we would look at a minimum below, a minimum loan of $500,000 subject to the lender's approval. This is on a deal-by-deal basis.

So he is explaining to you he's looking to go and give

Q693MAL2                    Anasta - Cross

you a lower loan.

A.   Yes.

Q.   And when he does that, he's saying but before I do that, I need you to satisfy me on certain things, and that's this list of five.

A.   Yes.

Q.   He asks you how you were going to pay it, the cost of construction, correct?

A.   Yes.

Q.   And you didn't provide him with an answer to that question.

A.   I believe I did.

Q.   You replied to this letter and you told him the costs of the construction, where you were going to get the money?

A.   Well, part of the money was supposed to be the loan.

Q.   Right.  But the loan wasn't going to cover all of the construction costs, was it?

A.   Not at the reduced amount, no.

Q.   Even at the intended 1.8 amount, and you said it was a little less, the 1.1 wasn't going to cover all of your

construction costs, even if he gave you that?

A.  No, it would have covered for what I needed, right, which was the new building, the 16,000-foot building and the connector building, which is all I needed the financing for.

Q.  And he asked you how are you going to pay off your existing debt.

A.  Yes, there was an existing mortgage on the property.

Q.  And you didn't answer that question either, did you?

A.  So, part of the whole deal sizing was the $1.1 million was going towards paying down M&T Bank, and some additional construction proceeds for the new building and the connector building.  In terms of the existing building, the funds was not supposed to be utilized for that.

Q.  So you were going to use some of the construction loans to pay off your existing loan.

A.  Yes.

Q.  And you were asking for a construction loan, not for a pay-off loan, correct?

A.  I was asking for a construction loan, but part of the terms of the deal is that they require first lien on the property. And since M&T Bank had the first lien since they had the existing mortgage, they would require that that mortgage get paid down first, so that their loan is the only loan on the property.

Q.  You are saying that Global Capital would require that?

Q693MAL2                          Anasta - Cross

A.  Yes.

Q.  And they informed you of that?

A.  Yes.

Q.  So, number 4 he asked you how you are going to -- this is at June 7, after you've been dealing with Mr. Malvasio and GCPF for about three months, he asked you, this is where he asks you for the first time how are you going to pay off the existing loan?

A.  No, it was already part of the consideration for the deal from the beginning.

Q.  Then, finally, he asks you why you haven't been able to supply him with a contract from a signed contract from the -- from your -- from your contractor.  Correct?

A.  Can you go to that page?

Q.  It's number 5.  On the next page.

A.  Can you ask your question again?

Q.  Looking at number 5, he asks you why you cannot provide a contract, signed contract.

THE COURT:  Why don't you quote.  Or let me put it this way, the exhibit speaks for itself, so look at number 5.

Q693MAL2                    Anasta - Cross

A.  I don't believe there's a request for a signed contract.

Q.  Going back to DX 3605, please.

        THE COURT:  Next question.

        MR. TALKIN:  Thank you.  I am going to ask for government exhibit, excuse me, Defense Exhibit 3615.  It is not in evidence.

Q.  Do you see that document?  That's an e-mail between you and Joe Malvasio?

A.  Yes.

Q.  And looking at that, there's some attachments to that that you gave?

A.  Correct.

Q.  The second attachment is projected construction costs?

        THE COURT:  Hang on.  It's not in evidence, counsel,

Q693MAL2                      Anasta - Cross

so don't inquire about the contents, please.

MR. TALKIN:  Your Honor, I'll move that.  I'll move 3615 DX into evidence, please.

THE COURT:  Any objection?

MS. KOSTOPOULOS:  One moment, your Honor.

THE COURT:  Is this just a one page?

MR. TALKIN:  Just the one page right now.

MS. KOSTOPOULOS:  No objection, your Honor.

THE COURT:  Admitted.

(Defendant's Exhibit 3615 received in evidence)

Q.  Looking at that, the second item is projected construction costs?

A.  Yes.

Q.  And I will now ask that DX 3616 be shown to the witness only.

Do you recognize that?  If you can flip through that for him, please.  Do you recognize those documents?

A.  Yes.

Q.  And that packet of documents that's under 3616, that is your projected construction costs, correct?

A.  What I'm seeing are the various payments that I've made for construction up to that point in time.

Q.  And you also have estimates in there as well?

A.  I haven't seen that.

MR. TALKIN:  If we can flip through the back and flip

Q693MAL2                           Anasta - Cross

forward, he'll get to the estimates quicker.

████  ██████████████████████████████████████████

████████████████████████████

        ███████████████████  ██████████████

        ███████████  ███████████  ██████████████████

████████████

        ██████████  ███████████████████████

        ██████████████  ████████████

        ████████████  █████████████████████

        ████████████  █████████████  ████████████████

        ████████████  ████████████████████

Q.   Looking at the documents in DX 3616, are those the
documents that you gave to Mr. Malvasio as your projected
construction costs?

        ████████████████  ████████████

        ████████████  ██████████  ████████████████

A.   What I'm seeing are my check payments for various work that
was done.

        THE COURT:  Did you provide those to Mr. Malvasio as
your estimated projected construction costs?

        THE WITNESS:  Not as my projected construction costs.
As my costs spent to date, showing how much.

        THE COURT:  Okay.

Q.   Costs that you show up to date, did you provide those to
Mr. Malvasio?

Q693MAL2                    Anasta - Cross

A.   Yes, all the check payments.

Q.   Is that a fair and accurate representation, all those documents of the packet that you gave him showing your expenses?

A.   Yes.

        MR. TALKIN:  I'll move that into evidence as 3616.

        (Defendant's Exhibit 3616 received in evidence)

Q.   You never presented to Mr. Malvasio a signed contract for the construction you were doing, correct?

A.   Can you elaborate on that?

Q.   On June 7 you sent Mr. Malvasio documents that include, that were included, included Rondack Construction's liability insurance and their workers' compensation insurance?

A.   I don't fully recall.

Q.   Can you please pull up 3605.  DX 3605 which is in evidence. Does that help you remember?

Q693MAL2                          Anasta - Cross

A.   Yes.

Q.   And the reason you sent those was in response to his request for a signed contract from a licensed and bonded contractor, correct?

███████████████     ████████████

         THE COURT:     ███████████     Is that why you sent those?

         THE WITNESS:   I wouldn't, I don't think there was a request for a signed contract from a contractor.  I think the request was just for an updated budget, and then for it to be provided by a contractor who is bondable and to provide their insurance information, which I provided.

Q.   And the updated budget was the budget for the $1.8 million that you provided.

A.   Yes, that's correct.

█  ████████████████████████████████████████████████

███████████

      ████████████████     ████████████

         ████████████     ████████████

Q.   On May 25 of 2021, you sent Mr. Malvasio two contracts you purported to be for the building of the shed, correct?

A.   Contracts or estimates?

Q.   Contracts.  Purchase orders.

A.   Oh, yes, for the physical steel frame building, yes.

Q.   And you sent those on May 25?

A.   I don't recall the exact timing, but...

Q693MAL2                        Anasta - Cross

Q. And neither of those two documents were actually signed by the contractor, were they?

A. Can you pull up the exhibit?

Q. Sure. DX 3610. It is not in evidence. I'll ask you to look at that. Do you recognize that?

A. Yes.

Q. Is that something you provided to Mr. Malvasio?

A. Yes.

Q. And is that a fair and accurate representation, is that a fair copy of the document that you gave him purporting to be a purchase order for Olympia Steel?

A. Yes, that's correct.

        MR. TALKIN:  I'll move 3610 into evidence, your Honor.

        MS. KOSTOPOULOS:  No objection.

        THE COURT:  Admitted.

        (Defendant's Exhibit 3610 received in evidence)

Q. And that document has a signature on it, but it's -- can it be displayed to the jury?  That document has a signature on it but it does not have -- it has your signature on it, correct?

A. Yes, that's correct.

Q. It does not have the contractor's signature on it.

A. No.

        MR. TALKIN:  And then I don't believe this is in the computer but if I may approach the witness, your Honor?

        THE COURT:  You may.

Q693MAL2                           Anasta - Cross

Q.  Do you recognize that document?

A.  Yes.

Q.  Is that the other document that you sent to Mr. Malvasio on May 25 of 2021?

A.  Yes.

THE COURT:  Do we have an exhibit number for this?

MR. TALKIN:  This is DX 3653.

Q.  Is that a fair and accurate representation of what you sent him?

A.  Yes.

MR. TALKIN:  I'll move that in evidence, your Honor.

THE COURT:  Admitted.

Q.  That document doesn't have a signature from a contractor either.

A.  No, but this is a quote.

Q.  It doesn't have your signature on it either.

A.  No, because it's a quote.

MR. TALKIN:  Can the government please pull up 3581 and 3581-A.  This was in evidence.

Q693MAL2                          Anasta - Cross

Q.  And this was the e-mail and attached to it the letter of intent that you signed?

A.  Yes, that's correct.

Q.  And if we can go to the actual letter which is 3581-A.  You went through certain terms of this on direct examination, do you remember that?

A.  Yes.

Q.  I want to go, if we can go to the second page, please. Going down to number 11, you see there that the letter of intent was going to expire within five days of the day of that letter, correct?

A.  Correct.

Q.  So you knew that action was going to be taken on this letter pretty fast.

A.  That's correct.

Q.  Now going back to the first page of the letter -- excuse me.  The top of the second page.  Paragraph 8 says to you that when you receive a commitment that the fund, the $10,000 would become non-refundable, correct?

A.  Correct.

Q.  And you were aware when you signed this letter?

A.  That's correct, yes.

Q.  So when you received the commitment, you understood that that $10,000 was not refundable.

A.  Agreed, yes.

Q693MAL2                        Anasta - Cross

Q.   When you were asking for refunds, as you discussed on your direct examination, you were asking for this $10,000 back as well?

A.   Yes, that's correct.

Q.   And then if we could go to 3571 and 3571-A which is in evidence.  This is the e-mail where you sent back the signed commitment?

A.   Yes.

Q.   Can we go to 3571-A.  And if we could go to the second page.  Paragraph 8.  Thank you.

     This tells you that we are talking about the commitment fee.  They say in here it says that this fee is payable in the following manner.  $10,000 which is paid, and that's the 10,000 we just talked about, right?

A.   Correct.

Q.   So, when it says which is deemed earned, you didn't have any issue with that because it was deemed earned?

A.   Correct.

Q.   Then it says that due payable upon the issuance of this agreement.  Or let me read it to you.  $11,000 due and payable upon the issuance of this agreement, this fee is non-refundable, right?

A.   Correct.

Q.   And you read this document before you sent that $11,000 to Global Capital.

Q693MAL2                         Anasta - Cross

A.   Yes.

Q.   And you knew that once you paid that amount, that would be non-refundable.

A.   Yes.

Q.   And after you read the document, you signed it and you paid that money, that $11,000.

A.   Yes, I did.

Q.   And you at the end of the day asked for that $11,000 back when you were asking for a refund.

A.   Yes, for sure.

Q.   And then you would pay a $12,000 balance due at closing?

A.   Yes.

Q.   So you were fine with that because that would come out of the closing proceeds when you closed?

A.   Yes.

Q.   If we could go down to the bottom of the document, please. One page up, not the fee, one page up, thank you.

     The second-to-last paragraph above the signature.  The last sentence in that paragraph says "Borrower is responsible for payment of all third-party reports in advance."  Correct?

A.   Yes.

Q.   To your understanding, was the appraisal a third-party

Q693MAL2                      Anasta - Cross

report?

██████████████  ████████████

████████████  █████████████  ████████  █████████

██████████████

A.   Appraisals are considered third-party reports in general, yes.

THE COURT:   Did you understand the reference to third-party reports to include appraisals?

THE WITNESS:   No, not at this time, no.

Q.   You had already provided an appraisal, correct?

A.   Yes.

Q.   And Mr. Malvasio told you that he was going to do his own appraisal?

A.   Not at this time, no.

Q.   You were borrowing $1.1 million, right?

A.   Yes.

Q.   You expected the borrower to engage in a loan review with an appraisal they did not conduct themselves.

A.   They said they would be able to use the appraisal I provided them since it was ordered by M&T.  That's why they set the loan to 1.1 based off of that value from that appraisal being 2.2.

Q.   So, someone from Global Capital said to you that they will accept your appraisal?

A.   Yes.  They said this should suffice.

Q693MAL2                    Anasta - Cross

Q.  They said it should suffice?

A.  Yes.

Q.  They didn't tell you they were going to accept it.  They said it should suffice?

A.  They said it should suffice.

Q.  And then Mr. Malvasio sent you that letter asking you for the appraisal fee.

A.  Yes, after I signed the commitment letter.

Q.  And in that letter, you understand it to be as-is and as-completed?

A.  Correct.

Q.  And you paid for that appraisal?

A.  Yes, I did.

Q.  And you -- paying for that appraisal, you knew that you thought it was an overcharged appraisal?

A.  Yes.

Q.  But you paid it anyway?

A.  Yes.

Q.  And you wanted this deal to close, right?

A.  Of course, yes.

Q.  And as part of that, you needed to satisfy the conditions that are in this document 3571, correct?

A.  The commitment letter?

Q.  All the conditions.

A.  You say the document.  Are you referencing the commitment

Q693MAL2                         Anasta - Cross

letter?

Q.  I'm sorry.  If we can go back up to the top of the document, please.

A.  I just don't know what number it is.

Q.  Sure.  This is 3571-A.  You see that?

A.  Hmm-hmm.

Q.  Then you go down to the next page, please.  You see there is a series of conditions that have to be met before the commitment will follow through, right?

A.  Yes.

Q.  And in there, there's a lender-ordered MAI appraisal?

A.  Yes.

Q.  There is also many other requirements, including legal opinion on all related documents?

A.  Yes.

Q.  Then you see (J) This agreement is partially based on information provided by the proposed borrowers or their representations.  Should any of this information be untrue, and/or misstatements, we shall not be obligated to proceed, and all the moneys received will be deemed earned as partial liquidated damages, right?

A.  Correct.

Q693MAL2                         Anasta - Cross

Q693MAL2

Q693MAL2

Q691MAL3          Anasta - Cross

(Jury present)

████████████  █████████████

████████████████████████   ██████████████

███████████████

██████████████████████████████

█████████████

█████████████████████████████████████

███████████████████████████████

BY MR. TALKIN:

Q.   Good afternoon, Mr. Anasta.

A.   Good afternoon.

Q.   I'm going to refer you back to DX 3605, which is in evidence.

          MR. TALKIN:  If the government would please put that up for me.

Q.   On the third page of that document, do you see in the middle there is an email from May 24th of '21 at 10:49 a.m. and it's from Mr. Malvasio to you?  Do you see that?

A.   Yes.

Q.   And in the second paragraph, you see that he says to you, "With that said, we need you to document to us the complete and accurate cost to complete the build."  You see that, right?

A.   Yes.

Q.   And then he says, "If you've submitted it already, kindly submit it again."  Then he says, "This documentation will

include a contract from a licensed, bonded, and insured contractor." Do you see that?

A. Yes.

Q. So you know that Mr. Malvasio is looking for you to give him a contract for the rebuild from a licensed, insured contractor at this point in time.

A. Yes.

Q. And you did not provide him with a contract from a licensed and bonded, insured contractor, did you?

A. I don't believe I provided that at the time, no.

Q. But you did, on June 7th, provide to him three documents that you had hoped would satisfy this request, correct?

Q. If we could go to the first—go to the first page of DX 3605. There are three attachments, correct?

A. Yes.

Q. You sent those attachments to Mr. Malvasio.

A. Correct.

Q. And the purpose of you sending those to satisfy his request of having a contract from a licensed broker—a licensed contractor.

A. Well, it's to show that—that the budget was from a contractor that would suffice what he was looking for.

Q. So in other words, he asked you for a contract from a

Q691MAL3          Anasta - Cross

contractor, and you sent him a budget from a contractor; is that right?

A. Yes, that's correct. Because you wouldn't——

Q. And——I'm sorry. Go ahead and finish.

A. Yeah, you wouldn't be in contract until you're like closer to actually executing and moving forward with the deal.

Q. Did you explain that to Mr. Malvasio, in that email?

A. Not in the email, no.

Q. And the budget that you sent to him, and that is seen——

MR. TALKIN: If we could pull up DX 3608, please.

Q. Do you recognize that?

A. Yes, I do.

Q. Is that a fair and accurate representation of the budget that you sent to Mr. Malvasio?

A. Yes.

MR. TALKIN: Your Honor, I'll ask that DX 3608 be moved into evidence.

MS. KOSTOPOULOS: No objection.

THE COURT: Admitted.

(Defendant's Exhibit 3608 received in evidence)

Q. Now looking at DX 3608, that budget, in the upper right corner——and I know it's hard to see 'cause it's dark, but if we could highlight the——excuse me——the upper left corner. Thank you.

That budget is from 2/26/19, correct?

A.   Correct.

Q.   So that was over two years prior to when—well, almost two and a half years prior to when you were sending it to Mr. Malvasio.

A.   That is correct.

Q.   And again, we can agree that that's not a contract.

A.   That's correct.

MR. TALKIN:  Oh, can that be published to the jury? I'm sorry if it isn't.

Q.   We can agree that's not a contract.

A.   Yes, correct.

Q.   And we also can agree that that's not signed by anybody.

A.   No.  This is just a budget.

Q.   And we can agree it's just a budget.

A.   That is correct.

Q.   And you're asking Mr. Malvasio to give you $1.1 million for this loan.

A.   That is correct.

Q.   And your expectation is that giving him a budget from February 26 of 2019 will give him enough satisfaction as to costs that he will give you that $1.1 million.

████████████  ████████

████████  ██████████

A.   That's not the only cost, right?  So the other—

Q.   My question isn't whether this is the only cost.  My

question is:  The reason you gave it to him was so that you could satisfy his request he was making about a contractor so that he would give you $1.1 million.

A.  Part of the reason, yes.

Q.  Okay.  And you did not go out and even get an estimate for the entire job you had pending at that point in time, correct?

A.  No, I did.  I think I provided multiple estimates to him.

Q.  But you say that Mr. —— that Rondack is the individuals doing the construction, correct?

A.  Yes.  So——

Q.  So yes, that's the one.  Did you provide an estimate from Mr. —— from Rondack's company to him telling him exactly what the cost would be?

A.  Yes.

Q.  And you did that in writing.

A.  You mean the——

Q.  You emailed it to him?

A.  Yes.

Q.  And do you remember when you sent that?

A.  I think I shared it a couple times, along with other estimates as well.

Q.  You shared?  Just so we're clear, when you say you shared it, you mean you emailed it to him.

A.  Yes, I emailed it to him, along with the other estimates as well.

Q691MAL3          Anasta - Cross

Q.  So you're saying that when we—when you sent a bunch, we were talking earlier today before lunch.  When we were talking about estimates, you're talking about in that batch of estimates that we were looking at before?

A.  What we were looking at before was the payments that I had put forward.

████  ████████████████████████████████████████████████████

████████████████████████████████

████████████████  ████████████

████████████  ██████████████

          MR. TALKIN:  Can we please pull up Defense Exhibit 3615.

          We talked about this email.  Your Honor, I believe this document is in evidence.  If it's not, just to save time, I will move it into evidence to be sure.  It's DX 3615.

Q.  This is an email between you and Mr. Malvasio?

          THE COURT:  It's in evidence.

          MR. TALKIN:  Thank you, your Honor.

A.  Yes, correct.

Q.  There's a lot of items attached to that document, correct?

A.  Yes.

Q.  And in this email, is this where you provided Mr. Malvasio with the contract from Rondack?

A.  I don't believe so.

Q.  But in this document—we talked about it yesterday—you did

provide, you said, some checks, and there was some estimates that you provided as well; is that right?

A.  You said yesterday?

Q.  Sorry.  It seems like yesterday.  Earlier today.

A.  Yes.  So there's the document, amount spent to date; that's the checks that we looked at.

MR. TALKIN:  I apologize for doing this, but DX—if DX 3617, which I believe is in evidence, can be shown to the witness.

THE COURT:  I don't think this is in evidence, counsel.

MR. TALKIN:  I'll ask that it be shown to the witness, please, then.  Thank you.

THE WITNESS:  Yes.  The first document I'm looking at shows a check.

MR. TALKIN:  Okay.  If you could do me a favor and—I'm going to ask the government to do me a favor and have you leaf through that by looking at it.  I think it would be better if we start from the back because the documents I'm interested in talking to you about are in the back.  So if the government can do that, I would greatly appreciate it.

BY MR. TALKIN:

Q.  Let me know when you've had a chance to see it all.

A.  It's still going through.

Okay.  Yeah, it's back to the front.

Q.   Thanks.  Can we agree that what you looked at is—the packet that's all put together in DX 3617 is a packet of information that you supplied to Mr. Malvasio?

A.   Yes.

Q.   And you supplied that on April 2nd of 2021?

A.   I believe so.

Q.   And you supplied that for the purposes of you obtaining a loan from him?

A.   Yes.

Q.   And you provided it—it is some checks, but you also provided estimates in there; is that correct?

A.   That's correct.

        MR. TALKIN:  Your Honor, I'll ask to move in DX 3617 into evidence.

        MS. KOSTOPOULOS:  No objection.

        THE COURT:  Admitted.

        (Defendant's Exhibit 3617 received in evidence)

        MR. TALKIN:  Okay.  If we can start in this exhibit, it's the Bates—it's the eighth page of the document, the Bates stamp ends 3092.

        Can this be published to the jury, your Honor?

        THE COURT:  It is.

BY MR. TALKIN:

Q.   Looking at this document, this is an estimate from an alarm company?

A.  Well, they do more than—than just that, but yeah, they also provide alarms.

Q.  It's an estimate for alarms and other services.

A.  Correct.

Q.  The next document, that's—that is a—an estimate from a masonry, landscaping?

A.  Yes.

Q.  And then the next document is from a construction company, from—I'll spell it—S-C-H-A-I-B-L-E Construction?

A.  Yes, correct.

Q.  So that's an estimate from a construction company?

A.  Correct.

Q.  Next document is a quote from an asphalt services company?

A.  Yes.

Q.  And I believe we may have seen this in another form already today, but here is a quote from Olympia Steel regarding the steel for the building; is that correct?  I'm sorry.

A.  Yes, that's correct.

Q.  And then you have another estimate from something called Building Outlet.  Do you see that?

A.  Yes.

Q.  And then there's another estimate from the alarm company called Comprehensive; that's the next two pages?

A.  Correct.

Q691MAL3          Anasta - Cross

Q.   You have numerous others added to that estimate, correct?

A.   That's correct.

Q.   So this is a packet that included not only checks about which you had paid but estimates for the cost of the construction, correct?

A.   Correct.

Q.   Nowhere in 3617 is there an estimate from Rondack, is there?

A.   No, at the time there wasn't that included.

Q.   You didn't include it, but you had the—you at least had this budget from Rondack as far back as 2019, February of 2019.

A.   Correct, yes.

Q.   You prevented—you provided extensive documentation on April 2nd to Mr. Malvasio, right?

A.   That is correct.

Q691MAL3          Anasta - Cross

Q.  You had been dealing with Rondack for well before April 2nd of 2021, correct?

A.  That's correct.

Q.  And when you provided the extensive documentation, you also provided quotes and estimates for construction.

A.  Yes.

Q.  And in those quotes and estimates for construction, there was nothing from the Rondack insurance company—excuse me—construction company.

A.  That's correct.

Q.  Then fast forward to June 7th of 2021.  In response to Mr. Malvasio's request for a contract, from a contractor, you sent information about Rondack, information from Rondack Construction, correct?

A.  Correct.

Q.  And that, what you sent, is 3608, correct?

A.  I don't——

Q.  I'm sorry.  Is the budget.

        MR. TALKIN:  Can we put up 3608 for the witness, please.  I'm sorry.

Q.  Can you see it now?  I'm sorry.  3608.

A.  Yes.

Q.  So when you provided that document, again, we can agree that's not a contract?

A.  Correct.

Q691MAL3          Anasta - Cross

Q.  And then you provided it along with some insurance documents from Rondack as well.

A.  That's correct.

Q.  Those insurance documents were up to date, correct?

A.  I believe so.

Q.  Let's take a look at——

MR. TALKIN:  Can we please put up for the witness only DX 3606.

Q.  Do you recognize that?

A.  Yes, I do.

Q.  And is that a certificate that you provided to Mr. Malvasio in that same email on June 7th of 2021?

A.  Yes.

MR. TALKIN:  And I'll ask that that be admitted into evidence, your Honor, DX 3606.

MS. KOSTOPOULOS:  No objection.

THE COURT:  Admitted.

(Defendant's Exhibit 3606 received in evidence)

MR. TALKIN:  And can we display that for the jury, please.

BY MR. TALKIN:

Q.  On the upper right corner, you see a date there?

A.  Yes.

Q.  June 4th of 2021.

A.  Correct.

Q691MAL3          Anasta - Cross

Q.   That's about from three days before you sent the email.

A.   Yes.

          MR. TALKIN:  If we could go to—and just for the witness only—3607, please.  DX 3607.

Q.   Is that another document you provided Mr. Malvasio as an attachment to the June 7th email?

A.   Yes.

          MR. TALKIN:  I'll offer that into evidence as well, your Honor, DX 3607.

          MS. KOSTOPOULOS:  No objection.

          THE COURT:  Admitted.

          (Defendant's Exhibit 3607 received in evidence)

          MR. TALKIN:  If it could be displayed for the jury, please.

BY MR. TALKIN:

Q.   Is that another insurance document, this one for workers' compensation; is that right?

A.   Correct.

Q.   And the date on that is also June 4th of 2021?

A.   Correct.

Q691MAL3          Anasta - Cross

[BLACK REDACTION BAR]

Q. In anything that I've shown you here today, you have not provided a contract from Rondack Construction Company, have you?

A. Not at the time.

MR. TALKIN: If we could pull up DX 3603, please.

Q. You're looking at that. That's the same letter that you—that's just a different copy of the letter you received from the government—I mean, excuse me—that the government put into evidence and you received on June 7, 2021, from Mr. Malvasio; is that right?

A. Correct.

MR. TALKIN: Your Honor, I move that into evidence as DX 3603.

THE COURT: This is the same letter?

MR. TALKIN: It's the same letter.

THE COURT: So let's not do that and cause confusion. It's already in evidence. Let's use the one that's in evidence, please.

MR. TALKIN: That would be 3798. And that would be 3798A. I just want to go to the first paragraph.

BY MR. TALKIN:

Q. Mr. Malvasio, at the beginning of that letter, in the first paragraph, informs you that he did receive the email with the Rondack Construction liability insurance and a spreadsheet with

the construction budget from early 2019.  You see that?  He

acknowledges you gave it to him?

A.   Yes.

Q.   But then he proceeds to tell you that that's not enough,

right?

A.   Yeah, that's what he states.

Q.   Right.  And he says, we required—excuse me.  "We have

requested on several occasions a detailed contract from a

licensed, bonded, and insured contractor," right?

A.   Correct.

Q.   And you had not, before June 7, 2021, provided that

contract, a contract not just from Rondack, or any contractor

that's detailed, from a licensed and bonded contractor.

A.   Can you elaborate on that.  That was a bit long.

Q.   Sure.  As Mr. Malvasio asked you this question, or said to

you, "We have requested on several occasions a detailed

contract from a licensed, bonded, and insured contractor," you

see that, right?

A.   Correct.

Q.   And in response to that, you have not provided what he

asked for, which is a detailed contract from a licensed,

bonded, and insured contractor.

A.   Correct.

          MR. TALKIN:  If the government could please pull up

3581A.  That's the letter of intent.

Q691MAL3           Anasta - Cross

Q.   When you were trying——when you wanted to borrow $1.1 million from Global Capital——Global Capital was the lender, correct?

A.   Correct.

Q.   M&T was not the lender.

A.   That is correct.

Q.   And as a matter of fact, if you go to paragraph 1 of the LOI, which is 3581A, it clearly states that, "Global Capital Partners Fund LLC, hereby referred to as the lender, will provide financing."  Do you see that?

A.   Correct.

Q.   So they are the lender who's going to give you $1.1 million.

A.   Yes.

          MR. TALKIN:  If we could go to Government Exhibit 3571A, please.  To page 2.  And in the stipulations section, can you highlight B or enlarge B.

Q.   One of the stipulations for you to receive that $1.1 million would be "receipt and review of a Lender-ordered MAI appraisal showing satisfactory value."  You see that?

A.   Correct.

Q.   You see that "Lender" is capitalized.

A.   Yes.

Q.   And that's referring to Global Capital as the lender; isn't that correct?

A.  I believe so.

Q.  M&T Bank is not Global Capital; we can agree on that, right?

A.  For sure, yes.

Q.  You reviewed this document before you signed it?

A.  Yes.

Q.  Carefully, I assume?

A.  Yes.

Q.  And then you signed it.

A.  Yes.

Q.  And then after that you sent in the $11,000.

A.  I believe so.

Q.  Going back to B, the second sentence says, "showing satisfactory value," correct?

A.  Correct.

Q.  So you understand that there has to be a Lender—with a capital L—ordered MAI showing satisfactory value; you understood that when you signed the document, right?

A.  Yes, but also nature to—

Q.  You'll be asked questions later.  Just answer my questions, please.

A.  Yes.

MR. TALKIN:  On the June 7th letter, which is 3798, if we could display that, A.

Q.  At the very end, Mr. Malvasio, the last paragraph—I'm sorry.  Page 2.  The last paragraph, Mr. Malvasio says to you, "If you wish to proceed with the loan request, you need to get your documentation in order."  You see that, right?

A.  Yes, I do.

MR. TALKIN:  One second, your Honor.  I believe I'm done.

Q691MAL3          Anasta - Cross

Q.  You talked about an appraisal that you had sent to Mr. Malvasio and Global Capital?  Do you remember that?

A.  Yes.

Q.  In that appraisal you sent that same budget from 2019 from Rondack?

A.  Correct.

████ ███████████████████████████████████████████████
████████████████████████████████████

     ███████████████  ██████████

     ████████████  ████████████

          MR. TALKIN:  Nothing further.  Thank you.

          THE COURT:  All right.  Ms. Jaroslaw?

CROSS EXAMINATION

BY MS. JAROSLAW:

Q.  Good afternoon, Mr. Anasta.

A.  Good afternoon.

████ ██████████████████████████████████████████████
████████████████████████████████████████  ████████████
████████████████████████████████████████████████████
████████████████

     ██████████████  ████████████

████ ████████████████████████████████

     ████████████  ████████████████████████████

████████████████████████████████████

          ████████████  ████

I'd like to start with a series of emails, DX 3656, not yet in evidence. If we could have that up on the screen for the witness and the lawyers, please.

BY MS. JAROSLAW:

Q.   And when it's up on the screen, I'm going to ask you actually to take a look starting from the last page forward, because very often when you print out emails, that's how it goes.

So that's the last page. Third page. The second page. And the first page.

Mr. Anasta, is that an email string between you and Gregg and Mr. Caswell in or around September 2020?

A.   I believe so.

MS. JAROSLAW:  At this time I'd offer DX 3656.

THE COURT:  ████████ ███████████████████

████████████      Admitted.

(Defendant's Exhibit 3656 received in evidence)

BY MS. JAROSLAW:

Q.   Mr. Anasta, if you would look at the last page, you'll see that it's at the end of an email on the third to last page, with the beginning of an email from Richard Caswell to you on September 1, 2020, at 10:57 a.m. Let's go to the page before

that so you can see the date and time.

You'll see towards three quarters towards the bottom, you'll see September 1, 2020, 10:57.

Do you know who Richard Caswell is?

A.  No, I do not.

Q.  Have you spoken to him before?

A.  I don't believe so.

Q.  Have you emailed with him at Global Capital Partners?

A.  I definitely recall emailing Global Capital, but in terms of Richard Caswell in particular, I'm not remembering that.

Q.  Is it your testimony that this is not an email that you received from Mr. Caswell on September 1, 2020?

A.  I don't remember these emails, but as far as what you're presenting, this does seem to be an email thread.

Q.  Well, let's look at the page before that.  And there, you'll see—oh, I'm sorry.  Back to page 3.

About a quarter of the way down, you'll see September 1, 2020, at 1:08 p.m.  It's a couple of hours from Mr. Caswell's email.  There's an email that's from anastascenter@gmail.com that begins, "Hi, Richard, below I have replies to your questions."  Do you see that?

A.  Yes.

Q.  Do you deny you wrote that email?

Q691MAL3            Anasta - Cross

A.   I don't deny it, but I just don't recall the email.

Q.   Take a look at the enumerated questions and answers and then what's written beneath No. 5, and let me know if that refreshes your recollection of questions that you answered for Global Capital back in September of 2020.

A.   To be honest with you, it doesn't, like, refresh my memory of that.

Q.   So the answers to questions 1 through 5, did it happen to be accurate to the deal you were seeking?

A.   Which questions?

Q.   Questions 1-5, there are questions:  Are you a mortgage consultant, broker or principal?  What is the deal type?  What is the geographic area?  What is the finance amount?  What is the collateral?  And then you'll see there answers below that. If you look at those, did those happen to match up with your property?

A.   Yes.

Q.   Okay.  Do you admit that you wrote that email on September 1, 2020, at 1:08?

A.   I don't remember, but if this is the email, this is the email.

███████  ████████

Q.  I'll move on to the page before that.

Can you just take a moment to read that, keeping in mind that what's at the bottom of the page comes before what's at the top of the page.

A.  I've read the email.

Q.  Does that refresh your recollection that you set up a call with Global Capital Partners in and around September of 2020?

A.  No, this does not reflect—this does not refresh my recollection.

Q.  When do you remember reaching out to Global Capital Partners?

A.  I remember reaching out to them in late 2020, but I don't remember, like, the exact, like, month or time frame.  I just remember that it was later in the year.

Q.  But it's your testimony it was not September 2020; is that correct?

A.  No, that's not my testimony.  It could have been, right.  I just knew that it was, like, usually after the summertime.

Q.  Okay.  Let's turn now to what's marked for identification as DX 3655.

And this document is seven pages, and I'd like you to take a look at it.

MS. JAROSLAW:  And if you wouldn't mind, Sara, we'll start with page 7, so Mr. Anasta can review it from the

beginning.

Q.  And let me know when you've had a chance to finish it.

THE COURT:  Are you ready?

THE WITNESS:  Yes.

Q.  Mr. Anasta, I'd like you—first of all, is this exhibit, 3655, a seven-page email string between yourself, my client Gregg, and someone by the name of Mr. Caswell?

A.  I believe so.

MS. JAROSLAW:  I'd like to offer 3655 in evidence.

████████████████    ████████████████

THE COURT:  ████████    Admitted.

**(Defendant's Exhibit 3655 received in evidence)**

Q.  Mr. Anasta, please turn to page 2 of this document, and I'd like to direct your attention to the bottom third of the document.

Do you see there's an email there, September 5, 2020, at 8:08 a.m.?  You write, "Attached is the further application. I'm also attaching the approved plan site as well."  Do you see that?

A.  Yes.

Q.  And is that a response to the email below, September 3, 2020, at 1:22 p.m., Gregg Pierce writing, Matel, at the bottom of the page, and in the top of page 3?

Matel, page 3.  "Matel, can you see attached GCPF application naming the sources and uses.  Please advise if you

have any questions."

So to rephrase that, is your September 5, 2020, morning email to Gregg in response to his September 3rd email at the bottom of page 2 and the top of page 3?

A.  I believe so, but I don't fully recall.

Q.  Now you'll see also, further up on page 2, September 8, 2020, Gregg wrote, "We still have the same issue.  The current asset value is 500,000 and debt is 230,000.  You mentioned there was another asset we could also secure.  Best regards, Gregg Pierce."  Do you see that?

A.  Yes.

Q.  And then was this your response on September 9, 2020, at 3:07:  "Hi, Gregg, we won't be able to put up any other property at this time.  If it is a matter of LTV, we are able to be flexible to make this happen.  We just need to know what threshold you are comfortable with.  We do have additional support for the construction if need be, Matel."  That was your response on September 9th, correct?

A.  Correct.

Q.  Now when you filled out that application as you were—which is on page 2 at the bottom.  Attached is the filled out application.  In September of 2020, did you pay an application fee at that time?

A.  No.

Q.  Okay.  And if you'd look on page 1, you'll see on

September 9th, Gregg Pierce responds to you, "Sorry, but our minimum is a million and we can't start at the 200,000 level. Best regards."  You see that, don't you?

A.  Yes.

Q.  And what was your response to Gregg, copying in Mr. Caswell?

A.  Are you saying the sentence that starts with, "I understand that"?

Q.  Yes.  Well, actually, you reply, says, "Attached is the updated appraisal.  I believe we can get 150,000 to add coverage to take out the existing mortgage."  You wrote that, correct?

A.  Yeah, but I think there's—there was a response before that.

Q.  Right.  "I understand.  I thought we were agreed at 1.1 million.  At what level can you start?"  And then you gave it an updated appraisal, correct?

A.  Yes.

Q.  Okay.  I'd like to show you Defense Exhibit 3654.  And please take a look at page 1 and page 2.  They're not government.  Defense.  DX 3654.

        And it's page 1.  Take your time to look at that, and then there's just a little bit on page 2.

        Okay.  Is that an email on or around September 29, 2020, between yourself, Gregg, with Mr. Caswell also on that

string?

A.   I believe so.

MS. JAROSLAW:  And at this time I'd like to offer 3654 in evidence.

MS. KOSTOPOULOS:  No objection.

THE COURT:  Admitted.

(Defendant's Exhibit 3654 received in evidence)

Q.   Focusing your attention to 3654.  In that correspondence, a call is being set up, and then Gregg Pierce responds to the setup of the call; is that correct?

A.   Yeah.  It seems to be him who responded.

Q.   Right.  And so it says——Richard Charles says he'll be available for a call Tuesday, September 29th, at 1 p.m., and you respond, "Yes, I will be available at that time."  You see that, correct?

A.   Yes.

Q.   And then do you see at the top Mr. Pierce replies, "Hi, have you put together the funds necessary to get the mortgage paid down or paid off?"

Do you see that?

A.   Yes.

Q.   And at that time on September 20, 2020, have you paid off that mortgage that you got from M&T Bank?

A.   No.

Q.   And it's a fact, isn't it, that you didn't have any

Q691MAL3          Anasta - Cross

correspondence with Global Capital Partners again until February in 2021; is that right?

A.   I believe so.

Q.   And I believe you testified that the reason was, understandably, you were looking for better rates and better terms, correct?

A.   Correct.

Q.   And of course this was, at the end of 2020, the beginning of 2021, before vaccines had been widely rolled out for COVID, correct?

A.   I'm not sure when vaccines were rolled out.

Q.   You had trouble finding, securing financing elsewhere; is that right?

A.   Yes, that's correct.

Q.   Now I'd like to show you DX—Defense Exhibit 3657.

You can look closely at the last page.  There's really nothing on it but a signature line, and then spend time on the first page.

Is this correspondence between you and someone at Global Capital Partners, Richard Charles, on February 2, 2021, and February 13, 2021?

A.  I believe so.

Q.  And at the top of the email on Saturday, February 13, 2021, that's when you tell an employee of Global Capital Partners, "I'm interested in doing this deal," correct?

THE COURT:  Counsel, it's not in evidence.

MS. JAROSLAW:  Oh, thank you, your Honor.  I would offer 3657 in evidence.

MS. KOSTOPOULOS:  No objection.

THE COURT:  Admitted.

(Defendant's Exhibit 3657 received in evidence)

BY MS. JAROSLAW:

Q.  Okay.  Looking now at that exhibit, do you see on February 2, 2021, Mr. Charles of Global Capital Partners Fund asks you if you're still interested in a loan, "because I hadn't heard from you in a while"?  Do you see that?

A.  Yes, I see his email.

Q.  Okay.  And that's your response, is it not, at the top of the page?

A.  Yes, I believe so.

Q.  And you expressed that you are interested in pursuing this deal, correct?

A.  Correct.

Q.  Okay.  And the final exhibit here, Exhibit 3659.  This exhibit has three pages.  I'll ask you to take a look before you identify it.

And again, if you wish to read from the last page to the first, that's certainly more sequential.  Let me know when you've had enough time.

A.  Yes, I've read it.

Q.  Okay.  Mr. Anasta, is Exhibit 3659 email correspondence among yourselves, Gregg, and Mr. Charles.

A.  Yes, it seems to be.

███ ████████████████████████████████████████████

████████  ████████████

████████████  ████████

████████  ██████████  ████████████

          MS. JAROSLAW:  Sorry.  Offer in evidence, your Honor.

          MS. KOSTOPOULOS:  No objection.

          THE COURT:  Admitted.  Now you may proceed.

          (Defendant's Exhibit 3659 received in evidence)

BY MS. JAROSLAW:

Q.  Do you see on the first page there, you write, on March 15th, "Yes, we are still interested.  I will touch base later this week once I confirm with my business partner.  Thank you."  Do you see that?

A.  Yes.

Q.  Was your business partner your brother?

A.  Yes, that's correct.

Q.  Okay.  Did you have any other business partners?

A.  Not at the time, no.

Q691MAL3            Anasta - Cross

Q. Okay. And then you see Gregg's response later that day, "Yes, we spoke earlier this morning. Let us know when you're ready to start the loan process." You see that, correct?

A. Correct.

Q. Okay. I'd like to ask you a few questions about your testimony before.

You said that you initially had a $250,000 mortgage from M&T Bank on the property that was partially paid down but still had a significant balance. That was your testimony, right?

A. Yes.

Q. And when did you obtain the $250,000 mortgage on that property?

A. In 2019.

Q. To date have you satisfied the $250,000 mortgage?

A. As in is it still—

Q.   Do you still owe money on it?

A.   Yes.

Q.   How much is the balance on that?

A.   Only approximately like $200,000 now.  Might be slightly less.

Q.   Is it a 30-year loan?

A.   20-year mortgage.

Q.   Now Mr. Talkin showed you Defense Exhibit 3617.  You may remember it was the exhibit with estimates from a masonry company, an alarm company, landscaping, construction, asphalt, steel, electrical heating, as well as a number of checks.  Do you recall that exhibit?

A.   Yes.

Q.   Okay.  Each of those estimates was dated between August 2019 and December 2019, correct?

A.   I believe so, but could you pull up the exhibit.

        MS. JAROSLAW:  Let's pull up the exhibit, 3617 in evidence.

        THE COURT:  3617.

        MS. JAROSLAW:  And we'll go through each page.

        Just a couple seconds on each page.  Enough to find the date.  A little slower so you can see the dates.

        THE WITNESS:  Yeah, I'm seeing some dates with 2018, also 2020.

        MS. JAROSLAW:  Let's continue scrolling through.

Q691MAL3          Anasta - Cross

And the date on that is at the bottom.

THE COURT:  All right.  Can we ask a question?

MS. JAROSLAW:  Yes, your Honor.

BY MS. JAROSLAW:

Q.  Looking at the estimates that have been scrolling on the screen, does that refresh your recollection that the majority of estimates that you provided were from 2019?

A.  Yes, correct.



Q.  Did you ever provide Global with updated estimates to account for costs in 2021?

A.  So not to Global, but when the appraiser reached out and asked for updated quotes and estimates, I provided her that information.

Q.  What information did you provide her with?

Q691MAL3          Anasta - Cross

A.   So I had gone back and reached out to the individual people that had provided the initial quotes, and asked them to provide updated quotes or if they were willing to stick to their original quotes, and they provided that; and then also any updated permits or anything that was provided by the town.

Q.   Did you get all new estimates?

A.   Most of estimates, they—the contractors said they were sticking to the price that they had provided.

Q.   And did you provide revised statements from these contractors to that effect to Global Capital Partners?

A.   I don't recall if I did, but the request was specifically coming from the appraiser to finish the report, so at that point in time I was dealing with her and providing her with all the information, and she stated that I provided everything that she needed.

Q.   So you have some experience with appraisals, correct?

A.   Yes.

Q691MAL3          Anasta - Cross

Q.  You wanted this loan very much, correct?

A.  Yes.

Q.  Do you have those new estimates?

A.  Well, it's past now so I have newer estimates.

Q.  And it's more—those new estimates are more expensive, correct?

A.  For some of the items, yes.

Q.  I'd like to talk now about 100 Town Hall Drive.  Do you recognize that address?

A.  Yes, that's—

Q.  That was the property, correct?

A.  Yes.

Q.  Okay.  It's about 1.6 acres; is that right?

A.  That's correct.

Q.  And right now it's leased in part by—what is that society called, the—excuse me one second.  By The Moose Lodge?

A.  It's not leased by The Moose Lodge right now.

Q. When did it stop being leased by The Moose Lodge?

A. Ooh, before I purchased it. So probably before 2019.

Q. Did you get a replacement tenant?

A. No. The idea was to redevelop the property and for my related entities to technically lease it but run the operations. That was part of the redevelopment plan.

Q. And your father, Pierre Anasta, he owned that property prior to you and your brother buying it, correct?

A. Yes. Technically it was under my mother's—yeah, under mother's name, my mother's name.

Q. What was her name?

A. Marie.

MS. JAROSLAW:  No further questions.



CROSS EXAMINATION

BY MS. JAROSLAW:

Q.  Good morning, Mr. Hescock.

A.  Good morning.

Q.  You met with the FBI several times since 2024, correct?

A.  Yes.

Q.  And you met with the government prosecutors several times

between 2024 and today, correct?

A.  Yes.

Q.  And you told the FBI and the prosecutors that you felt your work was unethical and dishonest, correct?

A.  Yes.

Q.  And yet you continued to do it for several years; is that right?

A.  I did it for approximately one year.

Q.  Well, the work you did with Search Manipulators—it's in the name—you were manipulating searches, correct?

A.  We were—are you asking about my work with Global Capital or in general?

Q.  In general.

A.  In general, yeah, my job was to boost search rankings for companies.

Q.  And in fact, after you spoke to the FBI for the first time, you decided to stop working with Search Manipulators; am I right?

A.  Yes.

Q.  Now you testified today that you knew that Gregg Pierce and Gregg Marcus are one and the same, correct?

A.  My understanding at that time was that they were the same person, yes.

Q.  Okay.  Now when—just give me one moment.

In May 2024, you were asked by the FBI about Gregg

Marcus, correct?

A.  I remember speaking to the FBI.  I don't remember the exact date.

Q.  Okay.  Initially you told the FBI that you did not know if Gregg Marcus and Gregg Pierce were the same person; that's what you told them, correct?

A.  I don't recall.

MS. JAROSLAW:  Okay.  I'd like to show the witness 3518-001, page 2, not in evidence, for the witness and counsel only.

And on page 2 in particular.  Could we make that bigger on the screen.

Q.  Please read page 2, and tell us whether that refreshes your recollection that you told the FBI that you did not know that they were the same person.

THE COURT:  Mr. Hescock, what you're being asked to do is just look at this, read it to yourself, and when you're done reading it to yourself, just look up, and Ms. Jaroslaw will repeat that question.

A.  Sorry.  It was page 2?

Q.  Okay.  And let's turn back to page 1.

A.  Sorry.  I didn't finish page 2.

Q.  Sure.

THE COURT:  Ms. Jaroslaw, could you maybe direct the witness's attention to—

Q6A1MAL2                        Hescock - Cross

MS. JAROSLAW:  Yes, I will do that, your Honor.

I'll move on to January of 2026.

THE COURT:  Let's take the document down then, please.

Q.  In January 2026——

THE COURT:  Can you move the microphone back.  Thank you.

MS. JAROSLAW:  Oh.

THE COURT:  Thank you.

MS. JAROSLAW:  Sorry.

Q.  In your January 2026 interview with the prosecutors, you were asked again about whether Marcus was a different person or another name that Pierce would go by; is that correct?

A.  I believe so.

Q.  But in your testimony today you now said that you know Gregg Pierce and Gregg Marcus were the same person, correct?

A.  Yes.

Q.  Do you know how many times you've met with the FBI or the government prosecutors?

A.  No.

Q.  Did you meet with them in 2024?

A.  I don't recall.

MS. JAROSLAW:  Let's put back 3500——3518-001, one more time, page 1.

Q.  And I'm going to ask you to look at the date on the top right.

Do you see that date, May 8, 2024?

A.   Yeah, May 9th.

Q.   Did you meet with the FBI over the course of two days when they first approached you?

A.   I had phone calls with the FBI, yes.

Q.   And that was over two days?

A.   I don't recall.

Q.   And you also spoke to the FBI in January of 2026; is that correct?

A.   I'm sorry.  I don't recall all the dates.

Q.   Do you recall speaking with them several months ago?

A.   That sounds about right, yes.

Q. And did you speak to them on May 22nd; that would be the Friday before Memorial Day?

A. I'm sorry. I don't——I've moved, I've done a lot of things the last two months; a lot of dates I can't recall.

Q. Isn't it the fact that you spoke with them on May 22nd, May 26th, May 27th, June 1st, June 4th, June 7th, and June 8th?

A. I don't know for sure all the dates. I have talked to them multiple times.

Q. Would you say that a dozen is a fair approximation for how many times you've met with the government?

A. Over what time period?

Q. Ever, from the first contact in May 2024.

A. Maybe not that much, but it's been multiple times, yes.

Q. And the pace of interviews has picked up since the end of May this year, correct?

A. Yes.

Q. I'd like to show you Government Exhibit in evidence JH112.

And while that comes up, Mr. Hescock, do you recall saying that it was always Gregg Pierce who approved the content, not Joe Malvasio?

A. Do I recall saying that?

Q. In your testimony just a short time ago.

A. Yes.

Q.   What you did was unethical, correct?

A.   I feel that it was unethical, yes.

Q.   Right.  And while you were doing it, while you were employed by Search Manipulators, did you think you were doing anything illegal?

A.   At the time I did not.

Q.   Did your opinion of that change?

A.   Of what——

Q.   Whether you were doing something illegal.

A.   I——I don't know if it was illegal or not.

Q.   You requested a nonprosecution agreement from the government; is that correct?

A.   It was offered to me.

Q.   And it was offered to you last week, in fact; is that right?

A.   Yes.

Q.   And you signed it this past Sunday, June 7th, correct?

A.   It was in the last week.  That sounds right.

Q.   I'd like you to take a look at what is 3518-13.

           MS. JAROSLAW:  And this is just for the witness and counsel.

Q.   And that's the first page.  And then tell us when you're ready for the second and third page.

A.   Do you want me to read it or just——

Q.   Look at the second and the third page.  I'm going to ask if it looks familiar.

A.   Okay.  Go ahead.

           Okay.

Q.   Next page.

A.   Yes, that looks familiar.

Q.   Okay.  Is that your nonprosecution agreement?

A.   It looks like it, yes.

Q.   And is that your signature above the line that says Jason Hescock?

A.   That's a digital signature that I did, yes.

Q.   Okay.  Was that on something like Docusign?

A.   On a pdf.

Q.   Okay.  But you had read the document prior to putting on your electronic signature, correct?

A.   Yes.

MS. JAROSLAW:  I offer 3518-13 into evidence.

THE COURT:  Any objection?

MR. GALLAGHER:  No objection.

THE COURT:  Admitted.

(Government's Exhibit 3518-13 received in evidence)

MS. JAROSLAW:  I'd like to start with the first page and publish it to the jury.

THE COURT:  You may.

BY MS. JAROSLAW:

Q.  I'd like to highlight part of paragraph 1 and direct your attention to that.

This says, "On the understanding specified below, the Office of the United States Attorney for the Southern District of New York ('this Office') will not criminally prosecute Jason Hescock for any crimes except tax violations, if any, as to which this Office cannot and does not make any agreement——"

THE COURT:  Slow down, please.

Q.  "——related to the following."  And then it says, "Any and all actions taken in connection with his work for Global Capital Partners Fund during his employment at Search Manipulator."

Had you read that before you signed the document?

A.  Yes.

Q.  Did you believe that the government could potentially prosecute you for the actions you took at Search Manipulator?

A.  Yes.

Q.  And explain what your criminal exposure was, in your view.

A.  Sorry.  I don't understand.

Q.  Well, did the government suggest to you that you might have aided and abetted the wire fraud that's at issue in this trial?

A.  They never mentioned anything about wire fraud.  I was only asked about my work at Search Manipulator.

Q.  Did they ask you that—did they tell you that you might have aiding and abetting liability, criminal liability?

A.  I don't recall those phrases being used, no.

Q.  Well, from your point of view, why did you need a nonprosecution agreement for whatever you did at Search Manipulator?

MR. GALLAGHER:  Objection.

THE COURT:  Let me interrupt for a moment.  The objection is overruled, subject to what I'm about to say.

So I take it this letter is addressed to Avraham Moskowitz.  That's your lawyer; is that correct?

THE WITNESS:  Yes.

THE COURT:  All right.  So first, ladies and gentlemen, let me just explain, obviously it's not uncommon—indeed, quite the contrary, it's very common—for someone like this witness, who is in communication with the government, with the prosecutor's office, to have a lawyer of their own to advise them in situations like this.

And Mr. Hescock, let me instruct you that in answering this, you may answer this question in a moment, but in answering it, I don't want you to talk about anything that your lawyer said to you or, for that matter, anything that you said to your lawyer. So you may answer about why you entered into this agreement, but again, don't share your communications with your lawyer.

Back to you, ladies and gentlemen. Just to explain that. You may have heard of something called the attorney-client privilege. Basically, communications between someone and their lawyer are given protection under our laws, and that is to basically ensure that a person can communicate freely with their lawyer without concern that those communications will be revealed, and so that's the reason that I'm instructing Mr. Hescock not to divulge anything that he spoke to his lawyer about or his lawyer spoke to him about.

But with that understanding, you may answer counsel's question, and if, at this point, since I've been going on for a while, you want counsel to repeat the question, you certainly may ask her to do so.

A.  Can you repeat the question, please.

Q.  Sure.  In your view, what did you do that gave you criminal exposure?

A.  In my personal view, I——I don't know much about the law in this area, and it seemed to be in my best interests to sign

this.

Q.  And is it fair to say that the government got you a lawyer last week?

A.  Yes.

Q.  And that lawyer started representing you last Thursday, in fact; is that right?

A.  Yes.

Q.  I'd like to turn your attention now to the second page of this document, first full paragraph, and the first half of that paragraph, going up to "obstruction of justice."

THE COURT:  Let me just add briefly to my instruction before so there's no misunderstanding here.  It's also not unusual, where the government is communicating with a person about either testimony or the like, for the government actually to help arrange for that person to get a lawyer, just to ensure that they understand their legal options and what have you. And I would also note, and although this hasn't been discussed, if somebody can't afford a lawyer, then one is provided to them free of expense, at public expense, in those circumstances.

So again, you may proceed, Ms. Jaroslaw.

BY MS. JAROSLAW:

Q.  Mr. Hescock, I'm going to read the highlighted area.

"It is understood that if the government has determined that Hescock has committed any crime after signing this agreement, or has given false, incomplete, or misleading

testimony or information, or has otherwise violated any provision of this agreement, that all statements made by Hescock to this Office or other designated law enforcement agents and any other testimony before a grand jury or other tribunal——" I'm going to skip some language, which is irrelevant, it may be—— "it shall be admissible in evidence in any criminal proceeding against Hescock."  Do you see that?

A.   Yes.

Q.   Now it's the government, the prosecution team here, that will determine whether your testimony was false, incomplete, or misleading, correct?

A.   No.

Q.   Who decides that?

A.   The truth is the truth.

Q.   The truth is the truth, but this agreement says that it's understood that if the government determines that you committed any crime or gave false or incomplete and misleading testimony, then all bets are off; that's what it says, right?

A.   I don't agree with the way that you're reading that.  I——

Q.   How do you interpret this?

          THE COURT:  Hang on.  Let the witness finish his

answer, please.

A.   The way I read this, when it says "has determined," it's not they decide, but if they find after investigation or research that I've lied, that I can be held liable for that.

Q.   And that would include lying at this trial, correct?

A.   Yes.

Q.   And obviously you want to be done with this case after today; is that right?

A.   On a personal note, yes, I'd like to go back to my regular life, but if necessary, I can come back again.

Q.   Is it fair to say that you don't want the government knocking on your door and prosecuting you for anything that happened at this trial; is that right?

A.   Do I not want to be prosecuted?

Q.   Correct.

A.   No.

          THE COURT:  Hold on.  Let me make sure we're clear on that.  Is that no, you would not want to be prosecuted or——

          THE WITNESS:  No, I don't want to be prosecuted.

          THE COURT:  Okay.  Just wanted to make sure we were clear on that.

          MS. JAROSLAW:  We can take this exhibit down.

BY MS. JAROSLAW:

Q. Now you were interviewed, as we established, in 2024 by the FBI and had several meetings, perhaps a dozen, between then and today, correct?

A. I believe so, yes.

Q. And over the course of those meetings, the prosecutors showed you documents and reminded you of prior statements, correct?

A. They would show me documents, work that I had done.

Q. And they tried to remind you of certain events that had happened several years ago; isn't that right?

A. I——they would show me things that I had done and asked me questions about them.

Q. And over the course of those meetings, your answers sometimes evolved; is that right?

A. Yeah.

Q. Now you testified that you didn't publish articles, reviews, or press releases without Gregg Pierce's approval, correct?

A. I don't know if I was asked that exact question.

Q. Well, you testified to that fact, did you not?

A. I——the things that I was asked about, that I was shown and asked if Gregg Pierce approved them, then I said yes to that, yes.

Q.  Did you publish things without Gregg's prior approval?

A.  There were a few press releases in the first stint that I worked for them that I believe were published without showing him first.

Q.  And let's look at one of those.

         MS. JAROSLAW:  This would be——it's at USA R1340763. We're going to call it Defense Exhibit 3700 for identification.

BY MS. JAROSLAW:

Q.  Mr. Hescock, do you see that exhibit?  It's now Defense 3700 in front of you, and do you recognize it?

A.  Yes.

Q.  And is that an email string between you and Mr. Pierce with Matt Peters in copy?

A.  Yes.

         MS. JAROSLAW:  I'd like to offer Defense Exhibit 3700.



Q6A1MAL2                        Hescock - Cross

Q6A1MAL2                    Hescock - Cross

Q6A1MAL2                        Hescock - Cross

THE COURT:  Sorry for the interruption, ladies and gentlemen.  I told you I will try to keep that to a minimum, but every once in a while, it's going to be necessary.

I am going to overrule the objection and admit Defense Exhibit——what did we call it, 37——?

MS. JAROSLAW:  3700.

THE COURT:  3700.  So that is admitted.

(Defendant's Exhibit 3700 received in evidence)

MS. JAROSLAW:  I'd like to publish that to the jury at this time.

BY MS. JAROSLAW:

Q.  Mr. Hescock, this is an email between you and Gregg Pierce with your boss, Matt Peters, in copy, correct?

A.  Yes.

Q.  Do you see Gregg's response at the top?

A.  Yes.

Q.  "Jason, did you just change the address and publish? Because I got something from PR published."  That's what it says, right?

A.  Yes.

Q.  Is that one of the instances where you published something without running it by Mr. Pierce?

A.  I don't believe so.  This, if I recall correctly, there was some confusion of something that was published that I don't

think was from me.  When he says "from PR," I think that's the PR.com website, which would not have been my work.  I would need to see the press release to know for sure.

Q.  Mr. Hescock, you have an interest in your testimony being pleasing to the government, correct?

A.  No.

Q.  Okay.  Mr. Hescock, you attended University of Western Michigan; is that correct?

A.  Yes.

Q.  What was your degree in?

A.  English.

Q.  In fact, according to your LinkedIn, it was creative writing; is that correct?

A.  Yes.

Q.  Okay.  And you testified that you made up some of these press releases out of whole cloth, correct?

A.  Can you repeat that?  Sorry.

Q.  Sure.  Did you make up some of the press releases out of whole cloth?

A.  I would use the basic information I was given and then elaborate on it.

Q.  Or make stuff up?

A.  I would make things up such as "so and so is world renowned" or "best in class," things of that nature.

Q.  And that's all you made up.

A.   No.   There were facts and figures that I made up also.

Q.   Those Google reviews, those ten reviews that we looked at, that was a creative writing project of yours, correct?

A.   That was work I did for Search Manipulator.

Q.   And you made those reviews up, right, from your imagination?

A.   With background information, context, I then created those, yes.

Q.   And you created false, misleading, and untrue Google reviews, correct?

A.   Yes.

Q.   And you had no problem doing that for years; am I right?

A.   I didn't do that for years.

Q.   How long did you make up false Google reviews?

A.   For Global Capital Partners?

Q.   Sure.

A.   I worked for them for a little over a year.   Within that time frame, it may have been a few months.

Q.   How many years did you make up false Google reviews for other clients?

A.   That was actually a very small part of what I did.

Q.   But you did it.

A.   Yes.

Q.   And you did it for what, two years, three years?

A.   I don't recall exactly.

Q.  And those press releases, you created the narrative out of your imagination, correct?

A.  I don't think it's—I don't think it's a yes or no.  I certainly was—I was hired for my writing abilities, but I didn't just completely make up everything.

Q.  Well, this wasn't expository writing on something that actually happened, was it?

A.  I don't understand.  I don't understand that question.

Q.  This was—those press releases were made up by you, correct?

A.  I wrote them, yes.

Q.  And they were false.

        Were they true?  Tell us if they're true.

A.  I—I was writing off of information I was given.  I don't know if these people ever worked for these companies, did these deals, or not.  I filled in some details, puffed it up, made it longer, yes, but the information I was given, I don't know if it was true or not.

Q.  Earlier this morning you were shown question-and-answer-type formats that you released publicly, correct?

A.  Yes.

Q.  You made up at least the answers, correct?

A.  Yes.

Q.  Sometimes you'd have the questions from a publication,

Q6A1MAL2                          Hescock - Cross

right?

A.   Yes.

Q.   And sometimes you made those up, the questions.

A.   Generally they were preset, so I can't say that for sure.

          MS. JAROSLAW:  I have no further questions.

          THE COURT:  Mr. Nicholas?

          MR. NICHOLAS:  Thank you, your Honor.

CROSS EXAMINATION

BY MR. NICHOLAS:

Q.   Good morning.

A.   Good morning.

Q.   You never spoke with Joe Malvasio, right?

A.   No.

Q.   No meaning that's correct, no meaning that's right, you never spoke with him?

A.   No, I never spoke with Joe Malvasio.

Q.   Okay.  You worked for Search Manipulator for something like four to five years; is that right?

A.   I think it was four years.

Q.   And in that time until you first spoke with the FBI, during the whole time you were at Search Manipulator, fair to say that you felt like what you were doing there was icky sometimes but not fraudulent; is that fair?

A.   At—at the time that—

Q.   At the time.

A.   Did I feel that it was icky?

Q.   At the time you worked at Search Manipulator, during that period, is it fair to say that sometimes you felt what you were doing there was a little bit icky but not fraud?

A.   There were some things that felt off, yes.

Q.   Off meaning icky?

A.   Sure.

Q.   So that's fair to say?

A.   Yes.

Q.   Okay.  Not that rose to the level of fraud, according to

your thinking at the time, correct?

A.  My thinking at the time, the work that I was doing, based on what my role was, I did not think that I was committing fraud.

Q.  You didn't think you were committing fraud when you worked at Search Manipulator until you spoke with the FBI; fair?

A.  I don't—to this day, I don't know if what I did was fraud. I was publishing information based off of things I was given.

Q.  Did you pay taxes when you worked at Search Manipulator?

A.  Yes.

Q.  Did you report the income that you made from Search Manipulator on your taxes?

A.  I believe so.

Q.  Are you not sure?

A.  This is years ago.  I can't recall.

Q.  Well, how many years ago?  When did you stop working at Search Manipulator?

A.  1/24, I believe.

Q.  Your testimony today under oath is you don't remember two years ago if you reported your income on your taxes?

A.  I—if I got a 1099 or a whatever form, then I certainly reported it, yes.

Q.  Did you get one?

A.  I believe so, yes.

Q.  Okay.  So you believe you reported your income on your

Q6A1MAL2                    Hescock - Cross

taxes.

A.   I think——I think that I did, yes.

Q.   You think that you did.

A.   Yes.

████  █████    ██████████████████████████████████████████

████████████████████████████████████████████████████

            ██████████████  ████████████

            ████████████  ██████████████

Q.   You thought the work you were doing was legitimate work, right?

A.   I thought so, yes.

Q.   Okay.  And you have an English degree from college, right?

A.   Yes.

Q.   You thought this was a fun thing to do with an English degree?

A.   Yes.

Q.   Okay.  And by the way, how much were you paid?  How much money did you make at Search Manipulator year to year?

A.   I don't recall the exact figure.  I think on average, it was maybe $20 an hour.  This was——it was a——a side thing I did.

Q.   Okay.  Now I think you testified you had between 40 and 50 clients that you worked with when you were at Search Manipulator; is that right?

A.   Somewhere around that, yes.

Q.   Okay.  And for some, or is it fair to say that for a lot of

those clients, you did things to manipulate the way searches
for them would come up on the internet; is that fair?

A.  We published things to—so that they could create links,
which would then, you know, improve their rankings or push
those links up, up to—

Q.  Okay.  Is the word "manipulate" a fair description of what
you were doing for most of those clients?  I mean, it is in the
title of the company you worked at.

A.  Yes.

Q.  Okay.  So you were manipulating internet searches for a
large number of your 40 to 50 clients; is that right?

A.  Yes.

Q.  Okay.  And you drafted fake Google reviews for some number
of your 40 to 50 clients, right?

A.  Yes, for a handful, I think.

Q.  For a handful?  More than five, you think?

A.  I can't remember the exact number.  That was a small
portion of what I did.

Q.  It was?  How much detail did you go into that with the
government during your dozen or so meetings with them, the work
you did with other clients?

A.  Very little.

Q.  Very little.  They didn't ask a lot of questions about
that, did they?

A.  About other clients' work?

Q. Yeah.

A. A little bit, but not a lot, no.

Q. Okay. So you wrote, did things to manipulate internet searches for other clients, you wrote fake Google reviews for other clients. Did you do fake interviews for any clients other than Global Capital?

A. Yes.

Q. Okay. How many?

A. The majority of the clients, we would do interviews for.

Q. Fake interviews.

A. Yes.

Q. Okay. So for a majority of your 40 to 50 clients at Global Capital, you would do fake interviews.

A. Yes.

Q. I'm sorry. I misspoke. That's my fault.

For a majority of your clients at Search Manipulator, you would do fake interviews.

A. So I would—it depends on what you mean by fake. I would ghostwrite them. So I would know about this person, their business, their, you know—what they did, I would write about it as if I were them, I would give it to them to look at, to make edits, and then it would be published.

Q. Well, I guess what I mean by fake is, you weren't—the person wasn't really being interviewed by whoever, by whoever was in the byline of the article, right?

Q6A1MAL2                          Hescock - Cross

A.   Correct.

Q.   The article would say an interview by so and so and it's not really an interview by so and so, right?

A.   Correct.

Q.   It's you writing it.

A.   Yes.

Q.   Secretly.

A.   What do you mean by secretly?

Q.   The public doesn't know that you're writing it.

A.   That is correct.

Q.   And that was true for a large number of your 40 to 50 clients; in other words, a bunch of clients who were not Global Capital.

A.   Yes.

Q.   And your nonprosecution agreement that we looked at earlier doesn't even cover those clients, does it?

A.   I don't believe so, no.

Q.   It only covers a period of time between 2022 and 2023 when you were working for——when you were doing work with Global Capital, right?

A.   I believe so.  I'd have to see the exact document.

Q.   So you didn't feel like you——even now, you don't feel like writing those fake Google interviews, doing things to manipulate internet searches, and writing fake interviews for those non-Global Capital clients were things that constitute

fraud.

A.   Are you asking my opinion?

Q.   I'm asking your opinion.

A.   I personally think there's a difference between ghostwriting an interview for, say, an actor who wants more exposure as opposed to ghostwriting an interview or—or fake reviews with made-up numbers.  I personally think there's a difference.

Q.   So where you draw the line is numbers.

A.   I—I don't know that you can put it that simply, but I—to me personally, there is a difference between those two things.

Q.   So if I asked you to draw a line, your answer—and I'm not criticizing this answer, but if I say you'd draw the line at numbers, your answer is, it's complicated, it's a complex question.

A.   If—yes.  If there's—for me, if there's details that relate to specific deals and figures as opposed to generic, you know, this person's well known for their great skills or service, to me, there's a difference there.

Q.   And so that's where you're drawing the line right now.

A.   What line?  I'm sorry.  I don't understand what line I'm drawing.

Q.   I'll move on.

          What number of your other 40 to 50 clients at Search Manipulator were actors?

A.   A few.  I don't remember exactly.

Q.   Okay.  So when you said just now there's a difference between when you're writing a puff piece for an actor, that example only applies actually to a handful of your clients when you were at Search Manipulator?

A.   Yes.

Q.   Okay.  By the way, how much pushback do you remember giving to either Matt Peters——he was your boss at Search Manipulator?

A.   Yes.

Q.   How much pushback do you remember giving Matt Peters or anyone else about the work you were being asked to or assigned to do by Mr. Peters with respect to Global Capital?

A.   What do you mean by pushback?

Q.   I mean, we saw a handful of exhibits today that the prosecutors showed you of emails that you were on with Mr. Peters and sometimes with one of the defendants in this case; is that accurate?

A.   Yes.

Q.   Okay.  And when you were shown those emails today by the government, did you look at them and review them, like, on the stand?

A.   Yes.

Q.   Did you see any emails where you said something along the lines of, well, let's not do that, this is where I——this is something different from what I usually do in my role at Search

Manipulator?

A.  Did I read any emails saying that?

Q.  Yes.  In the exhibits you looked at today, did you see words to that effect coming from you?

A.  No.

Q.  Okay.  You rehearsed this testimony with the government 10 or 12 times, fair to say?

A.  No.

Q.  Okay.  You've met with them 10 or 12 times?

A.  I've met with them, yes.

Q.  Okay.  And in those 10 or 12 times, have you been looking at documents with them where you're saying at the time, hey, I don't think this——I don't think——I don't do this kind of thing, this feels different from what I do normally at Search Manipulator?

A.  Did I look at documents where I was saying that?

Q.  Where you were saying that.

A.  No.

Q.  And that's because what you did at Global Capital was not really very different from what you did for your 40 to 50 other clients.

A.  Are you asking me that question?

Q.  I'm asking you.

A.  I would not agree with that, no.

Q.  Okay.  The drafting fake interviews, you did for 40 to 50,

Q6A1MAL2                    Hescock - Cross

right?

A.   Most of them, yes.

Q.   Okay.  Manipulating internet searches, you did for 40 to 50.

A.   I produced the information, the articles, press releases, gave them to Matt Peters; manipulating search results directly, I didn't do that.

Q.   Okay.  "Produced" means write.

A.   Correct.

Q.   The use of an AI-generated photo, that was your idea, right?

A.   I don't remember where the——the team at Search Manipulator——I don't remember who originally came up with it, but in those emails that we looked at today, yes, I made that suggestion.

Q.   And the suggestion came from you; it did not come from anyone sitting at this table back here.

A.   That is correct.

Q.   Okay.  And it came from——whether it came from you, it either came from you originally or came from someone else at the team at Search Manipulator, right?

A.   Yes.

Q.   Okay.  So you felt comfortable enough with the use of an AI-generated photo in this context of your work at Search Manipulator to affirmatively suggest it.

A.   Yes.

Q.   Okay.  So this wasn't the first time that you had made that suggestion.

A.   I can't say——I can't say if that was the first time or not. I don't think——that wasn't something I'd typically done.  I don't remember if that's the first time I had ever suggested it though.

Q.   Okay.  You don't know one way or the other.

A.   No.

MR. NICHOLAS:  Nothing further.

JURY NOTE

Count Exhibit 5

Your Honor,

May we please get the transcript on page 210 ?

thank you.

**Date:** 6/23/26

**Time:** 4:04 pm

Foreperson's signature

**JURY NOTE**

Court Exhibit 6

Your Honor,

The members of the jury have reached a verdict

Date: 6/23/26

Time: 4:58 pm

**Foreperson's signature**

Court Exhibit 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

UNITED STATES OF AMERICA,                            :

   -v-                                               :            23-CR-396 (JMF)

JOSEPH MALVASIO, a/k/a "Joe Cohen,"                  :
and GREGG MARCUS, a/k/a "Gregg Pierce,"              :            <u>VERDICT FORM</u>

                Defendants.                       :

--------------------------------------------------------------------X

*All Answers Must Be Unanimous*


**<u>Count One</u>: Conspiracy to Commit Wire Fraud**

    **Joseph Malvasio**

        Guilty ✓_____        Not Guilty _____

    **Gregg Marcus**

        Guilty ✓_____        Not Guilty _____


**<u>Count Two</u>: Wire Fraud**

    **Joseph Malvasio**

        Guilty ✓_____        Not Guilty _____

    **Gregg Marcus**

        Guilty ✓_____        Not Guilty _____


**<u>Count Three</u>: Wire Fraud**

    **Joseph Malvasio**

        Guilty ✓_____        Not Guilty _____

*After completing the Verdict Form, please sign your names below and fill in the date and time.*



Foreperson

Date and Time:    6/23/26, 4:58pm

*Once you have signed the Verdict Form, please give a note — **NOT** the Verdict Form itself —
to the Court Security Officer stating that you have reached a verdict. The foreperson should retain the
official Verdict Form to be handed to the Judge in open court.*

2