UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>-against-<br><br>JOSEPH MALVASIO and GREGG MARCUS<br><br>Defendants. | Case No.: 23 Cr. 396 (JMF) |

**JOSEPH MALVASIO'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT ONE**

Sanford N. Talkin
Noam B. Greenspan
Talkin, Muccigrosso & Roberts, LLP
100 Pearl Street, Suite 1801
New York, New York 10004
(212) 482-0007

*Attorneys for Joseph Malvasio*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii
PRELIMINARY STATEMENT ..... 1
RULE 29/33 LEGAL STANDARDS ..... 3
BACKGROUND ..... 4
A. The Government's Single Conspiracy "Evidence" ..... 4
B. Chris Polk's Proffer Statements in the 3500 Material ..... 7
C. The Court's Multiple Conspiracies Jury Charge ..... 8
ARGUMENT ..... 9
A. The Law Regarding Multiple Conspiracies ..... 9
B. Discussion ..... 10
CONCLUSION ..... 18

# TABLE OF AUTHORITIES

## Cases

*Jackson v. Virginia*, 443 U.S. 307 (1979) .......... 3

*Kotteakos v. United States*, 328 U.S. 750 (1946) .......... 9

*United States v. Anderson*, 747 F. 3d 51 (2d Cir. 2014) .......... 12

*United States v. Cassese*, 428 F.3d 92 (2d Cir. 2005) .......... 3

*United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022) .......... 3

*United States v. D'Amato*, 39 F.3d 1249 (2d Cir. 1994) .......... 4

*United States v. Eisenberg*, 784 F. Supp. 3d 579 (S.D.N.Y. 2025) .......... 7

*United States v. Fishbein*, No. 1:21-cr-296, 2023 WL 5035179, 2023 U.S. Dist. LEXIS 138631 (S.D.N.Y. Aug. 8, 2023) .......... 3

*United States v. Geibel*, 369 F.3d 682 (2d Cir. 2004) .......... 9, 11

*United States v. Glenn*, 312 F.3d 58 (2d Cir. 2002) .......... 4

*United States v. Gore*, 154 F.3d 34 (2d Cir. 1998) .......... 4

*United States v. Johansen*, 56 F.3d 347 (2d Cir. 1995) .......... 17

*United States v. Klein*, 913 F.3d 73 (2d Cir. 2019) .......... 3

*United States v. Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990) .......... 9

*United States v. Morrison*, 153 F.3d 34 (2d. Cir. 1998) .......... 4

*United States v. Mulheren*, 938 F.2d 364 (2d Cir. 1991) .......... 4

*United States v. Nusraty*, 867 F.2d 759 (2d Cir. 1989) .......... 3

*United States v. Resto*, 824 F.2d 210 (2d Cir. 1987) .......... 10

*United States v. Rodriguez*, 392 F.3d 539 (2d Cir. 2009) .......... 3

*United States v. Samaria*, 239 F.3d 228 (2d Cir. 2001) .......... 3, 4

*United States v. Sepulveda*, 420 F. Supp. 3d 153 (S.D.N.Y. 2019) ........ 3

*United States v. Sureff*, 15 F.3d 225 (2d Cir. 1994) ........ 9, 10, 11

*United States v. Taggert*, No. 09 Cr. 984 (BSJ), 2010 U.S. Dist. LEXIS 11992, 2010 WL 532530 (S.D.N.Y. Feb. 11, 2010) ........ 10, 12

*United States v. Ulbricht*, 31 F. Supp. 3d 540 (S.D.N.Y. 2014) ........ 9

*United States v. Valle*, 807 F.3d 508 (2d Cir. 2015) ........ 4

*United States v. Weiss*, 930 F.2d 185 (2d Cir. 1991) ........ 3

*United States v. Williams*, 205 F.3d 23 (2d Cir. 2000) ........ 17

**Rules**

Fed. R. Crim. P. 29 ........ 1, 3

## PRELIMINARY STATEMENT

Count One of the Superseding Indictment charges three defendants, Joseph Malvasio ("Malvasio"), Greg Marcus ("Marcus"), and Chris Polk ("Polk"), with engaging in a single conspiracy to commit wire fraud, but the evidence at trial demonstrated something quite different.[1] At trial, the government failed to present any evidence of a common purpose shared by the three defendants, which was required for conviction according to the Court's instructions. Instead, the evidence demonstrated that Marcus partnered in a business with Malvasio, Global Capital Financial Partners ("GCPF"), with which Polk was not involved. Likewise, the evidence was unequivocal that Marcus was not involved in Polk's businesses, Commercial Private Equite ("CPE") and Harbor Equity ("Harbor"). There was, in fact, no evidence at trial that Marcus was even aware of Polk's existence. The evidence also established that neither Polk nor Marcus received any of the profits made by the business or businesses of the other. Because their financial interests were entirely separate, they shared no common purpose or objective and legally could not be in a conspiracy with one another.

In its summation to the jury, the government cited only three pieces of evidence—and no testimony whatsoever—that it asserted demonstrated a single conspiracy between all three defendants. Even a cursory examination of the cited exhibits reveals that they do not support the government's position. Two of the exhibits are snippets of text messages between Polk and Malvasio (but not Marcus) which the government introduced without any context or explanation. No document or testimony explained what was being discussed or even to which transaction the document related. One mentioned only that Malvasio had seen a similar deal before, with no evidence that this prior experience had anything to do with Marcus, let alone any explanation of

[1] Malvasio and Marcus were convicted at trial, and Polk pled guilty just prior to commencement of the trial. *See* May 20, 2026 Minute Entry; June 23, 2026 Minute Entry.

why this previous experience would amount to Marcus's involvement in any future contemplated business. The second text involved Polk expressing to Malvasio that he ***did not wish to do business with Marcus***.

The third exhibit cited by the government was an email string about a potential deal between Marcus and Malvasio. Reference is made in the email to the borrower having previously attempted to get a loan from one of Polk's companies in a deal with which Malvasio was not even involved. Marcus does not appear to know that the company being referenced relates to Polk or that Malvasio had any relationship with that company. Like the Polk/Malvasio texts, this exhibit thus is evidence of the lack of any agreement between Polk and Marcus and undercuts, rather than supports, the government's position of a single conspiracy.

Indeed, the lack of any relationship (business or otherwise) between Polk and Marcus was no accident. Time and again in proffers with the government, Polk, a cooperating witness, explained that he refused to be involved in any way with Marcus. Polk further explained that Malvasio had given him assurances that he would not be associated with Marcus, and the two of them structured their business arrangement specifically to insulate Polk from any association with Marcus. Polk's proffers, while not part of the record, are instructive of the propriety of the government attempting to rely on requested inferences and confirm that which was already apparent from the record: Polk and Marcus had no association, either directly or indirectly, with one another.

Because there was insufficient evidence of a single conspiracy between and among the three defendants, no rational jury could have found the elements of Count One satisfied, particularly in light of the multiple conspiracies instruction they received. The Court should

therefore grant Mr. Malvasio's motion and enter judgment of acquittal as to Count One pursuant to Federal Rule of Criminal Procedure 29(c)(2).

## RULE 29/33 LEGAL STANDARDS

A judgment of acquittal pursuant to Rule 29 must be entered if no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2009) (same). This Rule permits a court to set aside a guilty verdict entered by a jury after the close of evidence and enter an acquittal in its place. Fed. R. Crim. P. 29(a), (c).[2] A defendant who challenges the sufficiency of evidence shoulders a heavy burden, but not one that is impossible or "insurmountable." *See United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005); *see also United States v. Samaria*, 239 F.3d 228, 233 (2d Cir. 2001); *United States v. Nusraty*, 867 F.2d 759, 762 (2d Cir. 1989). In evaluating a defendant's challenge to the sufficiency of the evidence to support a conviction, a district court must view the evidence "in the light most favorable to the [g]overnment" drawing "all inferences and resolving all issues of credibility in favor of the government." *United States v. Weiss*, 930 F.2d 185, 191 (2d Cir. 1991). The evidence should be assessed "as a whole" and "not evaluate[d] piecemeal or in isolation." *United States v. Connolly*, 24 F.4th 821, 832 (2d Cir. 2022) (citing *United States v. Klein*, 913 F.3d 73, 78 (2d Cir. 2019)).

A reviewing court should defer to a jury's assessments with respect to credibility, conflicting testimony, and "the jury's choice of the competing inferences that can be drawn from

[2] A defendant may make a renewed motion to set aside the verdict and enter an acquittal under Rule 29(c)(2) even after the Court has denied a prior motion for judgment of acquittal made pursuant to Rule 29(a). *See United States v. Sepulveda*, 420 F. Supp. 3d 153, 158-59 (S.D.N.Y. 2019); *United States v. Fishbein*, No. 1:21-cr-296, 2023 WL 5035179, at *2, 2023 U.S. Dist. LEXIS 138631, at *4 (S.D.N.Y. Aug. 8, 2023).

the evidence." *Samaria*, 239 F.3d at 233 (quoting *United States v. Morrison*, 153 F.3d 34, 49 (2d. Cir. 1998)). However, in order to be given deference, a jury's inferences must arise from "a logical and convincing connection between the facts established and the conclusion inferred." *United States v. Gore*, 154 F.3d 34, 41 (2d Cir. 1998) (citation omitted). While inferences must be drawn in the government's favor in a Rule 29 motion, inferences that are "specious" are "not indulged," for that would permit a conviction of a defendant who is merely "probably guilty." *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015).

Although there is "always some evidence of guilt" in a criminal trial, a district court must be convinced that the evidence at trial was sufficient for a jury to "reasonably find" a defendant guilty "beyond a reasonable doubt." *Id.* at 513, 515. "[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt," meaning the district court must grant a judgment of acquittal. *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (citation omitted); *see also Valle* 807 F.3d at 513 (If the trial record "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence," that means a "reasonable jury must necessarily entertain reasonable doubt"). Similarly, it is not enough for the government to have introduced evidence "at least as consistent with innocence as with guilt." *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) (quoting *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991)).

## BACKGROUND

### A. The Government's Single Conspiracy "Evidence"

In its summation, the government laid out its evidence of "a single conspiracy." Tr. 1572. The government argued that "every single victim went through the exact same process," with "similar contracts . . . similar fees, and [] run by the same person, Joseph Malvasio." *Id.*

The government argued that this "playbook" was "powerful evidence" of an agreement between the three defendants. *Id.*

Next, the government argued to the jury that an agreement existed between the defendants because witnesses Kirthiga Krishnamurthy and Scott Myrick "paid fees to one of the defendants' companies, got rejected, and then went through the exact same process all over again with another one of the defendants' companies." Tr. 1573. The sole specific piece of evidence the prosecutor pointed to in this regard was GX- 401-49, a June 13, 2023, text in which Malvasio writes to Polk "FYI. I did this deal October 2022." The government presented no contextual evidence for this text, including a lack of evidence as to which deal this text message related—the timing would have established that it did not relate to any transaction involving either Krishnamurthy or Myrick, contrary to the government's implication to the jury. Nor did the government introduce any evidence regarding whether Malvasio was referring to a deal he did with Marcus (or as part of some other business venture) or what, if anything, Polk understood the text to mean. Despite this complete lack of context, the government described the text as "clear evidence of the defendants' intent to defraud the victims." Tr. 1574.

The government continued by arguing that "common sense tells you that this was one conspiracy led by Joseph Malvasio" because the Polk and Marcus companies operated similarly, which was "not a coincidence." Tr. 1575. Thus, according to the prosecution, "[a]ll of their actions were part of the same criminal agreement." Tr. 1575-76.

The government then pointed out two additional documents. The first was GX 401-21, a September 1, 2020, text in which Malvasio informs Polk, "Can't write direct in my name. I can only do table funding to you or write it with gcp." And Polk responds, "If I send to Greg, we all make 1/3??????" No further evidence was offered regarding this text, including evidence

regarding what deal was being discussed, why Polk used six question marks in response to the suggestion that GCP be involved, or why Malvasio would ask Polk for approval to involve an entity and an individual with whom Polk was already allegedly in a conspiracy. The prosecutor described this exhibit as "the whole conspiracy in a nutshell," asserting that Polk is "talking about bringing [Marcus] in on a deal so that all three men can make more money" with no explanation for that counterfactual description of the document.[3] Tr. 1576.

Finally, the government pointed out GX-5447, an email from a broker named Jennifer Stewart, which "recap[s]" a call with Marcus and attaches what Stewart says Marcus "requested . . . the redacted commitment letter from the other lender." Marcus then forwards that email to Malvasio stating, "Here is the deal I talk to you about form the guy at Harbor." *Id.* The government (inaccurately) argued to the jury that Stewart sent Marcus "Malvasio and Polk's commitment letter," Tr. 1577, despite the fact that there is no evidence in the record that Malvasio had any involvement in Polk's transaction with Stewart.[4] The government further argued, without supporting evidence, that Marcus "kn[ew] exactly who issued the commitment

---

[3] Notably, and as explained in more detail below, the government was aware that Polk, its own cooperator, would refute the position it was advancing to the jury. In an April 22, 2026 proffer, Polk told the government that he was "not splitting [the deal] three ways" and that he "didn't take" the deal. 350-030 at 2. Regarding the "If I send to Greg" portion of the text, Polk explained that he was saying that he "didn't [] want the deal." *Id.*

[4] Because Polk was a cooperating witness, the government should know that Malvasio was not involved in several of Polk's transactions, including his dealings with Jennifer Stewart and the borrower she represented, Vardan. There is no correspondence between Stewart and Malvasio in the discovery regarding the Harbor transaction with Vardan. Moreover, the structure of every one of the deals that Malvasio did with Polk involved Polk issuing a letter of intent and commitment signed by Polk. *See* 3501-047 (Polk explaining this structure during a government proffer). Once Polk's commitment letter was executed, Malvasio would issue Polk a take-out commitment from National Commercial Mortgage to Polk's company. No such take out exists for the Stewart/Vardan application, confirming that Malvasio was not involved in that transaction.

letter" and that he was "asking [] for a copy of [the] commitment letter . . . because this is all the same conspiracy." *Id.* The government offered the jury no explanation for why Marcus would need to see a commitment letter issued by his supposed co-conspirator or why he would call him "the guy at Harbor" if, as the government baldly stated, "[h]e's not in the dark about who Polk is." *Id.*

This was the sum total of the evidence the government cited in its summation, and it has cited no other evidence of a conspiracy in any other conference or motion practice, despite being challenged specifically regarding the conspiracy count on multiple occasions. *See*, *e.g.*, Dkt. 99 (Marcus motion for severance and to dismiss Count 1 of the Superseding Indictment).

### B. Chris Polk's Proffer Statements in the 3500 Material[5]

In a March 2, 2026 proffer with the government, Polk, who was seeking and would receive a cooperation agreement, claimed that Malvasio had informed Polk that Marcus "had gotten in trouble and been fined by HUD" and that Polk had responded that he did not "want any part of that." 3501-019 at 1. Polk further asserted that Malvasio had assured him that Polk "won't have any part of that" and that their arrangement "[w]ill just be you and me" and "would be separate" from Marcus. *Id.*

Then, in an April 22, 2026 proffer, Polk claimed that he had told Malvasio, "I don't want anything to do with that," in reference to Marcus's "business and criminal history" and that Malvasio agreed to "keep them completely apart. You'll have nothing to do with each other."

[5] While not part of the evidentiary record, at least one other judge in this District has noted 3500 material contradicting certain inferences advocated for by the government in considering a Rule 29 motion. *See United States v. Eisenberg*, 784 F. Supp. 3d 579, 593, 594 n. 4 (S.D.N.Y. 2025) (noting that 3500 material, "[w]hile not presented at trial and does not factor into the decision," nevertheless was consistent with the lack of evidence that certain actions took place in the District and that venue was lacking).

3501-030 at 1. Polk further asserted that the "[i]dea of keeping them separate was the only way I would have done business with" Malvasio. *Id.*

In a May 27, 2026 proffer, Polk contended that he and Malvasio set up their business to have Polk interact with the loan applicants without any involvement from Malvasio and that Polk would "collect[] the money directly" and "represent[] himself as a lender" and that Malvasio would only come in after the deal was agreed upon and "just be [Polk]'s banker," providing him the financing to close. 3501-047. Polk asserted that he liked the structure "because [he] wanted to keep [his] business separate from" Marcus. *Id.*

Just days before trial in this matter commenced, in a June 4, 2026 attorney proffer, Polk's counsel represented that Polk "didn't want anything to do with [Marcus] because of his criminal history." 3501-051 at 1.

### C. <u>The Court's Multiple Conspiracies Jury Charge</u>

The Court gave the jury the following instructions regarding multiple conspiracies:

> With respect to Count One, which charges both defendants with conspiracy to commit wire fraud, the defendants argue that there were actually separate and independent conspiracies with various groups of members and that these separate conspiracies are distinct from the charged conspiracy.
>
> Whether there existed a single unlawful agreement, or multiple such agreements, or indeed, no agreement at all, is a question of fact for you, the jury, to determine in accordance with the instructions I just gave you. When two or more people join together to further one common unlawful design or purpose, a single conspiracy exists. By way of contrast, multiple conspiracies exist when there are separate unlawful agreements to achieve distinct purposes.
>
> Proof of several separate and independent conspiracies is not proof of the single, overall conspiracy charged in Count One unless one of the conspiracies proved happens to be the single conspiracy described in that Count.
>
> You may find that there was a single conspiracy despite the fact that there were changes in personnel, activities, or both, so long as you find beyond a reasonable doubt that some of the co-conspirators continued to act for the duration of the conspiracy for the purposes charged in Count One. The fact that the members of a conspiracy are not always identical does not necessarily imply that separate

> conspiracies exist. In addition, the existence of subgroups or subunits within a larger conspiracy does not necessarily mean that the larger conspiracy does not exist.
>
> On the other hand, if you find that the conspiracy charged in Count One did not exist, you cannot find any defendant guilty of the single conspiracy charged in Count One. This is so even if you find that some conspiracy other than the one charged in Count One existed, even though the purposes of both conspiracies may have been the same, and even though there may have been some overlap in membership.
>
> Similarly, if you find that the defendant you are considering was a member of another conspiracy, and not the one charged in Count One, then you must acquit that defendant of the conspiracy charged in Count One. A person can be part of more than one conspiracy at the same time, and his actions can further the interests of more than one conspiracy at the same time.
>
> Therefore, what you must do is determine whether the conspiracy charged in Count One existed. If it did, you then must determine the nature of the conspiracy and who were its members.

Tr. 1737-39.

## ARGUMENT

### A. The Law Regarding Multiple Conspiracies

In determining whether a single conspiracy involving a defendant existed, the jury must determine whether there is a "mutual dependence" among the participants. *United States v. Geibel*, 369 F.3d 682, 689 (2d Cir. 2004). "To prove a single conspiracy, 'the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal.'" *United States v. Sureff*, 15 F.3d 225, 229 (2d Cir. 1994) (quoting *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990)).

In a hub-and-spoke (or 'wheel') conspiracy, "one person typically acts as a central point while others act as 'spokes' by virtue of their agreement with the central actor." *United States v. Ulbricht*, 31 F. Supp. 3d 540, 554 (S.D.N.Y. 2014) (citing *Kotteakos v. United States*, 328 U.S. 750, 754-55 (1946)). "To prove a single conspiracy in such a situation, the government must show that there was 'rim' around the spokes, such that the 'spokes' became coconspirators with

each other. To do so, the [g]overnment must prove that 'each defendant participated in the conspiracy with the common goal or purpose of the other defendants.'" *Id.* (citing *United States v. Taggert*, No. 09 Cr. 984 (BSJ), 2010 U.S. Dist. LEXIS 11992, 2010 WL 532530, at *1 (S.D.N.Y. Feb. 11, 2010)). Without such a "rim" connecting the "spokes," there may in fact be multiple separate conspiracies, but there cannot be a single conspiracy. *See id.* (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002) ("A rimless wheel conspiracy is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction.")).

To prevail on a Rule 29 challenge on a multiple conspiracies theory, a defendant "must [] show that no rational trier of fact could have concluded that a single conspiracy existed based on the evidence presented." *Surreff*, 15 F.3d at 229 (citing *United States v. Resto*, 824 F.2d 210, 212 (2d Cir. 1987)).

**B. <u>Discussion</u>**

No evidence was presented at trial establishing the single conspiracy alleged in Count One of the Superseding Indictment. Rather, the evidence was conclusive that there were two separate silos of business entities with no overlap.

On one hand, Marcus owned and GCPF, taking in and processing loan applications and conducting underwriting in conjunction with Malvasio. *See* GX-2116 (flow of funds); GX-715-310 (bank statement); GX-707-193 (same); GX-707-49 (same). The government cited no evidence in its summation that Polk was ever involved in any aspect of GCPF's businesses—and there was no such evidence in the record. Nor did the government present any evidence that Polk shared in any of the revenue or profit generated by GCPF. *See* GX-2116 (flow of funds); GX-2108 (same); GX-2110 (same); GX-2101 (sample withdrawals); GX-2102 (victim deposits).

On the other hand, Polk owned and operated CPE and Harbor. *See* GX-2109 (flow of funds); GX-700. The evidence demonstrated that Polk alone communicated with borrowers and that he alone issued letters of intent and commitment letters to prospective borrowers and that Malvasio would, in the normal course, become involved in the application process only after the borrower had executed the commitment letter, at which time Malvasio would issue a take-out commitment letter to CPE/Harbor and participate in underwriting the loan. *See* GX-401-13 (text message regarding take-out agreement); GX-401-49 (same); GX-2109 (flow of funds); GX-2101 (sample withdrawals). The government cited no evidence in its summation that Marcus was ever involved in any aspect of the CPE/Harbor businesses—and there was no such evidence in the record. Indeed, there was no evidence that Marcus was even aware of the business dealings of Polk and Malvasio or even the existence of Polk at all.

Given the evidence that was (and was not) presented, no rational jury could have concluded that the government met its burden to prove "a single conspiracy existed [involving Polk, Marcus, and Malvasio] based on the evidence presented." *Surreff*, 15 F.3d at 229. There was simply no evidence of "mutual dependence" between and among the three defendants. *Geibel*, 369 F.3d at 689. Similarly, the government failed to prove either "that each alleged member agreed to participate in what he knew to be a collective venture" or that any such venture was "directed toward a common goal." *Sureff*, 15 F.3d at 229. Marcus did not participate in any transaction relating to CPE/Harbor and did not share the goal of making those companies succeed. Likewise, Polk did not participate in any transaction relating to GCPF and did not share the goal of making that company succeed.

Nor did the government carry its burden to prove conspiracy through a "hub and spoke" or "wheel" theory. To do so, the government would have needed to prove that there was a "rim"

around the spokes such that "each defendant participated in the conspiracy with the common goal or purpose of the other defendants." *Taggert*, 2010 WL 532530, at *1. For the reasons stated above, no evidence was presented to the jury that Marcus and Polk ever agreed on a common goal or purpose. While Marcus was associated with GCPF and worked to advance that company's business and profits, Polk was not involved in any of this. Conversely, the same is true of Polk's companies, CPE and Harbor, with which Marcus was not involved. That Malvasio had (totally separate) business arrangements with both Polk and Marcus is irrelevant given the absence of any evidence that Marcus and Polk shared a common goal. *See Dickson*, 309 F.3d at 203 ("A rimless wheel conspiracy is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction.")).

Though it was not part of the trial record because Polk was never called to the stand, the notes of Polk's proffers confirm not only that Polk never formed an agreement to conspire with Marcus but also that he (and Malvasio) actively worked to keep Polk's businesses entirely separate from Marcus's. *See* 3501-019; 3501-030; 3501-047. This fact is pertinent to a Rule 29 sufficiency analysis because surely the government cannot and would not advocate for an inference they know from their meetings with their cooperating witness to be untrue and therefore that cannot be deemed a "reasonable inference" under Rule 29. *See United States v. Anderson*, 747 F. 3d 51, 60 (2d Cir. 2014) ("[S]pecious inferences are not indulged."). Polk informed the government that he told Malvasio that he "d[id]n't want any part of that" in reference to associating with Marcus and that Malvasio responded that Polk "won't have any part of that" and that their business dealings "[w]ill just be you and me." 3501-019.

Thereafter, Polk and Malvasio structured their business arrangements to ensure that they were totally separate from Marcus's business at GCPF. Polk explained to the government in a proffer that he alone would interact with the loan applicants initially and that he would "collect[] the money directly" and "represent[] himself as a lender," with Malvasio only becoming involved after the deal was agreed upon and "just [to] be [Polk]'s banker," providing him the financing to close. 3501-047. Polk asserted that the structure was meant "to keep [his] business separate from" Marcus. *Id.* Were that not sufficiently definitive, Polk told the government that the "[i]dea of keeping them separate [from Marcus] was the only way I would have done business with" Malvasio. 3501-030 at 1.

Polk was thus unambiguous that he (and Malvasio) took affirmative steps to ensure that Polk avoided associating with Marcus, and he thus never entered into any agreement with him. Remarkably, despite Polk's unequivocal (and true) denial of any association with Marcus, two of the only three pieces of evidence the government cited in its summation arguments to the jury purportedly in support of its theory of conspiracy were Polk's text messages. Neither supported the government's case.

The first was a June 13, 2023 text message in which Malvasio writes to Polk "FYI. I did this deal October 2022." Tr. 1574; GX- 401-49. As noted above, the government presented no contextual evidence establishing what transaction was being referenced, whether the transaction was one Malvasio previously did with Marcus, whether Polk ultimately moved forward with the application, or any other context for the text. More importantly, the government did not introduce any evidence that Polk ever read the text message, let alone any response given by him. In sum, neither the text nor any reasonable inference that can be drawn from the text provided any evidence that Polk agreed to associate himself with Marcus. The fact that, in the

government's view, this was one of the three most compelling pieces of evidence supporting its single-conspiracy allegation spoke to the total lack of evidence in the record supporting this theory.

The second Polk text message, which the prosecutor described as "the whole conspiracy in a nutshell," Tr. 1576, was a September 1, 2020 message in which Malvasio writes Polk, "Can't write direct in my name. I can only do table funding to you or write it with gcp," and Polk responds, "If I send to Greg, we all make 1/3??????" GX 401-21. As with the prior Polk text message, the government failed to provide any additional information beyond the single message and then attempted to argue for specious inferences that both lacked the supporting context necessary to reach them and contradicted the written message. *See Valle*, 807 F.3d at 515 (holding in evaluating Rule 29 motion that inferences that are "specious" are "not indulged" because that would permit a conviction of a defendant who is merely "probably guilty"). Regarding this September 1 text, the prosecutor argued that Polk was "talking about bringing [Marcus] in on a deal so that all three men can make more money." Tr. 1576. But the text does not say that at all. Polk does not agree to go forward with the proposal in the text. In fact, he does the opposite. He is so incredulous about the notion of involving Marcus that he answers with ***six question marks***.

Moreover, the very fact of the text message undercuts the government's theory. The government alleged that Polk was already in a conspiracy with Marcus before this episode and failed to offer any explanation for why Malvasio would have to propose this unusual arrangement requiring Polk's acquiescence to do business with someone with whom the government contends he already had a criminal agreement. The text chain also ends with Polk's six-question-mark message. Even accepting the government incredible assertion that Polk was

genuinely asking a question in this text message, that question, with no response, would be the end of the discussion. Polk never wrote that he wished to go forward with this arrangement. Rather, the conversation terminated with his (obviously incredulous and rhetorical) question. No rational jury could have inferred from the text that Polk and Marcus—who was not even involved in the conversation—entered into a meeting of the minds based on this discussion.

It is also notable that the government would advocate for an inference from the jury that Polk, the government's cooperating witness, told them in no uncertain terms was false. In an April 22, 2026 proffer—less than two months prior to trial—the government asked Polk about this text, and he responded that he was "not splitting [the deal] three ways" and that he "didn't take" the deal. 350-030 at 2. Regarding the "If I send to Greg" portion of the text, Polk explained that he was saying that he "didn't [] want the deal." *Id.* The government therefore knew that the text was Polk reiterating his position that he was not interested in having any dealings with Marcus—even as the prosecutor remarkably argued the opposite to the jury, asserting that Polk was "talking about bringing [Marcus] in on a deal so that all three men can make more money." Tr. 1576. The text thus directly undercuts the government's argument that Marcus, Polk, and Malvasio were in a single conspiracy.

Finally, the government, in summation, relied on GX-5447, an email from a broker named Jennifer Stewart, which "recap[s]" a call with Marcus and attaches what Stewart says Marcus "requested[,] . . . the redacted commitment letter from the other lender." Tr. 1576-77. Marcus then forwards that email to Malvasio stating, "Here is the deal I talk to you about from the guy at Harbor." GX-5447. Like the two previous documents relied upon by the government, this exhibit not only did not support the government's argument; it directly undercut it. Initially, there was no evidence in the record that Malvasio had any involvement in any prior deal with

Stewart, and the government surely knows from its many extensive meetings with Polk that Malvasio was not involved in any prior dealings Polk had with Stewart. GX-5447 therefore cannot establish a connection between all three defendants. Moreover, the email chain simply says nothing about Marcus agreeing to do anything with Polk. Indeed, there is no evidence from this exhibit (or any other item in the record) that Marcus even knows who Polk is, let alone Polk's connection to Harbor/this deal. Rather than refer to this as "Polk's deal," Marcus calls it "the deal . . . from the guy at Harbor" with no indication that he knows who "the guy" is or that "the guy" has any relationship with Malvasio. *Id.* The government's totally unsupported argument that this exhibit demonstrates that Marcus knows about Polk is precisely the type of specious inference that the law rejects in the Court's consideration of a Rule 29 motion. *See Valle*, 807 F.3d at 515.

Regardless, even if the exhibit demonstrated that Marcus knew that Polk and Malvasio were in business together—and it did not—that alone is not evidence that Marcus formed an agreement with Polk, even via Malvasio, to further a common objective. Notably, the government could point to no such evidence in its summation, and the evidentiary record contradicted this conclusion. The evidence was conclusive that Marcus was concerned only with furthering GCPF's business ventures. Polk was not involved in GCPF. Because there was no evidence that Polk and Marcus (and Malvasio) were engaged in a "collective venture directed toward a common goal," there was insufficient evidence for the jury to convict any of the defendants of Count One. *Sureff*, 15 F.3d at 229.

Notably, the government's argument for a single conspiracy relied exclusively on three documents totally lacking in context. *Compare* Tr. 1574-77 *with* GX- 401-49, GX 401-21, GX-5447. The government could point to no testimony in the record that would establish a common

objective or understanding between and among the three participants. Instead, the government attempted to rely upon snippets of text messages lacking context about what was being discussed, what the participants in the conversation meant or understood, and what, if anything, was done in response to the conversation. These texts were thus not evidence of a single conspiracy.

The government may argue that this motion raises a variance from the Superseding Indictment and that Malvasio therefore needs to show that he "was substantially prejudiced by the variance." *United States v. Johansen*, 56 F.3d 347, 351 (2d Cir. 1995). It is true that in the variance context, courts have held that a defendant cannot show prejudice if he was involved in both conspiracies at issue. *See United States v. Williams*, 205 F.3d 23, 33 (2d Cir. 2000). But critically, this motion is predicated on insufficiency of the evidence—not a variance from the Superseding Indictment. Accordingly, Malvasio need only meet the Rule 29 standard to show that "no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2009).

As noted above, the Court instructed the jury, among other things, that:

> Proof of several separate and independent conspiracies is not proof of the single, overall conspiracy charged in Count One unless one of the conspiracies proved happens to be the single conspiracy described in that Count. . . . [I]f you find that the conspiracy charged in Count One did not exist, you cannot find any defendant guilty of the single conspiracy charged in Count One. This is so even if you find that some conspiracy other than the one charged in Count One existed, even though the purposes of both conspiracies may have been the same, and even though there may have been some overlap in membership.

Tr. 1738-39. Because no rational jury could have deemed the government to have proved a single conspiracy beyond a reasonable doubt in light of this clear instruction and the evidence presented, the Court should grant this motion and enter judgment of acquittal in favor of Malvasio.

## CONCLUSION

For the reasons described herein, the Court should grant Malvasio's motion and enter judgment of acquittal as to Count One under Rule 29.

Dated: August 6, 2026

Noam Greenspan
Sanford N. Talkin
Noam B. Greenspan
Talkin, Muccigrosso & Roberts, LLP

*Attorneys for Joseph Malvasio*